UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ALLSTATE INSURANCE COMPANY;
ALLSTATE FIRE AND CASUALTY
INSURANCE COMPANY; ALLSTATE
PROPERTY AND CASUALTY
INSURANCE COMPANY; ESURANCE
INSURANCE COMPANY; and
ESURANCE PROPERTY AND
CASUALTY INSURANCE COMPANY,

                         Plaintiffs,

v.

411 HELP, LLC; 4 UR RECOVERY
THERAPY LLC; A1 OCCUPATIONAL
THERAPY LLC; GRAVITY IMAGING,
LLC; 4 TRANSPORT INC.; NEW
HORIZON CHIROPRACTIC PLLC;
SPINE & HEALTH PLLC; FIRST
MEDICAL GROUP, PLLC; UNIQUE
LAB SOLUTIONS LLC; 4 HEALTH
MANAGEMENT LLC; VELOCITY
MRS – FUND IV, LLC; VELOCITY
MRS – FUND V, LLC; HMRF – FUND
III, LLC; NATIONAL HEALTH
FINANCE DM, LLC; HASSAN
FAYAD; MIRNA FAYAD; WILLIAM
GONTE, M.D.; GEOFFREY KEMOLI
SAGALA, D.C.; and ERNESTO
CARULLA, P.T.,

                         Defendants.

C.A. No. _____

**Demand for Jury Trial**

## **COMPLAINT**

1

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Property and Casualty Insurance Company, Esurance Insurance Company, and Esurance Property and Casualty Insurance Company (hereinafter collectively referred to as "Allstate" and/or "plaintiffs"), by their attorneys SMITH & BRINK, hereby allege as follows.

## I.  <u>INTRODUCTION</u>

1.      This is a case about a pain management clinic, physical therapy clinics, a chiropractic clinic, an occupational therapy clinic, a magnetic resonance imaging ("MRI") facility, a transportation company, a urine drug testing laboratory, a marketing company, medical funding companies, and the owners, managers, agents, and representatives of the same who abused the medical benefits available under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., by engaging in a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent medical records, bills, and invoices through interstate wires and the U.S. Mail seeking payment under the No-Fault Act for treatment and services that were not actually rendered, were medically unnecessary, were fraudulently billed, and were not lawfully rendered.

2.      Defendants 411 Help, LLC ("411 Therapy"), 4 Ur Recovery Therapy LLC ("4 Ur Recovery"), A1 Occupational Therapy LLC ("A1"), Gravity Imaging, LLC ("Gravity Imaging"), 4 Transport Inc. ("4 Transport"), New Horizon

2

Chiropractic PLLC ("New Horizon"), Spine & Health PLLC ("Spine & Health"), First Medical Group, PLLC ("First Medical"), Unique Lab Solutions LLC ("Unique Lab"); 4 Health Management LLC ("4 Health"), Velocity MRS – Fund IV, LLC ("Velocity"), Velocity MRS – Fund V, LLC ("Fund V"), HMRF – Fund III, LLC ("HMRF"), National Health Finance DM, LLC ("NHF"), Hassan Fayad, Mirna Fayad, William Gonte, M.D. ("Gonte"), Geoffrey Kemoli Sagala, D.C. ("Sagala"), and Ernesto Carulla, P.T. ("Carulla") (collectively, the "defendants") each conspired to, and did in fact, defraud Allstate by perpetuating an insurance billing fraud scheme in violation of state and federal law.

3.     The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in payments from Allstate to and on behalf of the defendants.

4.     All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

5.     By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment. Allstate also seeks declaratory relief that no previously-denied and pending claims submitted to it by the defendants are compensable.

6.     As a result of the defendants' fraudulent acts, Allstate has paid in excess of $876,936 to them related to the patients at issue in this Complaint.

## II.     THE PARTIES

### A.     PLAINTIFFS

7.     Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company are each companies duly organized and existing under the laws of the State of Illinois.

8.     Esurance Insurance Company and Esurance Property and Casualty Insurance Company are each companies duly organized and existing under the laws of the State of Wisconsin.

9.     Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company have their respective principal places of business in Northbrook, Illinois.

10.     Esurance Insurance Company and Esurance Property and Casualty Insurance Company have their respective principal places of business in San Francisco, California.

11.     At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

B.   DEFENDANTS

### 1.   411 Help, LLC

12.   411 Help, LLC is organized under the laws of the State of Michigan.

13.   411 Help, LLC also does business using the registered fictitious name 411 Therapy.

14.   411 Therapy is owned by Hassan Fayad and Mirna Fayad, who are both citizens of the State of Michigan.

15.   At all relevant times, 411 Therapy was operated and controlled by 4 Ur Recovery, A1, Gravity Imaging, 4 Transport, New Horizon, Spine & Health, First Medical, 4 Health, Velocity, Fund V, HMRF, Hassan Fayad, Mirna Fayad, Gonte, Sagala, and Carulla.

16.   411 Therapy's principal place of business is located in Southfield, Michigan.

17.   411 Therapy billed Allstate for services that were not actually rendered, were medically unnecessary (to the extent services were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 1.

### 2.   4 Ur Recovery Therapy LLC

18.   4 Ur Recovery Therapy LLC is organized under the laws of the State of Michigan.

19.    4 Ur Recovery is owned by Hassan Fayad and Mirna Fayad, who are both citizens of the State of Michigan.

20.    At all relevant times, 4 Ur Recovery was operated and controlled by 411 Therapy, Gravity Imaging, 4 Transport, New Horizon, Spine & Health, First Medical, 4 Health, Hassan Fayad, Mirna Fayad, Gonte, Sagala, and Carulla.

21.    4 Ur Recovery's principal place of business is located in Detroit, Michigan.

22.    4 Ur Recovery billed Allstate for services that were not actually rendered, were medically unnecessary (to the extent services were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 2.

### 3.    A1 Occupational Therapy LLC

23.    A1 Occupational Therapy LLC is organized under the laws of the State of Michigan.

24.    A1 is owned by Hassan Fayad and Mirna Fayad, who are both citizens of the State of Michigan.

25.    At all relevant times, A1 was operated and controlled by 411 Therapy, 4 Ur Recovery, 4 Transport, 4 Health, Spine & Health, Fund V, Hassan Fayad, Mirna Fayad, Gonte, Sagala, and Carulla.

26.    A1's principal place of business is located in Southfield, Michigan.

6

27.     A1 billed Allstate for services that were not actually rendered, were medically unnecessary (to the extent services were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 3.

### 4.     Gravity Imaging, LLC

28.     Gravity Imaging, LLC is organized under the laws of the State of Michigan.

29.     Gravity Imaging is owned by Hassan Fayad and Mirna Fayad, who are both citizens of the State of Michigan.

30.     At all relevant times, Gravity Imaging was operated and controlled by 411 Therapy, 4 Ur Recovery, 4 Transport, New Horizon, Spine & Health, First Medical, 4 Health, Velocity, HMRF, NHF, Hassan Fayad, Mirna Fayad, Gonte, Sagala, and Carulla.

31.     Gravity Imaging's principal place of business is located in Berkley, Michigan.

32.     Gravity Imaging billed Allstate for services that were medically unnecessary (to the extent services were rendered at all) and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 4.

### 5.      4 Transport Inc.

33.      4 Transport, Inc. is incorporated under the laws of the State of Michigan.

34.      At all relevant times, 4 Transport was operated and controlled by 411 Therapy, 4 Ur Recovery, A1, Gravity Imaging, New Horizon, Spine & Health, First Medical, 4 Health, Velocity, Fund V, HMRF, Hassan Fayad, Mirna Fayad, Gonte, Sagala, and Carulla.

35.      4 Transport's principal place of business is located in Dearborn, Michigan.

36.      4 Transport billed Allstate for services that were not actually provided, were medically unnecessary (to the extent services were provided at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 5.

### 6.      New Horizon Chiropractic PLLC

37.      New Horizon Chiropractic PLLC is organized under the laws of the State of Delaware.

38.      New Horizon is owned by Sagala, who is a citizen of the State of Michigan.

39.     At all relevant times, New Horizon was operated and controlled by 411 Therapy, 4 Ur Recovery, Gravity Imaging, 4 Health, Fund V, Hassan Fayad, Mirna Fayad, Sagala, and Carulla.

40.     New Horizon's principal place of business is located in Dearborn, Michigan.

41.     New Horizon billed Allstate for services that were not actually provided, were medically unnecessary (to the extent services were provided at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 6.

## 7.    Spine & Health PLLC

42.     Spine & Health PLLC is organized under the laws of the State of Michigan.

43.     Spine & Health PLLC also does business using the registered fictitious name SHP Services.

44.     Spine & Health is owned by Gonte, who is a citizen of the State of Michigan.

45.     At all relevant times, Spine & Health was operated and controlled by 411 Therapy, 4 Ur Recovery, A1, Gravity Imaging, 4 Health, First Medical, Velocity, HMRF, Hassan Fayad, Mirna Fayad, Gonte, and Carulla.

46.    Spine & Health's principal place of business is located in Southfield, Michigan.

47.    Spine & Health billed Allstate for services that were not actually provided, were medically unnecessary (to the extent services were provided at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 7.

### 8.    First Medical Group PLLC

48.    First Medical Group, PLLC is organized under the laws of the State of Michigan.

49.    First Medical is owned by Gonte, who is a citizen of the State of Michigan.

50.    At all relevant times, First Medical was operated and controlled by 411 Therapy, 4 Ur Recovery, Gravity Imaging, Spine & Health, 4 Health, Hassan Fayad, Mirna Fayad, Gonte, and Carulla.

51.    First Medical's principal place of business is located in Farmington Hills, Michigan.

52.    First Medical billed Allstate for services that were not actually provided, were medically unnecessary (to the extent services were provided at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 8.

### 9.     Unique Lab Solutions LLC

53.     Unique Lab Solutions LLC is organized under the laws of the State of Michigan.

54.     Upon information and believe, Unique Lab is owned by Stephen Jankowski, who is a citizen of the State of Michigan.

55.     At all relevant times, Unique Lab was operated and controlled by Spine & Health, First Medical, 4 Health, Hassan Fayad, Mirna Fayad, and Gonte.

56.     Unique Lab's principal place of business is located in Birmingham, Michigan.

57.     Unique Lab billed Allstate for services that were not actually provided, were medically unnecessary (to the extent services were provided at all), and were unlawful in relation to several Allstate insureds, including the patients set out in Exhibit 9.

### 10.     4 Health Management LLC

58.     4 Health Management LLC is organized under the laws of the State of Michigan.

59.     4 Health is owned by Hassan Fayad, who is a citizen of the State of Michigan.

60.     4 Health's principal place of business is located in Dearborn, Michigan.

61.     4 Health illegally and improperly induced individuals to undergo unlawful and medically unnecessary treatment (to the extent treatment was provided at all) billed to Allstate by the defendants.

## 11.     **Velocity MRS – Fund IV, LLC**

62.     Velocity MRS – Fund IV, LLC is organized under the laws of the State of Texas.

63.     Velocity is owned by Ovation Alternative Income Fund, L.P., a limited partnership for which all partners are citizens of the State of Texas.

64.     Velocity's principal place of business is located in Austin, Texas.

65.     Velocity provided the liquidity and funding that allowed 411 Therapy, 4 Transport, Gravity Imaging, and Spine & Health to bill for the medically unnecessary and unlawful treatment detailed herein.

## 12.     **Velocity MRS – Fund V, LLC**

66.     Velocity MRS – Fund V, LLC is organized under the laws of the State of Texas.

67.     Fund V is owned by Ovation Alternative Income Fund, L.P., a limited partnership for which all partners are citizens of the State of Texas.

68.     Fund V's principal place of business is located in Austin, Texas.

69.     Fund V provided the liquidity and funding that allowed 411 Therapy, A1, 4 Transport, and New Horizon to bill for the medically unnecessary and unlawful treatment detailed herein.

### 13.     HMRF – Fund III, LLC

70.     HMRF – Fund III, LLC is organized under the laws of the State of Texas.

71.     HMRF is owned by Ovation Alternative Income Fund, L.P., a limited partnership for which all partners are citizens of the State of Texas.

72.     HMRF's principal place of business is located in Austin, Texas.

73.     HMRF provided the liquidity and funding that allowed 411 Therapy, 4 Transport, Gravity Imaging, and Spine & Health to bill for the medically unnecessary and unlawful treatment detailed herein.

### 14.     National Health Finance DM, LLC

74.     National Health Finance DM, LLC is organized under the laws of the State of Arizona.

75.     NHF is owned by Mark Siegel, D.O. and David Wattel, both of whom are citizens of the State of Arizona.

76.     NHF's principal place of business is located in Austin, Texas.

77.     NHF provided the liquidity and funding that allowed Gravity Imaging to bill for the medically unnecessary and unlawful treatment detailed herein.

### 15.   **Hassan Fayad**

78.   Hassan Fayad is a resident and citizen of the State of Michigan.

79.   At all relevant times, Hassan Fayad operated and conducted 411 Therapy, 4 Ur Recovery, A1, Gravity Imaging, 4 Transport, New Horizon, Spine & Health, and First Medical.

### 16.   **Mirna Fayad**

80.   Mirna Fayad is a resident and citizen of the State of Michigan.

81.   At all relevant times, Mirna Fayad operated and conducted 411 Therapy, 4 Ur Recovery, A1, Gravity Imaging, 4 Transport, New Horizon, Spine & Health, and First Medical.

### 17.   **William Gonte, M.D.**

82.   William Gonte, M.D. is a resident and citizen of the State of Michigan.

83.   At all relevant times, Gonte operated and conducted 411 Therapy, 4 Ur Recovery, A1, Gravity Imaging, 4 Transport, Spine & Health, and First Medical.

### 18.   **Geoffrey Kemoli Sagala, D.C.**

84.   Geoffrey Kemoli Sagala, D.C. is a resident and citizen of the State of Michigan.

85.   At all relevant times, Sagala operated and conducted 411 Therapy, 4 Ur Recovery, Gravity Imaging, 4 Transport, and New Horizon.

### 19.   **Ernesto Carulla, P.T.**

86.     Ernesto Carulla, P.T. is a resident and citizen of the State of Michigan.

87.     At all relevant times, Carulla operated and conducted 411 Therapy, 4 Ur Recovery, A1, Gravity Imaging, 4 Transport, New Horizon, Spine & Health, and First Medical.

## III.   **JURISDICTION AND VENUE**

88.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action relating to the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq.* because they arise under the laws of the United States.

89.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states (as detailed in the foregoing section).

90.     Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

91.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) whereas the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.   **BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME**

92.    The defendants used the defendant medical provider entities to submit exorbitant charges to Allstate for purported medical services, procedures, and equipment that were not actually provided, were unlawful, were not medically necessary, and were fraudulently billed.

93.    The fraudulent scheme described herein was driven by defendant Hassan Fayad; his family, including defendant Mirna Fayad; and their businesses and clinics, including defendants 411 Therapy, 4 Ur Recovery, A1, 4 Transport, Gravity Imaging, Spine & Health, First Medical, and 4 Health.

94.    Hassan Fayad, Mirna Fayad, their family, and their associates oversaw a vast network of runners, solicitors, and medical providers who worked in concert to identify individuals who claimed to have been involved in motor vehicle accidents, and to unlawfully and improperly induce such individuals to present to the defendant medical providers to generate claims to Allstate, including through cash payments to patients in exchange for purported treatment.

95.    After patients were unlawfully and improperly induced to seek medical treatment that they did not actually need and that they did not seek out of their own volition, they were directed to medical clinics owned or controlled by the defendants, including defendant Spine & Health,  where Hassan Fayad was the "office manager" and controlled the treatment and referrals, which invariably resulted in thousands of

dollars of charges submitted by his entities 411 Therapy, 4 Ur Recovery, A1, 4 Transport, Gravity Imaging, and Unique Lab.

96.     Defendant First Medical is merely a continuation of Spine & Health's business using a separate name.

97.     Indeed, bills were submitted for several months by the defendants in First Medical's name but using Spine & Health's tax identification number until a batch of bills were mailed by the defendants using First Medical's own tax identification number in late September 2020.

98.     Hassan Fayad's control over Spine & Health was explained by a former nurse practitioner at the clinic, who testified that Spine & Health is actually owned by Hassan Fayad and run by members of his family:

Q:     Okay.  Do you know who – and you started answering this question – do you know who owns Spine & Health or who owned them when you were there, Spine & Health, not ISpine.  You said Hassan somebody?

A:     It's Hussein, Hassan, Hassin.  I don't know.  I know his last name.  I think starts with an F.

        …

Q:     It was a male person?

A:     It was a male person . . . and I think his whole family worked, I think that was his family business or I know that him and a lot of family members did that and I think they were like a referral service to physical therapy, to OT, I mean.

99.     When Spine & Health negotiated to open a new location in a building

owned by Michael Angelo in Clinton Township in April 2018, the lease was sent

directly to Hassan Fayad and Gonte (the paper owner of Spine & Health) was not

included in the communication.  *See* Exhibit 10.

100.    Hassan Fayad also controlled defendant New Horizon, as confirmed by

numerous actions and records.

101.    For example, a commercial for 411 Therapy clearly depicts a patient

presenting for treatment at New Horizon:



102.    The telephone number 833-I'M-IN-PAIN is also used by 411 Therapy

and 4 Transport, confirming that all of these entities operate as part of the same

network:





103.    New Horizon has submitted bills to Allstate claiming that the location

of purported treatment was at "H & K Holding Group LLC," which is another entity

owned and operated by Hassan Fayad.

104.    Defendant 4 Ur Recovery has also submitted claims to Allstate

representing that the place of service was at H & K Holding Group LLC.

105.   Patients have reported to Allstate that they were referred to New Horizon from the other defendant entities, including from 411 Therapy, which did not employ any healthcare professional qualified to make a chiropractic referral.

106.   New Horizon and Sagala also participated in the operation and control of the other entity defendants.

107.   For example, New Horizon faxed bills for purported MRIs by Gravity Imaging to Allstate.

108.   Vehicles owned by Sagala have been observed in the 411 Therapy parking lot during its business hours, patients have reported that Sagala evaluated them at Spine & Health, and more than 87% of the patients for whom New Horizon submitted bills to Allstate also incurred bills from one or more of the other entity defendants.

109.   Spine & Health and New Horizon use defendant Gonte and Sagala as the ostensible owners because they are medical and chiropractic clinics that cannot be owned by laypersons such as Hassan Fayad and his family.

110.   Layperson direction of and control over the treatment described herein is also confirmed by email correspondence between the defendants and their associates.

111.  The defendants were members of a "cooperative" run by their associates Michael Angelo ("Angelo") and Wesley Blake Barber ("Barber"), who is the practice administrator of a separate entity called ISpine, PLLC ("ISpine"):



112.  Once patients were identified, Hassan Fayad, along with Angelo and Barber, directed that the patients be transported to the medical clinics they own and control in order to generate claims for unnecessary medical services for submission to Allstate:

| | |
|---|---|
| **From:** | USL Intake [uslintake@gmail.com] |
| **on behalf of** | USL Intake <uslintake@gmail.com> [uslintake@gmail.com] |
| **Sent:** | 5/30/2018 9:36:11 AM |
| **To:** | Wesley Barber [blake.ispine@gmail.com]; jordan.ispine@gmail.com |
| **CC:** | Michael Angelo [mamarketing@yahoo.com] |
| **Subject:** | Fwd: 1-800-US-LAWYER Deangelo Early |

PER MICHAEL:

WAITING ON CONFIRMATION FROM HASSAN WHEN THE PATIENT IS COMING IN. PLEASE DO NOT CALL UNTIL IT HAS BEEN ARRANGED BY HASSAN. ALL PROCEDURES, IF NECESSARY, WILL BE DONE AT MASRI.

113. Moreover, once patients were identified by the "cooperative," they were used like currency by the members to generate charges to Allstate:

| | |
|---|---|
| **From:** | USL Intake [uslintake@gmail.com] |
| **on behalf of** | USL Intake <uslintake@gmail.com> [uslintake@gmail.com] |
| **Sent:** | 9/5/2018 1:06:59 PM |
| **To:** | Chitra Sinha [dr.csinha@gmail.com] |
| **CC:** | Marketing Wiz [marketingwiz33@gmail.com]; hassan fayad [transport4inc@yahoo.com] |
| **Subject:** | US LAWYER Callers |

Per Michael, the below US LAWYER callers were referred to your office/. Please forward any and all MRIs for the below to Hassan.

114. Patients who were allotted to Hassan Fayad by the "cooperative" were originally sent to a clinic called Mercyland Health Services, PLLC ("Mercyland"), where they were given prescriptions as a matter of course for physical therapy at defendant 411 Therapy.

115. After the formation of defendant Spine & Health, patients allotted to Hassan Fayad were sent to that clinic where he personally controlled their referrals to the other medical providers he owned and controlled.

116. As detailed below, Spine & Health used a predetermined treatment protocol to maximize the amount of charges generated by the defendant clinics,

including prescriptions for physical therapy and occupational therapy (billed by 411 Therapy, 4 Ur Recovery, and A1), orders for MRIs (billed by Gravity Imaging), issuance of disability certificates claiming patients needed medical transportation (billed by 4 Transport), and orders for urine drug testing (billed by Unique Lab).

117. In addition to the layperson directed "cooperative," the defendants identified patients claiming to have been involved in motor vehicle accidents using several methods, including information obtained from paid solicitors, police reports, associates at area hospitals, and auto body shops.

118. One patient solicitor used by the defendants was Dajhion Sims a/k/a "Sevenmile Buck" (hereafter "Sims").

119. Sims refers to himself as a "marketing assistant" for 411 Therapy on social media.

120. Sims used social media accounts to post messages about obtaining "car accident reports."

121. Sims also posted images of payments from auto body shops that are involved with solicitation of individuals claiming to have been involved in auto accidents, including Somerset Auto of Michigan.

122. Many of Sims's social media posts contain images of dangerous narcotic drugs that are the same as those prescribed to many of the patients at issue herein:





123.   The image above, which depicts commonly abused opioids and benzodiazepines, also includes a physical therapy prescription form commonly used by the defendants, further suggesting that Sims obtained these drugs through his patient solicitation and inducement activities on behalf of the defendants.

124.   As detailed below, several patients have reported that the defendants used other runners, including individuals named "Jay" and "Ali," to recruit patients from places like homeless shelters and pay them for undergoing treatment.

125.   Patients have reported being paid $200 for their first visit to 411 Therapy, $100 for every third physical therapy appointment, and $250 for MRIs at Gravity Imaging.

126.   As one patient explained, "everybody - - basically everybody that went to 411 Pain got paid to go to 411 Pain from the start to the end."

127.   Hassan Fayad also organized defendant 4 Health to facilitate the defendants' unlawful and improper solicitation, inducement, and kickbacks.

128.   4 Health's Articles of Organization state that the purpose of the business is "Health Referral and Marketing."

129.   However, 4 Health's bank records confirm that it was only used for transactions with medical providers associated with the defendants.

130.   For example, prior to the formation of Spine & Health on February 15, 2018 and Hassan Fayad and Mirna Fayad's acquisition of Gravity Imaging on June

11, 2018, patients of 411 Therapy who were solicited by the defendants were referred to other pain management clinics and MRI facilities, including Mercyland, Michigan Pain Management PLLC, and Integrated MRI Center, LLC.

131.   In 2017, 4 Health received at least $390,000 in payments from these entities and their owners and managers.

132.   During the same period, 4 Health spent less than $10,000 on expenses that could be characterized as "marketing" or "advertising."

133.   The vast majority of the money that was paid to 4 Health was withdrawn in large cash transactions that, upon information and belief, were used to make the cash payments reported by patients to induce unnecessary medical treatment.

134.   In addition to making cash payments directly to patients, the defendants made payments to other medical providers in exchange for referrals.

135.   For example, a former office manager of a clinic called Midwest Multispecialty Institute PLLC ("Midwest Multispecialty"), which operated as a successor to Mercyland, testified that she was told to refer all patients of the clinic to 411 Therapy.

136.   This direction was made despite the fact that the owner of Midwest Multispecialty owned and operated his own physical therapy clinic, confirming that

the financial incentive provided by 411 Therapy for the referrals was greater than the profit he could make if the patients were treated at his own clinic.

137.   The Midwest Multispecialty office manager was also directed to refer all patients to the same person who arranged patient appointments at 411 Therapy.

138.   When one of Midwest Multispecialty's physicians told patients they could get MRIs wherever they chose, the owner was upset and said "what do we get out of that," further confirming the financial incentive provided by the defendants for referrals into their network.

139.   A former nurse practitioner of Spine & Health also testified that Hassan Fayad and Spine & Health referred patients to Mercyland, one of the entities that made significant payments to 4 Health, "because that's where [the patients] would get their opioids."

140.   The defendants' facilitation of opioid prescriptions was another tactic used to ensure patients continued to return for unnecessary treatment, as such prescriptions were easily abused or monetized, as confirmed by the social media posts of the defendants' solicitor/runner Sims.

A.   THE DEFENDANTS' CRIMINAL AND DISCIPLINARY HISTORY

141.   Notably, several of the defendants and their employees and associates have histories of participating in illegal and fraudulent schemes.

142.   In 2011, Hassan Fayad pleaded guilty to embezzlement and unarmed robbery and served a nearly two-year prison sentence as a result.

143.   In 2016, Hassan Fayad pleaded guilty to attempt to receive stolen property, and was sentenced to 90 days' confinement and probation for two (2) years.

144.   Hassan Fayad was not removed from probation until October 16, 2018, at which point the scheme described herein was well underway.

145.   Defendant Gonte has a history of disregard for boundaries of proper medical practice, including a consent order with the Michigan Board of Medicine through which he agreed to probation and a fine related to unethical prescription practices.

146.   On August 26, 2020, Gonte was indicted on seven (7) felony counts in relation to a scheme to defraud an insurance company.  *See* United States of America v. William S. Gonte, *et al*., 20-cr-20380-NGE-DRG (E.D. Mich. 2020).

147.   Gonte created "false medical records" as part of the scheme that "made it appear that [the patient] was in far worse health than she was in actuality."  Id. at ECF 1, ¶ 30.  As discussed *infra*. Gonte also created false medical records to submit to Allstate as part of the scheme detailed herein.

148.   Following his indictment, Gonte signed an affidavit stating that he intends to invoke the Fifth Amendment right against self-incrimination in response to any questioning about his purported provision of healthcare, expressly including

his relationship with and services for defendants Spine & Health, 411 Help, 4 Transport, and Gravity Imaging.  *See* Exhibit 11.

149.   Gonte is also identified as a participant in the fraudulent conduct of convicted felon Robert Gross ("Gross") in <u>United States of America v. Robert A. Gross</u>, 17-cr-20790-DML-RSW (E.D. Mich. 2017).

150.   According to Gross's plea agreement, Gross defrauded a number of creditors in concert with, and for the benefit of, two (2) unindicted co-conspirators identified as "Person A" and "Person B" between 2013 and 2016, a period of time that substantially overlaps with the fraudulent conduct committed by Gonte that is the subject of this Complaint.

151.   "Person A" was later identified as defendant Gonte in a decision dated September 26, 2018.  *See* <u>id</u>. at ECF 22.

152.   According to Gross's plea, Gonte, in concert with Gross and "Person B," sought fraudulent loans from their victims, including by preparing a forged deed purporting to transfer Gonte's father's condominium to Gonte, which was then used as collateral on a loan.

153.   The fraudulent loans Gross, Gonte, and Person B procured from their victims totaled more than $3,000,000.

154.   These debts created substantial motivation for Gonte to engage in the conduct described herein to defraud Allstate by taking advantage of Michigan's No-

Fault Act to make as much money as quickly as possible, regardless of medical necessity or whether the services were actually performed.

155.   On December 14, 2012, Sagala was indicted for theft or embezzlement in connection with healthcare in relation to a scheme in which he stole billing information from a competitor's office and then submitted bills representing that he had rendered treatment at his own chiropractic clinic.

156.   Sagala pleaded guilty to one of the charges related to his fraudulent scheme and agreed to a period of probation and payment of restitution.

157.   As part of his Rule 11 Plea Agreement, Sagala acknowledged that he billed Medicare for services that were never rendered.

158.   Sagala also entered into a consent order with the Michigan Board of Chiropractors on November 20, 2014, whereby he agreed to a suspension of his chiropractic license and payment of a fine in relation to this scheme to defraud.

159.   Defendant Spine & Health also employed numerous physicians with significant criminal and disciplinary histories, including Ali Makki, M.D., who pleaded guilty to several felony charges involving healthcare fraud and was sentenced to two (2) years in prison.

160.   Defendant Spine & Health also billed Allstate for treatment allegedly rendered by David Jankowski, D.O. ("Jankowski").

161. Jankowski has been under indictment since June 7, 2017 for conspiracy to commit healthcare fraud (18 U.S.C. § 1349).  United States v. Jankowski, 17-cr-20401-BAF-DRG (E.D. Mich.).

162. Jankowski was under indictment the entire time he worked for Spine & Health.

163. The State of Michigan suspended Jankowski's license for 3 years on April 11, 2019 and fined him $25,000.

164. Jankowski was replaced at Spine & Health by Reese James, D.O., who agreed to a fine of $35,000 and a year-long suspension of his medical license on August 3, 2017 in response to an Administrative Complaint alleging that he was among the highest prescribers of dangerous controlled substances in the State of Michigan, that his prescriptions for such substances increased six-fold in 2016, and that for a period of time in 2016 he was writing an average of more than 87 controlled substance prescriptions every day.

## B. ROLE OF VELOCITY, FUND V, HMRF, AND NHF IN PERPETUATING THE FRAUDULENT SCHEME

165. In order to monetize their fraudulent claims without waiting for claim investigations by insurers, the defendants entered into contracts whereby they sold their right to collect No-Fault payments for the services allegedly performed to third parties, including defendants Velocity, Fund V, HMRF, and NHF.

166.   Velocity, Fund V, HMRF, and NHF were aware that the defendants' claims were fraudulent and were unlikely to be paid by insurers upon investigation, as evidenced by the fact that they paid just a small fraction of the amounts billed by the defendants to acquire their accounts receivable.

167.   For example, Velocity, Fund V, and HMRF paid defendant 4 Transport just 21% of the amount billed to insurers to purchase its accounts receivable.

168.   Velocity, Fund V, and HMRF paid defendant 411 Therapy just 23% of the amount billed to insurers to purchase its accounts receivable.

169.   Velocity, Fund V, and HMRF paid defendant Gravity Imaging just 33% of the amount billed to insurers to purchase its accounts receivable.

170.   Although Velocity, Fund V, and HMRF are based in Texas, and NHF in Arizona, they routinely sent representatives to Michigan to oversee and assist with the operations of the defendant clinics.

171.   Velocity, Fund V, and HMRF participated in the operation and control of the defendant clinics in several ways, including by having their Chief Legal Officer prepare the assignment of benefit forms 4 Transport required patients to sign.

172.   Velocity, Fund V, and HMRF prepared and organized billing information to send bills to insurers for the unnecessary services herein:

| From: | Geoff Beyer |
|---|---|
| To: | Keith Halabu |
| Subject: | 4 Transport Information for Notices |
| Date: | Wednesday, September 13, 2017 5:11:00 PM |
| Attachments: | 4 Transport P-2017-2428 Historical.xlsx |

Keith,

I have attached a spreadsheet of everything we have done for 4 Transport. We have highlighted cells where we must have information in order to send notices.  We have to have all insurance company names, addresses, and claim numbers. Please fill out as soon as you can.

Thanks,

Geoff

173.   Velocity, Fund V, and HMRF coordinated with personal injury attorneys who sought payment from insurers on behalf of the defendants:

| From: | Ryan Hodge |
|---|---|
| To: | Wesley Barber |
| Subject: | Fw: A██ K██ |
| Date: | Thursday, November 29, 2018 8:48:10 AM |
| Attachments: | A. K██ - iSpine.pdf |

Blake here is the spine and health bill for assistant surgery that was sent to Danielle Yatooma.

**Ryan Hodge**
*Chief Collection Officer*
**Velocity Medical Receivables Solutions, LLC**
P: 316-734-3940 (c) | F: 888-509-8375
rhodge@velocityrs.com | www.velocityrs.com

174.   Velocity, Fund V, HMRF, and NHF also mailed claims to Allstate seeking payment for the fraudulent services billed by the defendant clinics.

175.   The total amount of the funding provided by Velocity, Fund V, HMRF, and NHF to facilitate the fraud committed by the defendant entities was substantial.

176.   Velocity and HMRF have alleged in separate litigation that they paid Gravity Imaging at least $5,329,531, 4 Transport at least $2,557,008, 411 Therapy at least $1,669,295, and Spine & Health at least $579,264.

177.   In addition to payments directly to the clinic defendants, Velocity, Fund V, and HMRF also paid "commissions" to individuals who were involved in the operation of the defendants, which were used to further incentivize the generation of excessive bills for unnecessary treatment.

178.   One person who was paid commissions by Velocity, Fund V, and HMRF was Barber, the member of Hassan Fayad's "cooperative" discussed above.

179.   A former nurse practitioner of Spine & Health testified that she was hired as part of a joint business arrangement between Barber and Hassan Fayad.

180.   She also provided the following explanation of Barber's role:

> I'll tell you what Blake does.  Blake is a factoring agent.  He will take a medical bill that he has for two years and he will give the surgeon or whomever that patient is and he will give them a percentage . . . .  So he held this purse, this never ending purse and everybody wanted in that purse . . . .

181.   Barber arranged for employees of Spine & Health to allegedly act as surgical assistants for procedure performed by ISpine, the clinic for which he was the office manager, which generated tens of thousands of additional charges to

Allstate, all of which were converted into immediate payments and commissions from Velocity, Fund V, and HMRF.

182. The owner of ISpine, Stefan Pribil, M.D. ("Pribil"), also signed bills submitted by both Spine & Health and 411 Therapy, including for unnecessary DME that was billed for tens of thousands of dollars, as detailed below.

183. The defendants would not have been able to perpetuate the extensive fraudulent scheme described herein but for the liquidity and assistance provided by Velocity, Fund V, HMRF, and NHF.

## V.    BILLING FOR SERVICES NOT RENDERED

184. The defendants regularly submitted bills to Allstate seeking payment for treatment and services that were never rendered to patients at issue herein.

185. The defendants' pervasive pattern of faxing and mailing demands for payment for services that were not rendered is indicative of their goal to submit as many claims for payment as possible regardless of whether the treatment was actually rendered and whether it was medically necessary (discussed in detail *infra*).

186. All of the claims submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking payment for treatment that never occurred are fraudulent.

187. Allstate is not required to pay the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any

payments tendered to the defendants in reliance on their fraudulent billing for services not rendered.

### A.    411 THERAPY BILLED FOR SERVICES NOT RENDERED

188.    Patients have reported that they were not directed to perform any treatment at all upon presentation to 411 Therapy.

189.    Instead, 411 Therapy told patients that they simply had to be present at their facility for a period of time in order to receive their cash kickbacks.

190.    For example, one patient testified:

Q.    When you were going to your therapy appointments, were they actually doing anything, or were you just kind of sitting there?

A.    At the beginning - - let me tell you the truth.  We wasn't doing nothing at all at the beginning.  Then, Jay was like . . . "I don't care what you do.  Find something to do in there, but you going to have to be in there 30 minutes to an hour.  Ain't no sitting around no more . . . .  Y'all going to have to work for this money.

191.    This is confirmed by the operation of the 411 Therapy facility, where patients arrive in groups in the dozens of transportation vehicles operated by 4 Transport and other associates of the defendants, and mingle with each other and with staff, including at an outdoor area with a grill and lounge furniture, before leaving the premises.

192.    The treatments billed by 411 Therapy, along with the other defendants, require actual supervision and treatment by licensed practitioners, as detailed below.

193.   411 Therapy's billing for services that were not actually performed was also confirmed by patient W.C. (Claim No. 0557489663)[1] who arrived and left 411 Therapy in just thirty-seven (37) minutes on September 9, 2019, a date that 411 Therapy billed Allstate representing that it performed 93 minutes of treatment to W.C.

194.   Nearly all of the purported treatments billed by 411 Therapy were claimed to have been performed or supervised by defendant Carulla.

195.   Many of the treatments billed by 411 Therapy required one-on-one supervision and/or constant attendance by the practitioner purportedly rendering the service.

196.   It would not have been possible for Carulla to actually perform or supervise the amount of services billed by 411 Therapy on many dates.

197.   For example, on October 3, 2018, 411 Therapy billed Allstate for performing seventy (70) different treatment modalities and three (3) patient re-evaluations to fourteen (14) separate patients.

198.   Pursuant to coding guidelines and the defendants' own records, these treatments, all of which were claimed to have been either performed or overseen by defendant Carulla, would have taken more than fourteen (14) hours to perform.

---

[1] To protect the confidentiality of its insureds, Allstate refers to them herein by initials and claim number.

199.  411 Therapy is open for either eight (8) or ten (10) hours per day, depending on the day of the week.

200.  The more than fourteen (14) hours of treatment billed to Allstate on October 3, 2018 does not account for any patient insured by any other entity for whom 411 Therapy also submitted bills to other payors for the October 3, 2018 date of service.

201.  It is not possible that 411 Therapy actually performed all of the treatment billed to Allstate on numerous dates based on its hours of operation and staffing.

202.  In addition to this evidence that 411 Therapy did not perform treatment at all, many of the bills submitted to Allstate by the defendants represented treatments that could not have actually been performed and such fraudulent claims were repeated numerous times because they were part of the defendants' standard practices.

## B.    4 TRANSPORT'S BILLED FOR TRANSPORTATION SERVICES NOT RENDERED

203.  4 Transport billed for purported transportation services that were never actually provided.

204.  4 Transport routinely billed for transporting patients to and from treatment facilities, especially the other defendants in this action, on dates that the patients did not actually undergo treatment at such facilities.

205.   For numerous patients, 4 Transport submitted charges for purported transportation on dates of service that the patient did not and could not have received proper medical transportation to a legitimate medical appointment.

206.   For example, patient R.J. (Claim No. 0476016084) claimed to have been involved in a motor vehicle accident on September 20, 2017.

207.   4 Transport billed Allstate for transportation allegedly provided on September 18, 2017 (two (2) days prior to the alleged motor vehicle accident) to a pain management clinic controlled by Angelo and September 19, 2017 (the day before the alleged motor vehicle accident) to 411 Therapy, despite neither facility billing Allstate for treatment rendered prior to R.J.'s motor vehicle accident.

208.   4 Transport also frequently submitted charges for purported transportation that differed from where the appointment actually occurred.

209.   For example, 4 Transport submitted seven (7) separate charges for purported round trip transportation for patient S.C. (Claim No. 0574214565) from her home to Spine & Health located at 15565 Northland Drive, Southfield, MI, 48075.

210.   Spine & Health's bills for each of these dates of service state that S.C. was actually examined at a separate facility, 22972 Lahser Road, Southfield, MI, 48033.

211.   4 Transport also submitted charges for transportation to multiple defendant providers that never occurred for the same patient.

212.   For example, for patient M.C. (Claim No. 0542949904), 4 Transport billed Allstate for round trip transportation to 411 Therapy on sixteen (16) separate dates of service on which M.C. did not receive treatment at 411 Therapy, New Horizon on nine (9) separate dates of service on which M.C. did not receive treatment at New Horizon, and 4 Ur Recovery on three (3) dates of service despite 4 Ur Recovery never submitting any bills for performing treatment to M.C.

213.   4 Transport also routinely submitted charges for transporting patients to attorney offices, which cannot be considered billing for medically necessary transportation services.

### C.   BILLING FOR TIMED SERVICES NOT RENDERED

214.   As discussed further below, the defendant physical therapy and chiropractic clinics billed for nearly identical courses of treatment for almost every patient, regardless of their age, injury, and medical history.

215.   The majority of the treatments and modalities used in these protocol treatments were timed services for which each unit billed to an insurer represents fifteen (15) minutes of treatment.

216.   Medical coding rules require a minimum of eight (8) minutes of treatment be performed in order to bill for a unit of a timed service.

217.   To properly bill for multiple units of a timed service, a provider must perform the full fifteen (15) minutes of service for the first (and any subsequent) unit, and at least eight (8) minutes of service for the second (or subsequent) unit.

218.   Many of the defendants submitted charges for purported timed exercises, often alleging multiple units were performed, that consistently failed to document the amount of time purportedly spent performing each timed service.

219.   Therapeutic treatments allegedly performed by defendants New Horizon, 411 Therapy, 4 Ur Recovery, and A1 were recorded and billed to Allstate using nothing more than a check box that failed to indicate the time spent performing the same.

220.   It is improper to submit bills for timed treatments when the time spent is not accurately recorded, and all claims by the defendant clinics for timed services not properly documented to allow for any form of authentication were fraudulent.

221.   In many cases, the defendants billed for timed services that were clearly not performed for the required amount of time for the number of units billed.

222.   One such timed service was purported self-care training, a timed treatment that requires at least eight (8) minutes of treatment to properly bill, that 411 Therapy routinely only performed for five (5) minutes.

223.   For example, 411 Therapy billed for self-care/home management training to patient T.T. (Claim No. 02173272119) on twelve (12) separate dates of

41

service for which it documented only five (5) minutes of self-care management was actually performed.

224.   411 Therapy also routinely billed for multiple units of the same treatment it did not actually perform.

225.   When a provider bills for two (2) units of a timed therapy, the full fifteen (15) minutes of the first unit must be performed, plus at least eight (8) minutes of the second unit, for twenty-three (23) minutes of total treatment.

226.   411 Therapy routinely submitted charges for multiple units of ultrasound and other treatments despite performing as little as sixteen (16) minutes of treatment, if any treatment was performed at all.

227.   Defendant Carulla also edited 411 Therapy records created by other providers to increase the amount of timed treatments claimed to have been performed.

228.   For example, 411 Therapy physical therapy assistant Khodr Abdulreda claimed to have performed twenty-five (25) minutes of therapeutic exercise to patient Z.A. (Claim No. TXA-0198116) on June 19, 2019:

**Procedures**

| CPT | Export Code | Intervention | Modifier | Minutes | Units |
|---|---|---|---|---|---|
| 97014 | 97014 | E-stim- unattended- application to 1 or more areas | | 15 | 1 |
| 97110 t | 97110 | Therapeutic Exercise - q 15 minutes | | 25 | 2 |
| 97530 t | 97530 | Therapeutic Activities, 1:1 contact- q 15 minutes | | 10 | 1 |
| | | | Total Timed Minutes | 35 | |
| | | | Total Treatment Minutes | 50 | |

**Therapist Signature(s)**

| Signed By: ABDULREDA, KHODR | | Signed By: CARULLA, ERNESTO | |
|---|---|---|---|
| State License #: 5502005398 | 6/19/2019, 3:27 PM | State License #: 5501004076 | 6/20/2019, 8:03 AM |

229.   The following day, Carulla signed a second record for this same June 19, 2019 appointment that increased the alleged time to thirty-eight (38) minutes in order to bill a third unit of therapeutic exercise:

**Procedures**

| CPT | Export Code | Intervention | Modifier | Minutes | Units |
|---|---|---|---|---|---|
| 97110 t | 97110 | Therapeutic Exercise - q 15 minutes | | 38 | 3 |
| 97014 | 97014 | E-stim- unattended- application to 1 or more areas | | 15 | 1 |
| 97035 t | 97035 | Ultrasound - q15 minutes - constant attendance | | 8 | 1 |
| | | | Total Timed Minutes | 46 | |
| | | | Total Treatment Minutes | 61 | |

**Therapist Signature(s)**

| Signed By: CARULLA, ERNESTO | | Signed By: RAY, BRYANT | |
|---|---|---|---|
| State License #: 5501004076 | 6/20/2019, 8:03 AM | State License #: 5502005184 | 6/20/2019, 4:02 PM |

230.   Allstate is not required to pay 411 Therapy for treatment that was not rendered for the amount of time required, if it was rendered at all, and is entitled to repayment of monies it paid in reliance on 411 Therapy's fraudulent submissions.

## D.   BILLING MULTIPLE TIMES FOR THE SAME SERVICE

231.   The defendants also routinely billed Allstate for multiple units of untimed treatments that are only permitted to be billed once per date of service.

232.   411 Therapy and New Horizon billed Allstate for allegedly applying hot/cold packs, an untimed service, to patients more than once on numerous dates of service.  *See* Exhibits 1 and 6.

233.   New Horizon's billing for multiple units of untimed hot/cold packs is particularly egregious since Michigan chiropractors are not permitted to submit any bills for use of hot/cold packs under Mich. Comp. Laws § 500.3107b(b).

234.   411 Therapy also billed Allstate for allegedly performing multiple units of unattended electrical stimulation on patients on the same date of service.  *See* Exhibit 1.

235.   Unattended electrical stimulation billed using CPT Code[2] 97014 is not a timed code and cannot be billed multiple times on a single date of service, yet 411 Therapy routinely charged multiple units to improperly generate higher treatment costs.

236.   Submission of multiple claims for the same service on the same date when coding rules prohibit more than one claim constitutes billing for services not rendered.

---

[2] Current Procedural Terminology (CPT) Codes are published by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

## E.   BILLING FOR SELF-CARE/HOME MANAGEMENT TRAINING NEVER RENDERED

237.   411 Therapy routinely billed for self-care/home management training that was never actually performed.

238.   Self-care/home management training is properly billed using CPT Code 97535 when a patient is instructed on how to manage an injury at home and how to prevent a secondary injury or how to prevent future exacerbations.

239.   The American Medical Association ("AMA") has provided a clinical example to illustrate the proper usage of CPT Code 97535:

> The patient is a 65-year-old woman recently discharged from the hospital with a diagnosis of CVA resulting in a right hemiparesis. The patient lives alone and wants to be able to remain in her home. The initial evaluation has revealed performance deficits in bathroom activities and meal preparation. At the home site, the therapist recommends and sets up the proper adaptive equipment in the bathroom, so the patient can safely transfer to toilet and bathtub by using compensatory techniques.
>
> In the kitchen, the therapist teaches and observes meal preparation using one-handed techniques and special adaptive equipment. The therapist must assure that the patient's functional level is sufficient to perform necessary self- care and home-management activities within safe limits (e.g., picking items off floor, lifting pots from stove, reaching items in cupboards, opening drawers).

*CPT Assistant, September 1996.*

240.   411 Therapy never performed services that meet the AMA guidelines for billing for self-care/home management.

241.   Instead, 411 Therapy billed for purported self-care/home management as a matter of course on dates of service that patients also allegedly received physical therapy evaluations.

242.   These automatic bills by 411 Therapy confirm that self-care/home management could not have actually been performed in any way that was properly billable.

243.   For example, 411 Therapy billed for allegedly performing self-care/home management training for patient C.E. (Claim No. 0470639881) on eighteen (18) separate dates of service that it also billed for a purported physical therapy evaluation.

244.   C.E.'s physical therapy re-evaluations never changed his prescribed course of treatment, as evidenced from the below changes/goals repeated at every re-assessment:

**CHANGES TO TREATMENT PLAN**

Cont. with same management.

**NEW GOALS**

NA

245.   As C.E.'s course of treatment never changed, 411 Therapy could not have actually performed legitimate self-care/home management training eighteen (18) separate times, since C.E.'s home training would likewise not have changed.

246.   411 Therapy uniformly failed to describe how or what type of self-care/home management training was actually provided to patients.

247.   Allstate is not required to pay 411 Therapy for self-care/home management that was not actually performed and is entitled to repayment of all monies it was induced to pay by 411 Therapy's fraudulent submissions.

## F.   BILLING FOR URINE DRUG TESTING NOT PERFORMED

248.   Unique Lab primarily submitted bills to Allstate for quantitative/definitive urine drug testing, which is performed using laboratory equipment to detect the presence of various drugs and analytes in urine specimens, as detailed *infra*.

249.   Unique Lab nearly always submitted bills to Allstate containing at least twelve (12) separate charges and claiming to have performed testing for the presence of thirty-six (36) separate drugs and analytes.

250.   As detailed below, this amount of testing was completely inappropriate, had no medical justification, and was performed, if at all, solely to generate the maximum amount of charges for each urine specimen collected.

251.   In addition to serving no valid medical purpose, many of the claims submitted by Unique Lab were for tests that were not performed at all.

252.   For example, nearly every claim for urine drug tests submitted by Unique Lab included a bill for testing for three (3) or more muscle relaxants using CPT Code 80370.

253.   However, Unique Lab's own laboratory reports confirm that it only tested for one (1), and occasionally two (2), muscle relaxants per urine specimen.

254.   All claims by Unique Lab for drugs and analytes that were not actually tested were fraudulent and are not eligible for payment by Allstate.

### G.   SPECIFIC EXAMPLES OF BILLING FOR SERVICES NOT RENDERED

255.   In addition to the fraudulent practices detailed above, each of which were standard practices of the defendants that resulted in numerous bills submitted to Allstate for payment for services not actually performed, the defendants faxed and/or mailed fraudulent bills and medical records relative to each of the following representative exemplar patients:

- Defendant Spine & Health billed for allegedly assisting with a lumbar surgery performed on patient S.K. (Claim No. 0544512627) by Pribil on October 30, 2019.  Allstate has never been billed by Pribil, any surgery center, or any anesthesiologist for this purported surgery that was only billed by Spine & Health.  No provider submitted any records for post-operative care of S.K.  ISpine billed Allstate for a surgical consultation on September 6, 2019, at which Pribil recommended against surgery and instead suggested continued conservative care.  Spine & Health claimed in its subsequent records that S.K. had undergone surgery, but that it was to her neck, not the lumbar surgery for which it billed.  Indeed, Spine & Health ordered MRIs to determine "why she is still having pain in the neck even after being postop with Dr. Pribil."  The MRI ordered by Spine & Health and billed by Gravity Imaging did not report any post-surgical changes or hardware.

48

- Spine & Health billed for alleged assistance for a surgery performed by ISpine and Pribil on patient T.Y. (Claim No. 0557411600) on January 22, 2020. A different physician who had been evaluating T.Y. every month since his alleged injury conducted a comprehensive evaluation on January 10, 2020, which was just five (5) days before ISpine allegedly evaluated T.Y. and scheduled him for surgery, and expressly recorded that T.Y. was "[n]ot interested in interventions." The same physician billed for another comprehensive evaluation of T.Y. on February 10, 2020, and did not record any reference to T.Y. having undergone a purported major surgery just two (2) weeks prior. Moreover, the records submitted by this long-term provider contradict those submitted by ISpine, including that T.Y.'s upper-extremity complaints were left-sided, not the right-sided complaints purportedly found by ISpine. T.Y. was also undergoing a lengthy course of physical therapy during the same time period, and on January 27, 2020, just five (5) days after the alleged surgery, the physical therapist who billed Allstate for performing therapeutic exercises to T.Y.'s neck, failed to make any note of T.Y. having undergone major surgery less than a week prior, and expressly noted that T.Y. had "mid to full" range of motion in his neck. When Allstate inquired to Spine & Health about this bill, Spine & Health sent Allstate an email stating "[p]atient [T.Y.] does not treat at Spine & Health," thus confirming that no service was actually performed.

- Spine & Health billed for allegedly assisting with a cervical spine surgery performed on patient K.H. (Claim No. 0550821920) on November 13, 2019. Pribil and ISpine never submitted a bill to Allstate for this alleged surgery. Pribil and ISpine did submit a bill to Allstate for a purported evaluation of K.H. on October 29, 2019, at which time Pribil reported that the patient would be a surgical candidate only if the patient did not respond to conservative therapy and could not return to work. It would not have been possible to both make this assessment and schedule a cervical spine surgery in just two (2) weeks.

- Patient K.P. (Claim No. 0498315167) was allegedly involved in a motor vehicle accident on April 10, 2018 and was referred by Spine & Health for a course of physical therapy at 411 Therapy. On April 17, 2019, K.P. was allegedly involved in a second motor vehicle accident that involved her falling asleep at the wheel after taking Percocet and

49

Xanax and rolling her car.  K.P. was admitted to an emergency room at 9:17 a.m. that day, and was subjected to a battery of tests, including CT scans of her brain, chest, and spine.  K.P. spent the majority of April 17, 2019 at the hospital undergoing these tests.  Despite this significant occurrence and documentation establishing that K.P. was elsewhere, both 4 Transport and 411 Therapy submitted bills to Allstate claiming to have transported K.P. and performed therapy on April 17, 2019.  Neither 4 Transport nor 411 Therapy made any reference to the occurrence of this second motor vehicle accident or treatment, and 411 Therapy claimed that K.P. performed the same modalities, including therapeutic exercises.

- Defendant 4 Ur Recovery billed for two (2) units of therapeutic exercises to patient J.G. (Claim No. 0499031672) on July 20, 2018, which would have required a minimum of twenty-three (23) minutes of treatment.  However, J.G. did not receive twenty-three (23) or more minutes of therapeutic exercises on that date.  Similarly, 4 Ur Recovery billed for two (2) units of therapeutic exercises on September 25, 2018 that J.G. did not receive.

- 411 Help billed Allstate on six (6) dates of service for self-care/home management training patient L.P. (Claim No. 0449849776), which requires a minimum of fifteen (15) minutes of treatment.  L.P. did not receive the billed-for treatment.

- 411 Therapy billed Allstate for two (2) units of therapeutic exercises to patient D.C. (Claim No. 0461245755) on eighteen (18) separate dates of service from July 2018 to December 2018, which required a minimum twenty-three (23) minutes of treatment on each date.  D.C. never received this many minutes of therapeutic exercises on each of these dates of service.

- 411 Therapy billed for four (4) units of therapeutic exercises to patient F.H. (Claim No. 0549657442) on October 16, 2019 and August 16, 2019, which required a minimum fifty-three (53) minutes of treatment. F.H. did not receive the billed-for treatment; thus, the four (4) units of therapeutic exercises charged to Allstate are billing for services not rendered.  On August 9, 2019, August 12, 2019, August 15, 2019, August 22, 2019, August 26, 2019, August 27, 2019, August 28, 2019, September 3, 2019, September 5, 2019, September 6, 2019, September

10, 2019, September 18, 2019, September 24, 2019, and October 3, 2019, 411 Therapy billed for three (3) units of therapeutic exercises, which required a minimum of thirty-eight (38) minutes of treatment. F.H. did not receive the billed-for therapeutic exercises on each of these dates.   On August 8, 2019, 411 Therapy billed for two (2) units of therapeutic exercises, which requires a minimum of twenty-three (23) minutes of treatment.   F.H. did not receive the billed-for therapeutic exercises on this date.

- 4 Transport submitted a bill to Allstate for purported transportation of patient H.S. (Claim No. 0470803784) from his home to 411 Therapy that included multiple rides from August 2017 to October 2017, but did not include a charge for September 8, 2017.  4 Transport then submitted a second bill that included the same dates as those already billed but added a charge for purported transportation to 411 Therapy on September 8, 2017.  H.S. did not receive treatment at 411 Therapy on September 8, 2017.

- 4 Transport billed Allstate for round trip transportation allegedly provided to patient R.P. (Claim No. 0449849776) to 411 Therapy for eight (8) separate dates of service on which R.P. did not receive treatment at 411 Therapy.

- 4 Transport billed Allstate for purported round trip transportation to patient L.P. (Claim No. 0449849776) to 411 Therapy on twelve (12) separate dates of service on which she never received treatment at 411 Therapy.

256.   The defendants submitted fraudulent claims to Allstate relative to each of the above-referenced exemplar patients and categories of services that were not actually provided, and Allstate relied on such submissions in adjusting the claims.

257.   Allstate is not required to pay the defendants for services that were not actually rendered and is entitled to reimbursement for payments it was induced by make by the defendants' fraudulent submissions.

51

## VI.   KICKBACKS TO INDUCE TREATMENT

258.   The defendants used multiple methods to ensure that individuals who were solicited or referred into their network continued to present for the medically unnecessary treatment and testing performed (if at all) solely to generate bills to Allstate.

259.   The defendants aggressively targeted patients with offers of cash and in-kind payments in exchange for presenting to the defendant clinics.

260.   Numerous patients have testified that they were offered cash payments in exchange for allowing the defendants to transport them to the defendants' network of facilities, including several who were living at homeless shelters at the time.

261.   One patient testified that she was contacted at a homeless shelter out of the blue by an individual named Ali who told her she "need[ed] to go to this doctor" and he had "doctors for [her]" and promised payment for physical therapy at 411 Therapy and MRIs at Gravity Imaging.

262.   She further explained that Ali had gotten her number from her friend whom Ali had solicited for treatment from a liquor store after hearing that she was involved in the same motor vehicle accident:

Q.    Did she say how she knew Ali?

A.    She met him at a liquor store, and he just started talking to her telling her about that.  And like when people homeless or ain't got no money, that's like where they recruit a lot of people from. Like a lot of drug users, a lot of people at shelters, a lot of people

that don't have nothing, because, you know, you desperate.  A lot of people going to do it and not ask questions or nothing, and that's how it was.

263.   After recruiting this patient, Ali returned to the homeless shelter to target additional patients who were at risk and susceptible to the defendants' scheme:

Q.   Did you ever see Ali in person at any of the shelters you were at?

A.   A couple times . . . [t]his older man.  He was in an accident for real . . . [h]e was cussing Ali out, saying how he was going to get the 411 Pain shut down . . . .  "You taking all this money from my insurance and you giving me crumbs."

264.   These patients from homeless shelters were transported in groups to the defendant clinics to generate bills for unnecessary medical treatment.

265.   Ali offered to pay patients $200 for initial visits to 411 Therapy, an additional $100 for every third physical therapy appointment, and $250 for MRIs at Gravity Imaging.

266.   Payments were made by the drivers who shuttled patients to the defendants' clinics.

267.   Ali also offered additional payment for recruiting patients into the scheme:

Q.   All right.  So I want to make sure I understand all this.  Start - - start from the point that Ali calls you, and tell me the whole thing that happened with you and this place.

A.   He said "why don't you, you know, find a couple more people that has been in an accident, and I'll pay you to come.  I'll pay you for your MRIs, and I'll pay y'all for all visit[s]." . . . And he

53

was like "you recommend more people, and I gave you an extra hundred dollars."

268.   Patient C.N. (Claim No. TXA-0233760) testified that she was referred to Gravity Imaging, but when she went to its office on 12 Mile Road, "it seemed like they were doing scams for the insurance.  That's why we're paying so much for insurance, because I've never seen so many kids in all my life supposed to be hurt."

269.   C.N. further testified that while she was in the lobby at Gravity Imaging, she heard that the clinic was paying patients $100 to undergo MRIs.

270.   Patient M.D. (Claim No. 0531880417) also testified that Spine & Health pays patients to continue returning to the clinic for unnecessary evaluations and treatment.

271.   Patients who require money or other inducement in order to undergo evaluation and treatment do not actually require medical treatment, and all charges submitted by the defendants related to such patients are fraudulent.

272.   As discussed above, Hassan Fayad and the defendant clinics also paid kickbacks to other physicians to incentivize referrals of patients into their network.

273.   Defendants Velocity, Fund V, and HMRF also paid kickbacks designed to maximize the amount of charges submitted to Allstate.

274.   For example, in addition to purchasing Gravity Imaging's accounts receivable for 33% of the amount billed to insurers, HMRF also paid an additional

4% kickback to individuals named Keith Halbu, Sal Delisi, and Christopher Beall who worked with Gravity Imaging and arranged for the sale.

275.   These payments, none of which were ever disclosed to Allstate, were designed to incentivize Gravity Imaging to bill as much as possible for as many MRIs as possible, and resulted in bills for countless MRIs at unreasonable rates that had no medical merit whatsoever.

## VII.   UNLAWFUL SOLICITATION AND FACTORS OTHER THAN LEGITIMATE MEDICAL JUDGMENT USED TO GENERATE UNLAWFUL BILLS TO ALLSTATE

### A.   MICHIGAN'S ANTI-SOLICITATION LAWS

276.   The solicitation and exploitation of motor vehicle accident victims for profit or professional gain is strictly prohibited in the State of Michigan, as is the use of factors other than legitimate medical judgment to bill insurers.

277.   Michigan law prohibits "[a]ny physician or surgeon engaged in the practice of medicine in this state" from "employ[ing] any solicitor, capper, or drummer for the purpose of procuring patients."  Mich. Comp. Laws § 750.429.

278.   Other conduct prohibited under Michigan law ranges from the identification and solicitation of potential patients of medical providers, to the use of agents to solicit patients, and to the receipt of fees obtained through such fraudulent methods, including the mere participation in any schemes relating to such

activity.  *See* Mich. Comp. Laws §§ 750.410b, 750.429, 257.503, and 500.4503(h)-(i).

279.   It is also illegal in Michigan to contact any motor vehicle accident victim to offer a service within thirty (30) days of the accident, Mich. Comp. Laws § 750.410b, and to use police reports to solicit any person identified in the report, Mich. Comp. Laws § 257.503(1)(a).

280.  Only  "lawfully-render[ed]  treatment"  is  compensable  under Michigan's No-Fault Act.  Mich. Comp. Laws § 500.3157(1).

281.   As set forth more fully below, the defendants participated in and willingly benefited from schemes to solicit patients through conduct prohibited under Michigan law.

### B.   IMPROPER AND UNLAWFUL METHODS USED TO SOLICIT PATIENTS

282.   Despite Michigan's prohibition on patient solicitation, the defendants actively employed a number of unlawful and improper methods to obtain patients.

283.   As detailed above, 411 Therapy paid an individual named Dejuan Sims, who goes by the name "Sevenmile Buck" on various social media platforms, to obtain police accident reports that were used to solicit accident victims for No-Fault Benefits treatment.

284.   Several of the defendants' associates, including brothers of Hassan Fayad, are or were police officers and, upon information and belief, provided the

defendants with contact information of individuals who filed police reports claiming to have been involved in motor vehicle accidents.

285.   Members of Hassan Fayad and Mirna Fayad's family also own a number of auto body shops and towing companies, which were used to identify persons involved in motor vehicle accidents and direct them to the defendant clinics immediately following alleged motor vehicle accidents.

286.   Once patients were solicited, they were immediately transported to Spine & Health and were uniformly prescribed excessive and medically unnecessary treatment according to a predetermined treatment protocol, as set forth more fully below, to maximize the charges for medical treatment.

287.   As detailed above, layperson defendant Hassan Fayad continued to direct patient referrals and treatment even after Spine & Health's evaluations.

288.   Indeed, former Spine & Health nurse practitioner Kim Lilly-Bernau ("Lilly-Bernau") testified that Spine & Health is controlled by Hassan Fayad.

289.   Patient testimony also confirms that treatment decisions and referrals were controlled by the layperson defendants.

290.   For example, N.C. (TXA-0228877) was involved in a motor vehicle accident on April 22, 2019.

291.   On April 26, 2019, N.C. received a call from someone identifying herself as a case manager and who told her to immediately present to Spine & Health.

292.    At Spine & Health, N.C. filled out paperwork, provided a urine sample, and then was transported by 4 Transport to another facility where she received an MRI from Gravity Imaging.

293.    The driver of the transport vehicle, who was responsible for arranging all of N.C.'s treatment and testing that day, identified himself as the owner of the physical therapy facility.

294.    4 Transport, Spine & Health, and Gravity Imaging, each submitted bills for payment relating to N.C.'s alleged treatment on April 26, 2019.

295.    The following patients are additional representative exemplars of the fact and extent of the defendants' illegal and improper solicitation efforts:

- Patient S.K. (Claim No. 0580825313) reported to Allstate that she was contacted by a woman named "Emily" after her alleged motor vehicle accident. "Emily" claimed to S.K. that she was a representative of the insurance company and directed S.K. to report to Spine & Health.

- Patient J.P. (Claim No. 0576827786) provided a statement to Allstate during which she explained that she was contacted by a woman named "June," who J.P. believed was associated with the insurance company. "June" directed J.P. to present to Spine & Health.

- Patient C.E. (Claim No. 0470639881) testified that following his alleged motor vehicle accident he received an unsolicited telephone call from 411 Therapy recommending that he undergo physical therapy. C.E. was directed to Mercyland for evaluation and a physical therapy prescription, and was then billed for an extensive course of unnecessary treatment by 411 Therapy.

- Patient A.A. (Claim No. 0552877920), who was employed by Hassan Fayad and Mirna Fayad at 4 Transport at the time of his alleged motor

vehicle accident, was told to seek treatment at Spine & Health by Hassan Fayad after declining treatment at the hospital.

- Patients L.P. and R.P. (Claim Nos. 0449849776) were involved in the same alleged motor vehicle accident on March 12, 2017 and both reported receiving calls from multiple solicitors immediately following the accident. Both patients were evaluated at the Mercyland facility before being referred to 411 Therapy and prescribed transportation billed by 4 Transport.  411 Therapy and 4 Transport generated more than $150,000 in charges for over 15 months of alleged treatment to the solicited patients.

- Patient L.P. (Claim No. 0592129217) reported that she was contacted by an individual who implied they were with Allstate following her alleged motor vehicle accident.  L.P. stated she felt "bamboozled" when she discovered the caller was actually from 411 Therapy.  The 411 Therapy caller set her up with transportation provided by a 1-800-PAIN vehicle to get an MRI billed by Gravity Imaging and examination, including DME and medications, billed by First Medical.

## VIII.  UNLAWFUL AND UNLICENSED TREATMENT AND SERVICES

296.    The defendants violated several Michigan laws and regulations in their effort to bill Allstate as much as possible.

297.    Spine & Health and 411 Therapy routinely billed Allstate for purportedly issuing DME to patients at issue herein.

298.    In order to legally issue DME in Michigan, a provider must obtain a license from the Michigan Board of Pharmacy.

299.    A license from the Michigan Board of Pharmacy is required for all "drugs **and devices** manufactured, distributed, prescribed, dispensed, administered, or **issued in this state** . . . ."  Mich. Comp. Laws § 333.17722 (emphasis added).

300.   Both Spine & Health and 411 Therapy never possessed valid licenses to issue DME in the State of Michigan.

301.   Despite having no license to issue DME, 411 Therapy billed Allstate more than $841,968 in DME in relation to at least forty-seven (47) separate patients. *See* Exhibit 1.

302.   Spine & Health billed Allstate at least $4,875 in DME in relation to at least twenty-two (22) separate patients despite having no license to issue DME.  *See* Exhibit 7.

303.   Not only was this DME medically unnecessary, discussed in detail *infra*, it was unlawful and not compensable under the No-Fault Act.

304.   Allstate is not required to pay Spine & Health and 411 Therapy for unlicensed DME and is entitled to reimbursement for payments it was induced to make by Spine & Health's and 411 Therapy's fraudulent bills.

## IX.   <u>FALSIFIED MEDICAL RECORDS</u>

305.   In order to conceal their fraud and induce Allstate to make payments to which they were not entitled, Spine & Health, Hassan Fayad, and Gonte routinely altered, forged, and falsified records submitted to support their bills.

306.   As discussed above, Gonte has a well-documented history of falsifying medical records, including criminal charges related to the same.

307.   Former Spine & Health physician assistant Nicole Weick testified that she stopped working at Spine & Health in the middle of March 2020.

308.   Spine & Health continued to bill Allstate for examinations allegedly performed by Weick well after she had stopped working at Spine & Health.

309.   For example, for patient K.M. (Claim No. 0586402414), Spine & Health billed for a purported level 4 comprehensive re-examination allegedly performed by Weick on April 15, 2020, one (1) month after she left Spine & Health.

310.   Weick's name was also listed on a disability certificate, including driving restrictions, that Spine & Health issued to K.M. on April 15, 2020.

311.   This falsified disability certificate allowed 4 Transport to bill Allstate for even more medically unnecessary services.

312.   Spine & Health, through SHP services, also billed for medications allegedly prescribed by Weick on May 6, 2020:



313.   All of the treatment and services for which Spine & Health, 4 Transport, and other defendants billed Allstate using falsified records and prescriptions were fraudulent and not compensable.

## X.   UNREASONABLE   AND   UNNECESSARY   FRAUDULENT TREATMENT

314.   The defendants' willingness to bill Allstate for services that were (1) never rendered, (2) induced by kickbacks and other unlawful and improper actions, and (3) not lawfully provided demonstrates their willingness to also bill for treatment that was unreasonable and unnecessary.

315.   The defendants' goal was to bill for as much treatment as possible, regardless of whether such treatment was reasonably necessary to patients' care, recovery, or rehabilitation, in order to generate bills for submission to Allstate.

316.   To maximize their financial gain, the defendants adhered to a predetermined protocol of unnecessary, indiscriminate, and excessive treatment and testing, as discussed more fully below.

317.   The defendants' purported treatment violated established standards of care in the medical community, as the vast majority of testing, diagnostics, DME, referrals, procedures, and treatment were not indicated, redundant, excessive, and repeated without any objectively documented benefit to patients.

318.   The full extent and pattern of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they allegedly provided was

not known to Allstate until it undertook the full investigation that culminated in the filing of this action, including identification of the defendants' pattern of overtreatment.

319. The unnecessary treatment billed by the defendants, discussed more fully below, includes, but is not limited to, the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 9.

320. All of the bills submitted by the defendants to Allstate through the U.S. Mail and interstate wires seeking payment for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

321. Allstate is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid in reliance on the defendants' fraud.

322. None of the above facts were known to Allstate until it undertook its investigation that resulted in the commencement of this action, and are not evident within the four corners of the medical records and bills submitted to Allstate by the defendants.

### A. THE DEFENDANTS' PREDETERMINED TREATMENT PROTOCOL

323. Allstate's investigation revealed a strikingly similar pattern of alleged diagnoses and treatment across all patients, including the discovery of a pattern by the defendants in (1) routinely recording substantially similar diagnoses regardless

of each patient's reported injuries; (2) providing mirrored treatment plans further confirming that patients were subjected to a predetermined treatment protocol; and (3) failing to indicate short- and/or long-term goals for patients.

324.   Each patient was assessed as having extremely similar reports of complaints, objective findings, and assessments regardless of the type of accident and regardless of each patient's age, sex, and pre-accident condition.

### 1.   Spine & Health's and First Medical's Role in the Defendants' Predetermined Treatment Protocol

325.   Many of the services for which the defendants billed, including physical therapy, non-emergency medical transportation, MRIs, DME, and urine drug tests, required physician prescriptions.

326.   All of the patients at issue herein required diagnoses to create the appearance of injuries that would justify the extraordinary amounts of bills submitted to Allstate.

327.   Spine & Health and First Medical were primarily used by the defendants to manufacture these diagnoses and to obtain the required prescriptions to permit further billing.

328.   Spine & Health and First Medical were also used by the defendants to directly bill Allstate for unreasonable and unnecessary evaluations, medications, procedures, and DME as described herein.

329. Because Spine & Health's and First Medical's referrals were predetermined, their examinations rarely diagnosed legitimate injuries and instead routinely documented highly similar and nonspecific diagnoses which were almost always nothing more than "pain" in various extremities and joints.

330. For example, Spine & Health only diagnosed patients using a predetermined selection of ICD-10 codes for which nearly every option is just "pain" or "contusion" of various body parts:

| | | |
|---|---|---|
| S06.0X9A Concussion | M25.512 Left shoulder pain | M25.551 Right hip pain |
| R51 Headache | S40.012A Left shoulder contusion | S70.01XA Right hip contusion |
| M54.2 Cervicalgia | M75.42 Impinge. syn., left shoulder | M25.552 Left hip pain |
| M54.12 Cervical radiculopathy | M75.102 Rot. cuff tear, left shoulder | S70.02XA Left hip contusion |
| G54.0 Brachial plexus disorders | M25.521 Right elbow pain | M79.604 Right leg pain |
| M54.6 Thoracalgia | S50.01XA Right elbow contusion | M79.605 Left leg pain |
| M54.14 Thoracic radiculopathy | M25.522 Left elbow pain | M25.561 Right knee pain |
| M54.5 Lumbago | S50.02XA Left elbow contusion | S80.01XA Right knee contusion |
| M47.816 Spondylosis w/o myelopathy or radiculopathy, lumbar region | M25.531 Right wrist pain | M25.562 Left knee pain |
| | M25.532 Left wrist pain | S80.02XA Left knee contusion |
| M54.16 Lumbar radiculopathy | M79.601 Right arm pain | M25.571 Right ankle pain |
| M54.17 Lumbosacral radiculopathy | M79.602 Left arm pain | M25.572 Left ankle pain |
| M25.511 Right shoulder pain | M79.641 Right hand pain | M79.671 Right foot pain |
| S40.011A Right shoulder contusion | S60.221A Right hand contusion | S90.31XA Right foot contusion |
| M75.41 Impinge. syn., right shoulder | M79.642 Left hand pain | M79.672 Left foot pain |
| M75.101 Rot. cuff tear, right shoulder | S60.222A Left hand contusion | S90.32XA Left foot contusion |
| Other: | Other: | Notes: |

331. "Pain" is not a diagnosis; it is a subjective symptom that cannot establish medical necessity for the extensive range of services billed by the defendants based on Spine & Health's purported evaluations.

332. In fact, a former Spine & Health physician assistant confirmed under oath that layperson Hassan Fayad mandated Spine & Health practitioners make specific, predetermined diagnoses used to falsely justify additional services at Hassan Fayad's other entities:

> Q:    You said there were incentives to diagnose patients with something in order to bring money.  What incentives were those if you diagnosed patients with things or followed his instructions?
>
> A:    …there were directives that came from Hassan to order more MRIs, to continue to order urine drug screens on patients, for what my belief was for increased billing.

333.   This same physician assistant further testified that she believed she would be fired if she altered layperson Hassan Fayad's Spine & Health treatment protocol:

> Q:    What would happen if you didn't follow the protocol?
>
> A:    There was always the understanding that my job would be in jeopardy if I did not.

334.   Radiculopathy, which was by far the most common injury claimed by Spine & Health and First Medical, was never actually supported by the evaluation and testing performed on the patients at issue herein.

335.   Radiculopathy describes injury to nerves in the spinal column that causes presentation of symptoms in the other body parts to which the injured nerve travels.

336.   A proper diagnosis of radiculopathy requires the performance of a neurologic examination to determine whether a patient's symptoms correspond to specific vertebral levels that are suspected to be injured.

337.   Diagnoses of radiculopathies are confirmed through additional testing, including electrodiagnostic tests and diagnostic injections.

338.   Rather than perform detailed neurologic examinations and confirmatory tests, Spine & Health and First Medical diagnosed nearly every patient at issue herein with radiculopathies without any supporting evidence.

339.   Indeed, Spine & Health and First Medical diagnosed patients with radiculopathies even when they did not exhibit any radicular pain or weakness at all.

340.   A former Spine & Health physician assistant testified the Gonte required Spine & Health practitioners to diagnose radiculopathies for all patients because they were harder to disprove for litigation:

> Q:   So if I'm understanding your testimony correctly, did Dr. Gonte tell you we only diagnose certain things because it's difficult to prove?
>
> A:   At some point, yes.
>
> Q:   Walk me through what that conversation was.
>
> A:   I was prescribing - - I mean, I was investigating other areas of the body, and he said, we only ever really do cervical radiculitis and lumbar radiculitis because that's - - you can't really prove whether or not that's there.
>
> Q:   Prove that's there, what do you mean in that regard, prove it how?  For what purpose?
>
> A:   For litigation.

341.   This physician assistant confirmed she did not know the difference between radiculitis and radiculopathy, yet was told to always include the diagnosis

codes for radiculopathy in patients' charts by Spine & Health's layperson office manager, who likely received this directive from Hassan Fayad.

342.    Spine & Health's and First Medical's false diagnoses of radiculopathies were used to create the appearance of medical necessity for the excessive predetermined treatment billed by the medical provider defendants described herein.

343.    For example, Spine & Health billed for a purported evaluation of patient M.E. (Claim No. TXA-0247586) on January 29, 2020 and "diagnosed" him with radiculopathy in the cervical and lumbar spine.

344.    M.E. did not complain of radicular pain or weakness and Spine & Health did not perform any neurologic examination or tests that indicated that M.E. had a spinal nerve injury.

345.    Spine & Health nevertheless "diagnosed" M.E. with radiculopathy in his cervical, thoracic, and lumbar spine, and used this fabricated diagnosis to create the appearance of support for tens of thousands of dollars of charges for medically unnecessary DME.

346.    Similarly, Spine & Health reported that patient C.S. (Claim No. 0554181685) had cervical pain that was "non-radiating" with "no numbness or tingling" at an appointment on November 13, 2019.

347.    Despite this clear denial of radicular symptoms, the only diagnosis made by Spine & Health at this initial evaluation was "cervical radiculitis."

348.   First Medical billed for a purported evaluation of patient C.G. (Claim No. 0538422998) on August 31, 2020 during which there was no physical examination or evaluation at all of the patient's spine.

349.   Despite performing no evaluation to support its diagnoses, First Medical diagnosed C.G. with radiculopathies of his cervical, thoracic, and lumbar spine.

350.   Because Spine & Health's and First Medical's referrals and prescriptions were predetermined based on the goal of generating bills by the other entity defendants addressed herein, the records created by Spine & Health and First Medical are remarkably similar and nearly always used identical language that was pre-printed before a patient was even evaluated or treated.

351.   For example, Spine & Health billed for allegedly performing injections on patient R.T. (Claim No. 0509395181) on February 15, 2018 and March 8, 2018.

352.   The records submitted by Spine & Health were almost entirely pre-printed, including the narrative describing the performance of the injection and the record of the patient's purported response thereto.  *See* Exhibit 12.

353.   Indeed, the March 8, 2018 record is the exact same document as the February 15, 2018 record with just the notation "DOS 3/8/18" added to the top right corner.  Id.

354.   Spine & Health's and First Medical's purported examination findings were also always nearly identical between patients, even when such findings could not have actually been made.

355.   For example, patient S.C. (Claim No. 0574214565) testified that she suffered a stroke in 2009 that paralyzed the right side of her body and that she never regained normal function in her leg.

356.   Spine & Health nevertheless reported that S.C. had equal muscle strength and sensation bilaterally, and could "heel and toe walk without difficulty."

357.   Spine & Health almost always claimed to have "instructed the patient on an aggressive home range of motion and strengthening program and proper icing technique," but there is no indication that patients ever performed these treatments (or that anyone ever followed up with patients about them), and instead patients were uniformly prescribed endless courses of physical therapy to generate bills by the other defendant clinics.

358.   Spine & Health and First Medical also routinely prescribed the same exact unnecessary and extensive treatment, including:

- Medications;
- Physical therapy three (3) times per week for four (4) weeks;
- Total disability from work for four (4) weeks;
- Replacement household services for four (4) weeks;
- Driving restriction for four (4) weeks;
- Urine drug tests;
- Diagnostic imaging including MRIs; and

- DME

359.   Because Spine & Health and First Medical ordered the same predetermined course of extensive treatment and testing for nearly every patient, regardless of their age, injury, or status, such treatment was rarely, if ever, appropriate.

360.   For example, patient N.P. (Claim No. 0498315167) was a 16-year-old female who suffered from schizophrenia, bipolar disorder, and oppositional defiant disorder whose mother reported that she was homeschooled and did not drive or work.

361.   Spine & Health nevertheless prescribed N.P. with its normal predetermined treatment, including a disability certificate stating that she was unable to work or drive, neither of which were applicable.

362.   Patient S.M. (Claim No. 0500283676) was a 15-year-old female at the time of her initial Spine & Health evaluation and was found to have normal muscle strength and full range of motion.

363.   Spine & Health nevertheless ordered both physical therapy and chiropractic treatment for S.M., and obtained a urine specimen that was referred for extensive testing despite S.M. not being prescribed any drugs susceptible to abuse or misuse.

364.   Spine & Health and First Medical also hardly ever altered their predetermined treatment protocol even when patients were involved in alleged motor vehicle accidents many years prior to their initial examination and had already undergone extensive treatment:

- Patient J.W. (Claim No. 0486042385) was allegedly involved in a motor vehicle accident on December 17, 2012.  Nearly six (6) years later, J.W. presented to Spine & Health on December 4, 2018.  Gonte's treatment plan nearly six years removed from J.W.'s purported motor vehicle accident recommended that J.W. perform the same home exercises as patients who presented to Spine & Health within days of purported accidents, in addition to physical therapy (billed by 411 Therapy), four (4) MRIs (billed by Gravity Imaging), and a disability certificate that included driving restrictions.

- Patient J.A. (Claim No. TXA-0171360) was allegedly involved in a motor vehicle accident on July 26, 2016.  J.A. presented to Spine & Health more than three (3) years later on July 30, 2019.  Spine & Health immediately ordered physical therapy (billed by 411 Therapy), chiropractic treatment (billed by New Horizon), medications (billed by Spine & Health through SHP Services), and issued J.A. a disability certificate that included transportation services (billed by 4 Transport).

365.   As set out further below, the predetermined treatment plans used by Spine & Health and First Medical resulted in a gross overutilization of physical therapy, chiropractic treatment, medications, procedures, MRIs, and DME, all of which were billed by the defendants in clear disregard for standards of care.

366.   For example, 100% of patients for whom A1 submitted bills to Allstate were purportedly evaluated at Spine & Health.

367.   100% of patients for whom 4 Ur Recovery submitted bills to Allstate were purportedly evaluated at Spine & Health.

368.   Of the 92 patients for whom 411 Therapy billed Allstate, 62 (68.13%) were purportedly evaluated at Spine & Health.

369.   More than 76% of patients for whom New Horizon submitted bills to Allstate were purportedly evaluated at Spine & Health.

370.   Treatment that was ordered by Spine & Health as a matter of course to generate charges by other defendants was not medically necessary.

### 2.   Medically Unnecessary Physical Therapy and Chiropractic Treatment

371.   411 Therapy, 4 Ur Recovery, A1, and New Horizon (collectively, the "defendant clinics") and their owners and managers billed Allstate for treatment that far exceeded applicable standards of care.

372.   Valid orders for chiropractic and physical therapy treatment require the services be objectively indicated and cannot be based on a patient's subjective complaints of pain alone.

373.   In the vast majority of all motor vehicle accident cases, mild injuries will resolve themselves within a few weeks without any treatment whatsoever.

374.   Thus, the immediate resort to physical therapy and chiropractic treatment using a predetermined protocol of excessive treatment was not related to the care, recovery, or rehabilitation of the patient, thus rendering such services

medically unnecessary and not compensable under applicable provisions of the Michigan No-Fault Act.

375.   A former Spine & Health physician assistant testified that Spine & Health had a policy to refer every patient for physical therapy.

376.   Patient were immediately referred for physical therapy regardless of actual medical necessity because "we could send patients to a facility that Hassan owned to further increase his profit."

377.   This former physician assistant specifically identified 411 Therapy, 4 Ur Recovery, and New Horizon as facilities were Spine & Health practitioners were directed to make referrals.

378.   Moreover, the defendants' immediate resort to extensive treatment may have caused harm to the patients at issue herein, as acute processes of injury were not allowed to dissipate naturally and follow the expected course of recovery.

379.   Because physical therapy exceeding twenty-one (21) days or ten (10) visits must be prescribed by a licensed medical or osteopathic doctor pursuant to Mich. Comp. Laws § 333.17820(1), 411 Therapy and 4 Ur Recovery required the participation of Spine & Health and First Medical to submit bills to Allstate.

380.   Spine & Health's and First Medical's immediate referrals for medically unnecessary physical therapy at 411 Therapy are exemplified by the following representative patients:

- Patient D.H. (Claim No. FXP-0482527): Allstate was billed for alleged treatment at Spine & Health and 411 Help on August 12, 2019, which was only one (1) day after D.H.'s purported motor vehicle accident.

- Patient S.A. (Claim No. TXA-0234158): Allstate was billed for alleged treatment at Spine & Health and 411 Help on June 10, 2019, which was only two (2) days after S.A.'s purported motor vehicle accident.

- Patient T.M. (Claim No. 0570763292): Allstate was billed for a purported initial evaluation at Spine & Health on December 9, 2019, which was only four (4) days after T.M.'s alleged motor vehicle accident. Physical therapy at 411 Therapy was billed starting the following day, December 10, 2019.

- Patient L.P. (Claim No. 0566748794): Allstate was billed for a purported initial evaluation at Spine & Health on November 6, 2019, which was only six (6) days after L.P.'s alleged motor vehicle accident. Physical therapy at 411 Therapy was billed starting the following day, November 7, 2019.

381.   The defendants' practice of immediately referring patients from Spine & Health and First Medical to the defendant physical therapy clinics as a matter of course is further confirmed by the fact more than 33% of Spine & Health patients were referred to 411 Therapy within one (1) week of their initial Spine & Health examination.

382.   4 Ur Recovery likewise billed for immediate physical therapy referrals from Spine & Health pursuant to the same internal referral arrangement:

- Patient S.H. (Claim No. 0581490406): Allstate was billed for alleged treatment at Spine & Health and 4 Ur Recovery on March 16, 2020, which was only one (1) day after S.H.'s purported motor vehicle accident.

- Patient D.O. (Claim No. 0582828539): Allstate was billed for a purported initial evaluation at Spine & Health on April 6, 2020, which was only one (1) week after D.O.'s alleged motor vehicle accident. Physical therapy at 4 Ur Recovery was billed starting the following day, April 7, 2020.

- Patient R.S. (Claim No. 0581775491): Allstate was billed for a purported initial evaluation at Spine & Health on March 5, 2020, which was only eight (8) days after R.S.'s alleged motor vehicle accident. Physical therapy at 4 Ur Recovery was billed starting the following day, March 6, 2020.

- Patient H.O. (Claim No. 0595915901): Allstate was billed for an alleged evaluation at First Medical on August 10, 2020, which was only one (1) day after H.O.'s purported motor vehicle accident. Physical therapy at 4 Ur Recovery was billed starting the following day, August 11, 2020.

383.   In fact, more than 53% of patients for whom 4 Ur Recovery submitted bills to Allstate were referred to 4 Ur Recovery within one (1) week of their initial Spine & Health examination.

384.   In addition to immediate physical therapy referrals, patients who were initially examined at Spine & Health and First Medical were also immediately billed for purported chiropractic treatment at New Horizon.

385.   For example, patient L.S. (Claim No. 0509401543) was involved in an alleged motor vehicle accident on July 12, 2018.   The very next day on July 13, 2018, both Spine & Health and New Horizon billed for purported initial examinations.

386.   Patient S.M. (Claim No. 0500283675) first presented to Spine & Health for an initial examination on October 2, 2018, and New Horizon immediately billed for an initial chiropractic examination that same day.

### a.   Fabricated Examination Findings

387.   Once referred to the defendant clinics, patients' complaints and findings were routinely exaggerated and fabricated in an attempt to create the appearance of justification for the extensive courses of treatment ordered.

388.   For example, patient R.J. (Claim No. 0476016084) was allegedly involved in a motor vehicle accident on September 20, 2017 and was evaluated the same day at DMC Sinai-Grace Hospital ("Sinai-Grace").

389.   Sinai-Grace found that R.J. exhibited a full range of motion in his upper and lower extremities and had no lumbar or thoracic tenderness.

390.   R.J. was then evaluated by a separate physician the next day, September 21, 2017, and was again found to have full 5/5 muscle strength in all extremities.

391.   The following day, R.J. allegedly presented to 411 Therapy where defendant Carulla claimed to find that R.J. had muscle strength of only 3/5 in his extremities and lumbar spine and only 2/5 in his cervical spine.

392.   411 Therapy's examination also alleged R.J. suffered an extremely debilitating range of motion restriction of 0 degree cervical/flexion extension on 10 degree lumbar flexion.

393.   Despite these findings, R.J. was prescribed a course of physical therapy that included extensive physical exercise for which he would need both spinal range of motion and muscle strength against resistance.

394.   The range of motion ("ROM") and motor muscle tests ("MMT") that were fabricated for patient R.J. were routinely used by the defendant clinics to create the appearance of injury where none existed.

395.   MMTs are scored using the Oxford Scale, as described on the chart below:

| Grade | Observation |
|:---:|:---|
| 0 | No muscle contraction is detected. |
| 1 | A trace contraction is noted in the muscle by palpating the muscle while the patient attempts to contract it. |
| 2 | The patient is able to move the muscle when gravity is eliminated. |
| 3 | The patient may move the muscle against gravity but not against resistance from the examiner. |
| 4 | The patient may move the muscle group against some resistance from the examiner. |
| 5 | The patient moves the muscle group and overcomes the resistance of the examiner.  This is normal muscle strength. |

396.   As demonstrated by the example of patient R.J. above, the MMT scores reported by the defendant clinics reflect patients who allegedly presented with crippling injuries, not the (at most) minor soft-tissue injuries that were reported by other physicians treating the patients and the patients themselves.

397.   The significantly diminished muscle strength reported by the defendant clinics, which often were directly contradicted by contemporaneous findings

78

recorded by outside physicians, were used to falsely create the appearance of necessity for their excessive course of physical therapy billed for all patients pursuant to an established predetermined treatment protocol.

398.   Several additional representative examples of the defendant clinics' reports of wildly exaggerated injuries and limitations are set forth below:

- Patient K.P. (Claim No. 0498315167) was allegedly involved in a motor vehicle accident on April 10, 2018.  More than four (4) months later, K.P. allegedly presented to Spine & Health on August 22, 2018 for an initial examination with Gonte.  Gonte confirmed that K.P. exhibited full range of motion in her neck and back and full muscle strength of 5/5.  Despite finding no significant limitations, Gonte referred K.P. to 411 Therapy for an initial physical therapy examination that was billed on the same day.  This physical therapy examination, allegedly performed by Carulla, reported extreme spinal ROM limitations, including a purported 10 degree cervical and lumbar flexion limitation and 0 degrees of spinal rotation.  K.P.'s muscle strength in her cervical and lumbar spine and upper and lower extremities was reported to be only 3/5.  411 Therapy used these fabricated examination findings to bill for its normal predetermined course of extensive physical therapy modalities.  After 411 Therapy billed for nearly three (3) straight months of physical therapy pursuant to these exaggerated limitations, K.P. was referred to defendant A1 on November 5, 2018, at which point she was inexplicably diagnosed with a severe right hand contusion with 0 degree range of motion and only a 2+/5 muscle strength.  Neither Spine & Health nor 411 Therapy had ever noted the existence of a hand injury.  Despite both A1 and 411 Therapy billing for purported treatment, K.P. was also referred to New Horizon on November 12, 2018 where she was diagnosed with yet more injuries that had never previously been noted, including to her shoulder and leg, but her allegedly severely debilitating hand injury was not noted.  Two (2) days later, on November 14, 2018, K.P. was again evaluated by Gonte who again confirmed that her actual ROM remained full and her muscle strength remained a completely normal 5/5.

- Patient H.S. (Claim No. 0470803784) was allegedly involved in a motor vehicle accident on August 9, 2017. Later that day, H.S. was examined at Henry Ford Health System where it was confirmed that he had no back pain, no chest pain, and had normal ROM with full passive range and no pain in his neck, right shoulder, left shoulder, cervical spine, thoracic spine, and lumbar spine. The sole diagnosis from H.S.'s examination was pain in both shoulders. Just two (2) days later on August 11, 2017, Gonte allegedly examined H.S. and prescribed physical therapy at 411 Therapy based upon his "diagnoses" that included both a cervical disc and lumbar strain, in direct contradiction to the prior report that H.S. had no back pain or injury. Three (3) days later, and only six (6) days after H.S.'s alleged accident, H.S. presented to 411 Therapy where it was claimed that he had diminished muscle strength of only -4/5 in his cervical and lumbar spine and severe spinal ROM limitations including only a 10 degree lumbar and cervical extension and only 5 degree lumbar and cervical rotation. In addition to these exaggerated limitations, 411 Therapy's examination inexplicably alleged H.S. also now suffered neck and right hip pain, both areas that Henry Ford had just confirmed exhibited no injury.

- Patient T.T. (Claim No. 02173272119) was involved in an alleged motor vehicle accident on September 10, 2008. On January 6, 2017, T.T. was evaluated by his regular physician who documented T.T. was approximately 90% improved in pain and physical functioning through prior physical therapy and medications, including no muscle strength or ROM limitations in his cervical , thoracic, and lumbar spine or upper or lower extremities. Later that year on October 4, 2017, T.T. reported to 411 Therapy for an initial examination allegedly performed by Carulla. Carulla claimed that T.T., now more than nine (9) years removed from his motor vehicle accident, still suffered severely debilitating muscle strength limitations of 2/5 in his right leg, 3/5 in his cervical and lumbar spine, and 4/5 in his upper extremities. Carulla also reported T.T.'s pain in his lumbar spine as an 8/10, which was far worse than the pain scores previously recorded by T.T.'s primary physician. Based on Carulla's exaggerated findings, 411 Therapy billed Allstate for more than eleven (11) months of physical therapy for T.T. pursuant to the defendants' predetermined treatment protocol.

- Patient J.G. (Claim No. 0499031672) was allegedly examined by Gonte at Spine & Health on July 3, 2018. Gonte confirmed that J.G. had full

range of motion in his neck and spine and full 5/5 muscle strength. Despite not diagnosing any strength or ROM limitations, Gonte still referred J.G. to 4 Ur Recovery, which billed for a purported examination on the same date. In direct contradiction to Gonte's findings, 4 Ur Recovery claimed that J.G. had significantly limited 3/5 muscle strength in his cervical spine, "grossly reduced" ROM restriction and 3/5 muscle strength in both shoulders, and severely limited cervical spinal ROM that was so limited it could not be properly measured due to supposed "acute pain." More than six (6) months later on January 11, 2019, J.G. was referred to 411 Therapy where he was inexplicably diagnosed with "right hand pain," which had never been mentioned during J.G.'s extensive purported treatment with 4 Ur Recovery. On May 15, 2019, Spine & Health billed for a re-examination of J.G. at which time Gonte confirmed that J.G. still had 5/5 muscle strength, no ROM restrictions, and no hand injury. Nevertheless, Gonte referred J.G. to New Horizon, where J.G.'s examination findings were again fabricated to claim spinal ROM restrictions and muscle strength limitations.

399.   The defendant clinics used these magnified injuries to falsely justify their own excessive courses of treatment, as well as referrals for treatment at the other defendant clinics, which almost always involved many identical treatment modalities and often occurred simultaneous with treatment purportedly rendered by a different defendant clinic as described above.

### b.    Identical and Excessive Treatment Plans

400.   After developing the appearance of necessity for treatment through fabricated examination findings, the defendants ordered highly similar courses of therapy for every patient so that they could bill Allstate for extensive unnecessary treatment over the course of many months pursuant to a predetermined protocol.

401.   For patients who actually received physical therapy treatment at 411 Therapy as opposed to simply being issued DME without ever being evaluated, 411 Therapy billed for therapeutic exercises for 100%, electrical stimulation for 92%, application of hot/cold packs for more than 85%, and ultrasound treatment for more than 65% of the patients at issue herein.  *See* Exhibit 1.

402.   4 Ur Recovery billed for application of hot/cold packs and electrical stimulation for more than 93% and therapeutic exercises for more than 86% of the patients at issue herein.  *See* Exhibit 2.

403.   A1 billed for massage, manual therapy, and self-care/home management training for 100% and therapeutic exercises for 75% of the patients at issue herein.  *See* Exhibit 3.

404.   New Horizon billed for application of hot/cold packs and mechanical traction for more than 100%, chiropractic manipulation treatment ("CMT") for more than 93%, and therapeutic exercises for more than 80% of the patients at issue herein. *See* Exhibit 6.

405.   411 Health's treatment plans contained a typographical error between the first and second physical exercise time/repetitions that was included in nearly every submission by 411 Therapy, evidencing that the evaluations were copied and pasted or pre-printed to the form and no patient-specific actual evaluation was performed.

406.   Once patients were set on the extensive predetermined courses of treatment used by the defendant clinics, they were rarely, if ever, re-evaluated by the purported referring physician to determine the efficacy of treatment.

407.   Moreover, the predetermined courses of therapy ordered by the defendant clinics were rarely altered or discontinued, even in the face of clear evidence that they were not working.

408.   Indeed, many of the defendant clinics' patients failed to improve at all, or in many cases got worse, despite purportedly undergoing treatment for many months or years.

409.   Specific examples of patients for whom the defendants submitted bills that far exceed standards of care include the following:

- Patient J.T. (Claim No. 0466622537) was allegedly involved in a motor vehicle accident on April 18, 2017.  On August 3, 2018, 411 Therapy billed for an initial evaluation of J.T. and placed her on the clinic's excessive predetermined protocol of therapeutic exercises, electrical stimulation, application of hot/cold packs, ultrasound treatment, and self-care/home management training.  411 Therapy billed Allstate for this excessive and medically unnecessary treatment to J.T. for at least 189 different alleged dates of treatment over the course of more than fifteen (15) months from August 3, 2018 to November 6, 2019.  Despite billing Allstate more than $113,600 for at least 643 treatment modalities over nearly fifteen (15) months of treatment, J.T. reported her pain barely changed at all from the 9/10 she reported at her initial August 3, 2018 date of service to an 8/10 at her final re-examination more than fourteen (14) months later on October 15, 2019.  411 Therapy did not change J.T.'s treatment plan throughout the entire course of her extended treatment despite her negligible improvement.

- Patient T.L. (Claim No. 0483589511) was allegedly involved in a motor vehicle accident on November 11, 2017.  On August 31, 2018, 411 Therapy first billed for an initial evaluation of T.L. and placed him on the clinic's excessive predetermined protocol of therapeutic exercises, electrical stimulation, application of hot/cold packs, ultrasound treatment, and self-care/home management training.  411 Therapy billed Allstate for this excessive and medically unnecessary treatment to T.L. for at least 166 different alleged dates of treatment over the course of more than thirteen (13) months from August 31, 2018 to October 10, 2019.  Despite billing Allstate more than $88,300 over more than (13) months of treatment, T.L.'s condition never improved as his pain score of 6-7/10 reported at his initial August 31, 2018 evaluation remained consistent with his pain score of 6/10 reported at his final October 10, 2019 appointment.

- Patient M.C. (Claim No. 0542949904) was allegedly involved in a motor vehicle accident on June 8, 2018.  On January 16, 2019, M.C. presented to New Horizon, where he was placed on the clinic's excessive predetermined protocol of hot packs, mechanical traction, CMT, therapeutic exercises, and massage.  New Horizon billed Allstate for this excessive and medically unnecessary treatment to H.F. for at least 189 different alleged dates of treatment over the course of nearly sixteen (16) months from January 16, 2019 to May 13, 2020.  Despite billing Allstate for at least 761 treatment modalities for more than $57,000 over nearly sixteen (16) months of treatment, New Horizon never billed Allstate for a single re-evaluation of M.C.

- Patient D.D. (Claim No. TXA-0239138) was allegedly involved in a motor vehicle accident on September 2, 2019.  On November 20, 2019, D.D. presented to 4 Ur Recovery, where she was placed on the clinic's excessive predetermined protocol of hot packs, electrical stimulation, and therapeutic exercises.  4 Ur Recovery billed Allstate for this excessive and medically unnecessary treatment to H.F. for at least 46 different alleged dates of treatment over the course of nearly five (5) months from November 20, 2019 to April 10, 2020.

### c.  Fraudulent Occupational Therapy

410.   One of the ways the defendants simultaneously billed Allstate for the same purported treatment was by characterizing some charges as occupational therapy.

411.   Occupational therapy differs from physical therapy in that, when properly used, it seeks to help patients improve their ability to perform specific tasks rather than simply seeking to improve body movement, which is the goal of physical therapy.

412.   The Michigan Public Health Code defines occupational therapy as treatment to "preserve functional capabilities, prevent barriers, and enable or improve performance in everyday activities . . . ."  Mich. Comp. Laws § 333.18301.

413.   The defendants did not use occupational therapy for its intended purpose; instead, they used occupational therapy as a vehicle to multiply the charges submitted to Allstate for general physical therapy treatment.

414.   As detailed below, in many cases this included submitting charges for the exact same modalities to the same patients on the same dates of service as bills submitted by the defendant physical therapy clinics and New Horizon.

415.   Even when not redundant, the purported treatment characterized by the defendants as occupational therapy was not designed to improve patients' abilities to improve specific tasks.

416.   Indeed, defendant A1 rarely, if ever, even inquired of patients about specific tasks they may have had difficulty performing.

417.   Because there was no actual evaluation of patients' abilities to perform tasks, A1 never evaluated whether patients' functional capabilities improved from the extensive courses of treatment it billed.

418.   Bills for treatment that were redundant and falsely characterized as occupational therapy to multiply charges to Allstate are fraudulent and Allstate is not obligated to tender payment and is entitled to repayment of all bills it was induced to pay through the defendants' misrepresentations.

### d.    Redundant Treatment

419.   In addition to characterizing some physical therapy treatment as occupational therapy in order to double bill, much of the treatment at issue herein was performed redundantly by multiple defendant clinics at the same time.

420.   The clear lack of medical necessity of these overlapping treatments is confirmed by the fact that the defendant clinics' evaluations and assessments, despite purporting to describe the exact same purported treatments and procedures on the same service dates, never acknowledged that patients were receiving the same course of treatment at multiple defendant clinics.

421.   For example, 100% of patients for whom bills were submitted by A1 also incurred bills submitted by 411 Therapy, including numerous charges for the same procedures allegedly rendered on the same date of service as noted above.

422.   75% of patients for whom bills were submitted by A1 likewise also incurred bills submitted by New Horizon.

423.   Specific examples of patients for whom the defendant clinics submitted bills for redundant, medically unnecessary treatment include the following:

- On November 21, 2018, New Horizon, 411 Therapy, and A1 all billed for allegedly performing the same treatment modalities to patient S.A. (Claim No. 0484207006).   411 Therapy and A1 both billed for purportedly performing therapeutic exercises, 411 Therapy and New Horizon both billed for purported application of hot/cold packs, and A1 and New Horizon both billed for alleged therapeutic massage.

- Over a five (5) month period from September 2018 to January 2019, 411 Therapy and A1 billed for identical, redundant treatment to patient B.G. (Claim No. 0506916097) on forty-three (43) of the same dates of service.  Alleged treatment billed by both defendant clinics on the same dates included therapeutic exercises, manual therapy techniques, self-care/home management training, electrical stimulation, and application of hot/cold packs.

- Over a six (6) month period from September 2018 to February 2019, 411 Therapy and A1 billed for overlapping, redundant treatment to patient D.D. (Claim No. 0439360462) on twenty-two (22) of the same dates of service.  Alleged treatment billed by both defendant clinics on the same date includes therapeutic exercises, manual therapy techniques, therapeutic massage, and the application of hot/cold packs. Despite billing for extensive identical treatment allegedly performed in the same building over a six (6) month period, neither 411 Therapy nor A1 ever acknowledged that D.D. was supposedly receiving the same treatments from two separate clinics on the same day.

- 411 Therapy and New Horizon billed Allstate for purported treatment of patient D.C. (Claim No. 0461245755) on twelve (12) of the same dates of service in July and August 2018, including for identical purported application of hot/cold packs.

- On November 5, 2018, both A1 and 411 Therapy billed for allegedly providing identical self-care/home management training to patient K.P. (Claim No. 0498315167). 411 Therapy and New Horizon billed for overlapping treatment modalities to patient N.P. (Claim No. 0498315167), who was allegedly involved in the same accident as K.P., on November 12, 2018. 411 Therapy also billed for alleged physical therapy to K.P. on at the same time that K.P. was allegedly undergoing a course of physical therapy with a separate provider called Step by Step Physical Therapy LLC, including at least twice on the same days Step by Step Physical Therapy LLC billed for nearly identical treatments.

424. Identical treatment simultaneously billed for and allegedly rendered on the same date by two (2) or more defendant clinics was clearly redundant and medically unnecessary, and Allstate is not required to pay for this alleged treatment billed pursuant to a predetermined treatment protocol as opposed to prescribed based on patients' actual medical need.

## B. EXCESSIVE AND MEDICALLY UNNECESSARY MRIs

425. The defendants' predetermined treatment protocol also included excessive orders for immediate MRIs.

426. Spine & Health and First Medical ordered these MRIs because they allowed their associate, Gravity Imaging, to submit hundreds of thousands of dollars of additional charges to Allstate for imaging studies billed at absurd rates that cost very little to perform.

427.   A former Spine & Health physician assistant testified that Spine & Health had a directive to order MRIs for every new patient or any patient that had not received an MRI within the past year, regardless of the imaging's actual medical necessity.

428.   This same physician assistant confirmed that this Spine & Health directive mandated MRIs still be ordered even if the patient was improving.

429.   These MRIs were ordered almost exclusively at Gravity Imaging "because Hassan Fayad owns it."

430.   In one outrageous example, Gravity Imaging billed Allstate for nine (9) MRIs totaling $45,900 allegedly performed for patient B.S. (Claim No. TXA-0219520) in a period of just over two (2) months.

431.   For patient E.W. (Claim No. 0469870587), Gravity Imaging billed Allstate for seven (7) MRIs totaling $35,100 allegedly performed on a single date of service.

432.   Patients at issue herein have also testified as to the steps the defendants took to induce patients to undergo these ridiculous numbers of MRIs.

433.   As discussed above, patients have reported that they were paid by the defendants in exchange for undergoing MRIs at Gravity Imaging.

434.   Patients were also pressured to present to Gravity Imaging by participants in the defendants' scheme that seemed to be in positions of trust and authority.

435.   For example, patient N.C. (TXA-0228877) reported that following an initial examination at Spine & Health her doctor called her and told her to immediately go to Gravity Imaging to receive an MRI.

436.   Gravity Imaging's reliance on the *pro forma* referrals of auto accident patients from defendants Gonte, Spine & Health, and First Medical is evident from the utilization data it reported to the State of Michigan in 2018.

437.   Despite being owned by Hassan Fayad and Mirna Fayad for only approximately half of the year in 2018, 49% of patients for whom Gravity Imaging reported performing MRIs were referred by physicians associated with Spine & Health, including Gonte, Jankowski, Pribil, Ali Makki, M.D., and Jeffrey Wingate, M.D.

438.   Gonte referred 82 separate patients to Gravity Imaging in 2018, which is 67 more patients than the next highest referring provider.

439.   The MRIs ordered by Spine & Health and First Medical and billed by Gravity Imaging were to generate charges for the defendants' scheme and were not used to guide patient care.

440.   Moreover, many of the MRIs billed by Gravity Imaging were allegedly interpreted by Christopher Sweet, M.D. ("Sweet"), who was also employed by the defendants as a physician at Spine & Health.

441.   Therefore, when Sweet and Spine & Health referred patients to Gravity Imaging for MRIs, Sweet was also compensated for performing the radiologic interpretation of the scans in yet another financial incentive created by the defendants to maximize the bills submitted to Allstate.

442.   As set forth below, the defendants' practice of ordering MRIs as a matter of course based on fabricated diagnoses of radiculopathies and patients' alleged subjective pain complaints violates established standards of care for MRI testing and the bills submitted to Allstate as a result of such practice are fraudulent.

## 1.   <u>Standard of Care for MRI Testing</u>

443.   Gravity Imaging had a responsibility to ensure that MRIs were properly ordered, but it intentionally chose not to do so in order to maximize the amount of charges it could submit to Allstate.

444.   The American College of Radiology ("ACR") is the principal professional organization of radiologists, radiation oncologists, and clinical medical physicists, and it defines the practice parameters and technical standards for conducting MRI scans.

445.   According to the ACR, an MRI should only be ordered after the physician has thoroughly evaluated and examined the patient and recorded the findings in the patient's medical record.

446.   For musculoskeletal joint MRIs, a basic orthopedic examination of the applicable part of the body, including documentation of range of motion and response to provocative maneuvers, should be performed and documented in the medical record.

447.   Prior to referring a patient for an MRI to rule out damage to spinal nerve roots or intervertebral discs, a physician should perform a basic neurological examination and document the findings of such testing, including the results of muscle stretch reflexes, pathological reflexes, muscle strength testing, and sensation (tested by using a pin prick or light touching).

448.   The ACR promulgates specific "Appropriateness Criteria" rating the appropriateness of various types of imaging studies in light of a patient's presenting symptoms and history.

449.   For example, ACR Appropriateness Criteria for cervical spine imaging guides that MRIs are "usually not appropriate" as the initial study for patients with chronic pain, including when the patient has a history of trauma or prior surgery.

450.   Instead, it is "usually appropriate" to perform x-rays, and it only becomes appropriate to move to an MRI when the x-ray is abnormal, or where there

is documented "[p]ersistant pain following failure of conservative management only in select cases."

451.   Even when a cervical spine x-ray reveals degenerative changes, the ACR only guides that it "may be appropriate" (emphasis added) to perform an MRI, and again only when pain persists following failure of conservative care.

452.   The ACR states that "[p]atients with normal [cervical spine] radiographs and no neurologic signs or symptoms need no immediate further imaging."

453.   MRIs should not be ordered in violation of the ACR Practice Parameters unless there is a clinical reason in the specific case and that reason must be documented in the patient's medical record.

454.   Spine & Health and First Medical made referrals to Gravity Imaging based only on patients' subject pain complaints and without documenting a clinical reason for the MRIs ordered as required by the ACR Practice Parameters.

455.   Vague, minor, and non-specific pain complaints such as those reported by Spine & Health and First Medical are precisely the findings that the ACR Appropriateness Criteria are designed to remove from early resort to MRIs.

456.   The ACR also provides that MRI prescription forms should provide sufficient information to demonstrate the medical necessity of the MRI and allow for its proper performance and interpretation.

457.   If the prescription does not contain sufficient information to demonstrate the medical necessity of the examination and allow for its proper performance and interpretation, the radiologist should contact the referring practitioner (who should be familiar with the patient's clinic problem or question) to obtain the missing information.

458.   Only upon receiving such information is it appropriate for the radiologist to interpret the study and issue a radiology report setting forth the professional findings and interpretation.

459.   MRI findings may be misleading if not closely correlated with the patient's clinical history, clinical examination, or physiologic tests.

460.   The ACR mandates that the interpreting physician "shall have the responsibility for all aspects of the study including, but not limited to, reviewing all indications for the examination . . . ."

461.   Nevertheless, the MRIs at issue in this Complaint routinely lack any documentation of why the MRI was recommended or medically necessary, much less sufficient information to allow for proper performance and interpretation of the MRIs prescribed by referring physicians.

462.   Pursuant to the ACR guidelines, it is the responsibility of Gravity Imaging to assure that all MRIs performed are proper.

463.   Rather than perform the duties required by the ACR, Gravity Imaging routinely billed for excessive and medically unnecessary MRIs in order to increase the amount of payment sought from Allstate.

### 2.   MRIs Billed During Initial Stages of Treatment

464.   MRIs at issue herein were routinely ordered by Spine & Health and First Medical at the outset of the patient's treatment, thus evidencing that MRIs were resorted to as a matter of course regardless of each patient's unique symptoms and each patient's response to initial treatment.

465.   Such a practice is belied by medical literature stating "that unnecessary imaging may do more harm than good.  Multiple randomized controlled trials have shown that the early use of imaging for [lower back pain] is not associated with improved outcomes and may even be harmful to the patient."   Brendan J. McCullough, et al., Lumbar MR Imaging and Reporting Epidemiology: Do Epidemiologic Data in Reports Affect Clinical Management?, 262 Radiology 941, 942 (2012).

466.   Indeed, early resort to MRI has been denounced by The American College of Physicians for its "inefficiencies" and "potential harms."   Id. at 945.

467.   At the onset of a soft-tissue injury (the type of injury claimed by almost all of the patients at issue herein), an MRI should only be ordered if there are objective neurological symptoms of spinal cord or other neurological injuries,

including radiculopathy (severe back pain radiating into an extremity) or where the medical practitioner suspects the patient has suffered a fracture.

468.   Short of these circumstances, an MRI should be deferred to allow for conservative treatment to run its course.

469.   Gravity Imaging routinely billed for MRIs of patients who had only just initiated treatment.

470.   More than 50% of the patients at issue herein who allegedly underwent MRI imaging at Gravity Imaging had such imaging performed within two (2) months of their alleged motor vehicle accidents.

471.   On several occasions, Gravity Imaging billed for the purported performance of multiple MRIs just four (4) days after patients' alleged motor vehicle accidents.

472.   It is not possible for patients for whom MRIs were billed just days or weeks after their alleged motor vehicle accidents to have attempted the conservative treatment required by the ACR guidelines before resorting to MRIs.

473.   Medically unnecessary MRIs ordered and billed during initial stages of treatment in violation of established ACR guidelines are exemplified by the following representative patients:

- Patient S.P. (Claim No. 0559152772) was allegedly involved in a motor vehicle accident on August 29, 2019.  S.P. allegedly presented to Spine & Health six (6) days later, where he was immediately prescribed two (2) MRIs to be performed at Gravity Imaging.  These

MRIs were billed the very same day on September 3, 2019, before any conservative treatments could have been attempted.

- Patient A.A. (Claim No. 0552877920) was allegedly involved in a motor vehicle accident on October 25, 2018.  A.A. allegedly presented to Spine & Health six (6) days later, where he was immediately prescribed three (3) MRIs to be performed at Gravity Imaging.  These MRIs were billed by Gravity Imaging the very same day on October 31, 2018, before any conservative treatments could have been attempted.

- Patient G.T. (Claim No. 0528528359) was allegedly involved in a motor vehicle accident on December 21, 2017.   G.T. allegedly presented to Spine & Health six (6) days later, where he was immediately prescribed two (2) MRIs to be performed at Gravity Imaging.  These MRIs were billed by Gravity Imaging only two (2) days later on December 29, 2017, still only eight (8) days after G.T.'s purported motor vehicle accident and before any conservative treatments could have been attempted.

- Patient N.C. (Claim No. TXA-0228877) was allegedly involved in a motor vehicle accident on April 22, 2019.  N.C. allegedly presented to Spine & Health four (4) days later on April 26, 2019, where she was immediately prescribed two (2) MRIs to be performed at Gravity Imaging.  These MRIs were billed by Gravity Imaging the very same day on April 26, 2019, before any conservative treatments could have been attempted.

- Patient R.E. (Claim No. TXA-0227038) was involved in an alleged motor vehicle accident on March 28, 2019.  R.E. allegedly presented to Spine & Health five (5) days later on April 2, 2019, where she was immediately prescribed two (2) MRIs to be performed at Gravity Imaging.  These MRIs were billed by Gravity Imaging the very same day on April 2, 2019, before any conservative treatments could have been attempted.

474.   The patients at issue herein who received MRIs at Gravity Imaging

within the first days and weeks after their alleged motor vehicle injuries had non-

emergent medical conditions that were often "diagnosed" as nothing more than pain, not the type of fracture or neurological injury that would justify overriding the ACR's directives to attempt conservative treatment before imaging.

475.   In addition to billing for MRIs performed at the outset of patients' treatment in violation of applicable standards of care, Spine & Health also routinely ordered redundant medically unnecessary MRIs for patients each time they appeared for re-examinations to further increase Gravity Imaging's bills charged to Allstate.

476.   For example, patient M.G. (Claim No. 0551554066) allegedly presented to Spine & Health on October 8, 2018, where she was prescribed upper extremity and lower extremity MRIs that were billed by Gravity Imaging on October 24, 2018.

477.   Gravity Imaging inexplicably billed for a second, redundant upper extremity MRI two (2) days later on October 26, 2018.

478.   M.G. was allegedly re-examined on February 22, 2019, at which time two (2) additional lower extremity MRIs were ordered and billed by Gravity Imaging the same day.

479.   M.G. then allegedly returned to Spine & Health for another re-examination only four (4) days later on February 26, 2019, which was used to once again order a redundant lower extremity MRI billed by Gravity Imaging on the same day.

480. By ordering redundant, medically unnecessary MRIs at each date of service, Spine & Health generated $35,802 in charges for MRIs at Gravity Imaging related to M.G.

481. Allstate is not required to pay Gravity Imaging for MRIs billed at the outset of patients' treatment that were ordered by Gonte, Spine & Health, and First Medical as a matter of course.

### 3. **Excessive MRI Scans**

482. In addition to performing MRIs as soon as possible after an alleged accident in violation of the standard of care, Gravity Imaging also sought to maximize the amount of the charges submitted to Allstate by billing for far more MRIs than were medically necessary.

483. MRIs should be limited to the symptomatic body part and it is uncommon to order MRIs on more than one region.

484. The rarity of MRIs of multiple body parts of the same patient is confirmed by the data reported to the State of Michigan by all MRI providers in 2019, which documents that just 12.32% (111,535 of 905,103) of all patients underwent MRIs of multiple body parts during the same visit.

485. This figure includes MRIs performed at hospitals, trauma centers, cancer treatment centers, and other facilities providing treatment to traumatically injured and gravely ill patients.

486.   By comparison, in 2019, Gravity Imaging performed multiple MRIs at more than six (6) times the statewide average, with 76.52% of patients purportedly receiving multiple MRIs.

487.   Because the defendants intentionally targeted automobile insurers for excessive and medically unnecessary MRIs, the patients at issue in this Complaint received multiple MRIs at an even higher rate; Allstate was billed for MRIs of more than one body part relative to 89.93% of the patients at issue herein.  *See* Exhibit 4.

488.  The extreme number of MRIs per patient performed by Gravity Imaging is illustrated on the chart below:



489.   Out of the 149 patients at issue herein who allegedly underwent MRIs at Gravity Imaging, 105 (70.45%) patients had MRIs of three (3) or more body parts. *See* Exhibit 4.

490.   Gravity Imaging billed for five (5) separate MRIs relative to at least fourteen (14) patients, six (6) separate MRIs relative to at least seven (7) patients, and seven (7) or more MRIs relative to at least three (3) patients.  Id.

491.   Gravity Imaging never provided MRIs to patients seeking emergency diagnosis and treatment.

492.   As discussed above, Spine & Health and First Medical immediately ordering MRIs in any part of the body where auto accident patients complained of even the slightest pain fell dramatically short of ACR standards for appropriate MRIs, and led to excessive medically unnecessary bills from Gravity Imaging that Allstate is not required to pay.

493.   Gravity Imaging's billing for extreme numbers of MRIs that it could not have believed to be medically appropriate is exemplified by patient J.F. (Claim No. 0491502597), who had MRIs of her brain, cervical spine, thoracic spine, lumbar spine, and bilateral shoulders in the months prior to being referred to Gravity Imaging.

494.   Gravity Imaging nevertheless billed Allstate for an additional eleven (11) MRIs over a period of just over a month, from February 5, 2019 to March 13, 2019, including to her bilateral knees, (repeat) bilateral shoulders, bilateral ankles, bilateral hips, bilateral elbows, and (repeat) lumbar spine.

495.   The imaging of J.F.'s hips and shoulders was ordered to be performed as arthrograms (with contrast), but Gravity Imaging ignored this direction and billed for these MRIs without the contrast requested by the physician.

496.   Performing MRIs with contrast requires the presence of a licensed physician to inject the contrast dye, which Gravity Imaging did not employ.

497.   Allstate is entitled to the return of money paid for Gravity Imaging's medically unnecessary imaging ordered pursuant to the defendants' predetermined treatment protocol.

### 4.    Unlawful MRIs

498.   Gravity Imaging also billed Allstate for numerous MRIs allegedly ordered by chiropractors, including defendant Sagala, which were performed, if at all, outside of the lawful scope of chiropractic practice under the No-Fault Act.

499.   Michigan Compiled Laws § 500.3107b(b) governs reimbursable services for chiropractors and makes clear that insurers are not required to pay providers for chiropractic services that were not included in prior January 1, 2009 definition of "practice of chiropractic."

500.   The January 1, 2009 definition of "practice of chiropractic" states that the practice of chiropractic includes "the use of x-ray machines in the examination of patients for the purpose of locating spinal subluxations or misaligned vertebrae of the human spine." Mich. Comp. Laws § 333.16401(1)(iii).

501. Given the Legislature's decision to specify only **x-rays** performed for the purpose of locating spinal subluxations or misaligned vertebrae fall under the scope of permissible diagnostic imaging within the "practice of chiropractic," Michigan courts have uniformly held that any type of MRI ordered by a chiropractor is not a payable service under MCL 500.3107b(b).

502. Gravity Imaging was always aware that MRIs for which it billed Allstate were ordered by chiropractors, because (a) they needed to be ordered through prescriptions and (b) Gravity Imaging was required to collect information about the referring physician to report to the State of Michigan.

503. Allstate is not required to pay Gravity Imaging for services that were ordered and performed outside the scope of practice set by the No-Fault Act and is entitled to reimbursement for claims it was improperly induced to pay.

## C. UNNECESSARY DME

504. Another integral part of the defendants' predetermined treatment protocol was to prescribe excessive and unnecessary items of DME.

505. A former Spine & Health physician assistant testified that Hassan Fayad directed Spine & Health employees to order DME for all patients.

506. This DME directive was specifically applied to auto accident claimants to abuse the Michigan No-Fault Act:

Q:     You touched a little bit on this earlier, what was the directive on instruction or instruction with respect to durable medical equipment?

A:     If they had a claim number, find something to give them.

Q:     What does that mean?

A:     If they had a claim number, give them a cold compression device or a back brace or something that we could bill off of.

Q:     Claim number, is that with respect to - -

A:     Insurance claim number, yeah.

Q:     Was that just health insurance or auto insurance?

A:     Only auto insurance. We never billed health insurance.

507.   Much of the DME billed for by the defendants, including back braces, was counter-productive to treatment of the type of myofascial pain complaints reported by the majority of patients at issue herein.

508.   Beginning in or about May 2019, Spine & Health routinely issued pre-fabricated lumbar braces to every patient who complained of spinal pain at their initial evaluations.

509.   These lumbar braces were only issued to generate charges to Allstate and had nothing to do with a medical determination that they would improve patients' pain.

510.   Indeed, although Spine & Health routinely claimed that patients had pain in multiple body parts (in an attempt to justify the excessive MRIs, physical

104

therapy, and transportation services billed by the other defendants), it never issued similar braces to treat other spinal areas and only twice billed for allegedly issuing DME to treat patients' extremities. *See* Exhibit 7.

511.   At approximately the same time that it started billing for lumbar braces as a matter of course, Spine & Health also began writing prescriptions for medically unnecessary intermittent compression devices, which were always billed as exorbitantly-priced rentals by defendant 411 Therapy.

512.   To the extent the type of compression therapy ordered by Spine & Health and purportedly provided by devices issued by 411 Therapy is ever medically appropriate for orthopedic and/or soft tissue injuries, it is only during the acute phase of injury or in the immediate aftermath of surgery.

513.   In order to generate the maximum amount of claims for submission to Allstate, Spine & Health regularly ordered and 411 Therapy regularly issued intermittent compression devices to patients who had been in alleged accidents months prior (i.e., patients who were in the chronic rather than acute stage) and who had not undergone surgery.

514.   Moreover, to the extent cold and compression therapy is ever medically necessary, which has not been proven in studies of clinical outcomes, such treatment is only appropriate for short periods of time.

515.  411 Therapy billed Allstate for renting intermittent compression devices to patients at issue herein for months at a time, at an incredible cost of $300 per day.

516.  Despite billing thousands of dollars per patient for intermittent compression devices, Spine & Health and 411 Therapy rarely, if ever, inquired whether patients were actually using the DME, much less whether the DME was effective in relieving symptoms.

517.  411 Therapy also billed Allstate for issuing compression devices to patients who were never actually evaluated.

518.  For example, 411 Therapy billed Allstate at least $8,400 in relation to a compression device allegedly issued to patient S.R. (Claim No. 0479615683).

519.  411 Therapy submitted a prescription form on Spine & Health's letterhead that is purportedly signed by the defendants' associate Pribil, but Spine & Health never actually evaluated S.R. and could not have made a determination that a compression device was medically necessary for this patient.

520.  Beginning in December 2019, Spine & Health began ordering and 411 Therapy began billing for the purported issuance of pulsed electromagnetic field ("PEMF") devices manufactured by a company called OrthoCor Medical, Inc. ("OrthoCor").

521.   OrthoCor devices were ordered solely to generate incredible charges to Allstate, sometimes billed at more than $40,000 per device and nearly always at more than $20,000 per device.

522.   It is also inexplicable why bills were submitted to Allstate by 411 Therapy for these PEMF devices at all, as they were ordered by Spine & Health and shipped directly to patients by OrthoCor.

523.   OrthoCor devices operate using disposable pods and are designed to provide an electromagnetic field for exactly two (2) hours.

524.   Neither Spine & Health nor 411 Therapy explained to patients how to operate OrthoCor devices, and it is unclear whether the prescribing physicians were even aware of how they operate.

525.   For example, First Medical nurse practitioner Diane Campbell reported on August 19, 2020 that patient L.P. (Claim No. 0566748794) was using her OrthoCor device "for lumbar and cervical support."

526.   OrthoCor devices are not intended to and do not provide any "support"; they are only used to deliver PEMF.

527.   As with the intermittent compression devices, the defendants rarely, if ever, checked in with patients to ascertain whether they were using the OrthoCor devices or whether the devices were working.

528.   Also like intermittent compression devices, OrthoCor devices are only intended to be used for short periods of time to treat post-surgical or acute pain.

529.   Indeed, the pre-printed form submitted by 411 Therapy in an attempt to induce Allstate to pay for unnecessary OrthoCor devices expressly states that the devices are only intended to treat post-surgical and acute injuries.

530.   Spine & Health nevertheless ordered and 411 Therapy billed for issuing OrthoCor devices to patients who had not had surgery and who were well into the chronic phase of any purported injury they may have sustained.

531.   For example, patient R.B. (Claim No. 0539932664) was allegedly involved in a motor vehicle accident on March 27, 2019, but 411 Therapy did not bill Allstate for the alleged issuance of an OrthoCor device until nearly nine (9) months later, on Christmas Day, December 25, 2019.

532.   If R.B. actually had persistent symptoms nine (9) months after his alleged accident, which is doubtful, his injury was chronic and was not appropriately treated by an OrthoCor device at all.

533.   Spine & Health also billed Allstate for issuing the same DME to the same patient on multiple occasions.

534.   For example, Spine & Health billed Allstate for allegedly issuing a lumbar-sacral orthosis brace to patient R.Y. (Claim No. 0546710187) on May 28, 2019.

535.   On October 14, 2019, Spine & Health billed for allegedly issuing R.Y. an identical lumbar-sacral orthosis brace.

536.   It cannot ever be medically necessary for a patient to require multiple items of identical DME.

537.   DME that was prescribed and issued for the defendants' financial gain and not based on an individualized evaluation of medical necessity is fraudulent and non-compensable under Michigan's No-Fault Act.

**D.    UNNECESSARY URINE DRUG TESTING**

538.   Defendant Unique Lab billed Allstate for a litany of urine drug testing that was not actually performed; was medically unnecessary, unreasonable, and excessive; and was not performed in accordance with established standards of care for urine drug testing.

**1.    Medically Unnecessary Urine Drug Test Orders**

539.   A former Spine & Health physician assistant testified that Hassan Fayad issued directives for Spine & Health practitioners to order urine drug screens on patients to increase billing.

540.   This physician assistant also testified that urine specimens were collected from patient before they were ever examined by a doctor or physician at Spine & Health, which confirms that testing was not patient specific and could not have been based on an assessment of actual medical need.

109

541.   Despite Hassan Fayad's policy to order every Spine & Health patient urine drug screenings, the former physician assistant confirmed these screens were "literally used for nothing.  I wouldn't even get the results of them."

542.   Urine drug testing was ordered even when no narcotic pain medication was prescribed because "Hassan Fayad wanted more money for his company."

543.   Urine drug tests that have no bearing on patients' treatment are clinically useless and not medically necessary, and are therefore not compensable under the No-Fault Act.

544.   This physician assistant testified that she felt uncomfortable with Spine & Health's urine drug testing policies established and enforced by layperson Hassan Fayad because she did not believe they were medically necessary, but complied with them because "I was scared of losing my employment."

545.   Urine specimens that were collected at Spine & Health and First Medical pursuant to this improper policy were forwarded to associates of the defendants purported testing, including to defendant Unique Lab.

546.   All of the urine drug testing ordered by Spine & Health and First Medical and billed by Unique Lab was performed as a matter of course and without regard to medical necessity.

547.   Moreover, the urine specimens allegedly collected by Spine & Health and First Medical were rarely, if ever, subjected to less expensive screening tests

before they were sent for definitive/quantitative testing that generated thousands of dollars of charges per specimen.

548.   It is never proper to order definitive/quantitative laboratory testing unless there is a reason to suspect that a urine specimen contains unexpected drugs and analytes based on a screening test.

549.   Only when screening shows unexpected results, such as the presence of an illicit drug or a medication that was not prescribed, should confirmatory testing be performed.

550.   This standard is documented by the Substance Abuse and Mental Health Services Administration (SAMHSA), a federal agency within the Department of Health and Human Services ("HHS") that sets guidelines for clinical drug testing federal programs, and states that "[i]n clinical settings, confirmation is not always necessary.  Clinical correlation is appropriate . . . .  In addition, a confirmatory test may not be needed; patients may admit to drug use or not taking scheduled medications when told of the drug test results, negating the necessity of a confirmatory test.  However, if the patient disputes the unexpected findings, a confirmatory test should be done" (emphasis added).

551. Thus, SAMHSA confirms that, at most, only unexpected initial screening results should be confirmed in the absence of a patient-specific decision otherwise from the treating provider.

552.   The level of confirmation defendant Spine & Health and First Medical ordered and defendant Unique Lab billed for the specimens of patients undergoing pain management treatment after involvement in low-level motor vehicle accidents significantly exceeded the level of confirmation required by the Nuclear Regulatory Commission's ("NRC") policy on drug testing confirmation.

553.   Persons authorized to operate a nuclear power reactor under the scope of the NRC are required to submit to drug and alcohol testing as part of their continued duties.  10 C.F.R. § 26.31 (NRC's Fitness for Duty Program).

554.   The NRC mandates that "[s]pecimens that yield positive initial drug test results or are determined by initial validity testing to be of questionable validity must be subject to confirmatory testing by the laboratory, except for invalid specimens that cannot be tested."  10 C.F.R. § 26.31(d)(3).

555.   The NRC defines "initial drug test" as "a test to differentiate 'negative' specimens from those that require confirmatory testing."  10 C.F.R. § 26.5.

556.   Thus, the NRC does not require that confirmatory testing be performed on negative screening (i.e., initial drug test) results for persons entrusted with operating nuclear reactors.

557.   Even when presumptive screens produce unexpected results, it is not proper to immediately refer a urine specimen for more extensive testing.

558. Instead, the physician should discuss the unexpected results with the patient, and if the patient admits to drug misuse, further confirmatory testing is unnecessary.

559. Spine & Health and First Medical never addressed unexpected test results with patients through discussion, as the urine tests they ordered were only intended to generate bills to Allstate.

560. The automatic ordering of definitive urine drug testing for nearly every patient at nearly every appointment illustrates the lack of consideration of individual medical necessity for such testing.

561. In fact, Spine & Health and First Medical routinely ordered urine drug tests for patients even when the patient was not prescribed any medications, which has no medical basis.

### 2. Improper and Medically Unnecessary Urine Drug Tests

562. To the extent that Unique Lab actually performed the urine drug testing that was billed to Allstate, any such testing was inappropriate and medically unnecessary, and therefore not compensable pursuant to the No-Fault Act.

563. Nearly every purported urine drug test billed by Unique Lab claimed to test for the same dozens of drugs and analytes that were not patient specific and could not have possibly had any bearing on medical decision-making.

564.   Abusive laboratory practices, including non-patient-specific testing and the use of pre-printed forms that encourage excessive testing, have been condemned by authorities.

565.   None of the records submitted to Allstate by Unique Lab contain any indication that the physicians or nurse practitioners ordering urine drug tests made any determination as to what type of testing should be performed or what substances should be tested for.

566.   The federal government has expressly stated that it holds laboratories responsible for unnecessary testing and does not allow laboratories to blame excessive urine drug testing on the referring provider.  63 Fed. Reg. 45080 (Aug. 24, 1998).

567.   Further, the Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS") has stated that "[t]he laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill."

568.   Unique Lab rarely, if ever, submitted requisition forms to Allstate and it appears that no such forms were used for the purported testing billed by Unique Lab.

569.   No physician or testing facility can properly make a blanket determination across all patients and all dates of service as to what constitutes reasonable definitive urine drug testing in all cases.

570.   Instead, the individual provider must determine the reasonableness and necessity of urine drug testing on a patient-by-patient and visit-by-visit basis.

571.   Unique Lab billed for all of the urine drug tests at issue herein performed, if at all, without such determination as it billed for alleged tests for the same drugs and analytes for nearly every patient.  *See* Exhibit 9.

572.   Use of such a predetermined slate of tests is necessarily not patient-specific as the drugs/analytes to be tested are established prior to the patient's urine drug testing referral.

573.   By testing for the same exact substances for each patient, regardless of age, medications prescribed, comorbidities, or other factors, Unique Lab knowingly submitted bills that could not have been medically necessary for each patient's clinic condition.

574.   The OIG also guides that "[l]aboratories should take all reasonable steps to ensure that it is not submitting claims for services that are not covered, reasonable, and necessary for the beneficiary, given his or her clinical condition." *See* 63 Fed. Reg. at 45079.

575.   Instead of taking steps to ensure that they were only submitting claims for necessary urine drug testing, Spine & Health, First Medical, and Unique Lab intentionally worked to increase the number of medically unnecessary tests referred by physicians and billed to payors like Allstate.

576.   The purported urine drug tests billed by Unique Lab were also clearly medically unnecessary and not used to guide patient care in any way because Unique Lab often took several weeks, and in some cases over a month, to actually test the urine specimens forwarded by Spine & Health.

577.   Urine drug testing in the context of a pain management practice is medically appropriate only if it is performed randomly and only if the results are used to guide the physician's prescription of medications that may be susceptible to abuse or misuse.

578.   When prescriptions for medications are written but laboratory test results are not received until weeks later, it is impossible that the urine drug testing was ever actually used for patient medical care.

### 3.   Examples of Improper and Medically Unnecessary Urine Drug Testing

579.   Unique Lab's medically unnecessary and excessive urine drug testing is exemplified by the following representative patients:

- Patient M.S. (Claim No. 0582752739) was allegedly involved in a motor vehicle accident on March 5, 2020 and first presented to Spine & Health less

than two (2) weeks later on March 16, 2020.  M.S. was not prescribed any medication that was susceptible to abuse or misuse, but Spine & Health nevertheless claimed to collect a urine specimen from M.S. on that date.  The urine specimen was not transported to Unique Lab for another ten (10) days, on March 26, 2020, and Unique Lab did not generate a report of its purported findings for another eleven (11) days after that, on April 7, 2020.  Unique Lab billed Allstate $2,132.55 using twelve (12) different CPT Codes for allegedly testing the urine specimen for more than thirty (30) separate drugs and analytes.  Among the charges submitted by Unique Lab was a claim for testing three (3) or more muscle relaxants, but its laboratory report confirms that it actually only tested for one (1) muscle relaxant.  It is not possible that the urine drug test ordered and billed relative to patient M.S. was used for any proper medical purpose.

- Patient J.P. (Claim No. 0576827786) was allegedly involved in a motor vehicle accident on January 31, 2020 and first presented to Spine & Health less than a week later on February 6, 2020.  A urine specimen was allegedly collected on this date despite no indication that any medications were prescribed and no explanation of why testing was necessary or even that such testing was contemplated or ordered by the physician assistant who performed the evaluation.   The urine specimen collected on February 6, 2020 unexpectedly tested positive (eight (8) days later, on February 14, 2020) for amphetamines.  Spine & Health never altered its treatment plan based on this evidence of drug abuse or noted this abnormal result in its records.  On March 3, 2020, Spine & Health inexplicably claimed to collect another urine specimen from J.P. and again sent it to Unique Lab.  Again, there were no medications reported and again the test result was not obtained for over a week.  The urine specimens collected from J.P. had no bearing on her medical treatment and the testing performed, if at all, was not medically necessary.

- Patient D.O. (Claim No. 0582828539) was allegedly involved in a motor vehicle accident on March 31, 2020.  On May 4, 2020, Spine & Health purportedly obtained a urine specimen from D.O.  The urine specimen was forwarded to Unique Lab, but it was not received for sixteen (16) days, on May 20, 2020.  Unique Lab did not issue a report of the results of its alleged tests for another week, until May 27, 2020.  Unique Lab confirmed that there was no indication that D.O. was prescribed any medication that would justify the performance of urine drug testing.  Unique Lab claimed to perform testing of the same drugs and analytes as nearly every other patient at issue herein, but billed Allstate nearly twice as much, $3,796, without any explanation.  The

alleged testing billed by Unique Lab was never used for the medical care of D.O.

- On June 26, 2020, First Medical allegedly obtained a urine specimen from patient B.P. (Claim No. 0575201322) despite expressly reporting that the patient "declined the need for medication at this visit." The specimen was forwarded to Unique Lab where it was not tested for a week. Unique Lab claimed to perform testing of the same drugs and analytes as nearly every other patient at issue herein, all of which were negative as expected since B.P. was not prescribed any medications, and again billed Allstate $3,796.

580. Allstate is not required to pay the defendants for urine drug testing that was redundant, not patient-specific, and that is unnecessary, and is entitled to a return of monies it paid to the defendants for these medically unnecessary urine drug tests.

### E.    UNNECESSARY TRANSPORTATION

581. 4 Transport billed Allstate for purported medical transportation services that were medically unnecessary and performed, if at all, only to multiply the amount of the defendants' claims for No-Fault benefits.

582. To properly bill for medical transportation, a licensed healthcare provider must determine that an individual is disabled and unable to drive and must document this determination in the patient's medical record.

583. Once a patient is evaluated and determined disabled, the licensed healthcare provider gives the patient a disability certificate that identifies the forms of necessary assistance, including medical transportation if necessary.

584.   Defendants Spine & Health and First Medical routinely issued disability certificates claiming that patients were unable to drive, but never explained why or how patients' supposed injuries impacted their ability to drive.

585.   Indeed, Spine & Health and First Medical rarely, if ever, performed the types of orthopedic and neurological examinations that would permit them to make a determination of whether a patient was capable of driving.

586.   A former Spine & Health physician assistant testified that at Spine & Health "essentially, anyone who asked [for a disability certificate] got one."

587.   This directive to provide any patient that simply stated they did not want to work a disability certificate, including driving restrictions, came directly from defendant Gonte.

588.   Defendant 4 Transport knowingly obtained these unsupported disability certificates from Spine & Health, First Medical, and other associates of the defendants, and used them to attempt to justify their medically unnecessary purported services.

589.   Moreover, 4 Transport repeatedly billed for transportation services prior to any determination by a licensed healthcare provider that the patient required transportation services.

590. For numerous patients, 4 Transport billed for transportation to Spine & Health for the patient's first appointment before any evaluation of disability could have been performed and before a disability certificate could have been issued.

591. 4 Transport almost exclusively transported patients to clinics owned and controlled by Hassan Fayad and Mirna Fayad, including defendants 411 Therapy, 4 Ur Recovery, A1, Gravity, Spine & Health, and New Horizon.

592. 4 Transport's medically unnecessary transportation is exemplified by the following patients:

- Patient A.A. (Claim No. 0552877920) was involved in an alleged motor vehicle accident on October 25, 2018. At the time of his alleged motor vehicle accident, A.A. was employed as a driver for 4 Transport. On October 31, 2018, 4 Transport billed for transportation of A.A. to Gravity Imaging, 411 Therapy, and Spine & Health, which A.A. was referred to by his boss, Hassan Fayad. 4 Transport submitted numerous charges for alleged transportation of A.A., including charges for transporting him to an attorney's office, which is not legitimate medical transportation. A.A. also continued to drive and to work as a medical transportation driver at the same time as 4 Transport was billing for his own alleged transportation. Indeed, A.A. submitted an application for benefits to Allstate reporting that he continued to work through at least April 9, 2019. A.A. was also issued a driving citation on October 30, 2018 by the Dearborn 19th District Court, just one (1) day before A.A. was evaluated at Spine & Health and deemed "disabled" from driving.

- Patient J.W. (claim No. 0486042385) was allegedly involved in a motor vehicle accident on December 17, 2012. J.W. first reported to Spine & Health and received a disability certificate that included driving restrictions almost six (6) years later, on December 4, 2018. Well before J.W. was actually evaluated and deemed disabled from driving by Spine & Health and before any other medical provider issued J.W. a disability certificate, 4 Transport billed for purported transportation to 411 Therapy on ten (10) dates of service for which there was no

medical need, including round trip transportation to his initial appointment at 411 Therapy on November 6, 2018.

- Patient P.R. (Claim No. 0537566416) was involved in an alleged motor vehicle accident on September 1, 2018. P.R. first obtained a disability certificate from Gonte restricting her ability to drive more than six (6) months later on March 14, 2019. Well prior to being issued a disability certificate, 4 Transport billed for purported transportation of P.R. to physical therapy and Gravity Imaging on twenty (20) separate dates of service. These transportation charges all submitted before any physician had determined P.R. was unable to drive were medically unnecessary and improper.

- Patient C.P. (Claim No. 0429966293) was involved in an alleged motor vehicle accident on September 24, 2016. C.P. first obtained a disability certificate that included driving restrictions on November 3, 2016. Prior to being issued a disability certificate, 4 Transport billed for purported round trip transportation of C.P. to physical therapy on twelve (12) dates of service for which there was no medical need.

- Patient J.O. (TXA-0191048) was involved in an alleged motor vehicle accident on August 30, 2017. J.O. was never issued a disability certificate by a physician and was likewise never deemed disabled from driving, yet 4 Transport billed for round trip transportation to 411 Therapy on four (4) dates of service in November 2017 for which there was no medical need.

593. Allstate has no obligation to pay for transportation services that were medically unnecessary.

## F. UNNECESSARY INJECTION PROCEDURES

594. Defendant Spine & Health subjected its patients to a battery of unnecessary steroid injections, facet joint injections, and other injection-related services without medical justification.

595.  The performance of invasive procedures (such as injections) for the relief of pain must be based upon adequate diagnosis and legitimate medical necessity.

596.  As discussed above, examinations billed by the defendants, if they were performed at all, resulted only in boilerplate findings and treatment plans that were not adequate to support the performance of invasive procedures.

597.  Many of the injections billed by the defendants had no explanation at all and were not part of treatment plans allegedly established for the patients at issue herein.

598.  Indeed, many of the injections billed by the defendants were diagnostic in nature and should have been used to establish diagnoses such as radiculopathies, which were instead assigned to patients without basis and without performing adequate tests, as detailed above.

599.  Spine & Health employed Jankowski and James specifically for the purpose of performing injections on patients that they never actually evaluated because these procedures could be billed to Allstate at excessive rates.

600.  For example, patient E.B. (Claim No. 0474205993) was evaluated at Spine & Health on July 19, 2018 and his examination resulted in a recommendation for E.B. to continue physical therapy and then return to Spine & Health in one (1) month.

601.   Despite this recommendation, Spine & Health billed for a lumbar epidural steroid injection allegedly performed by Jankowski, who had never previously evaluated E.B., only eleven (11) days later on July 30, 2018.

602.   Without performing any reevaluation, Spine & Health then billed for another lumbar epidural steroid injection, a transforaminal lumbar epidural steroid injection, and three (3) level lumbar facet injections only seventeen (17) days later on August 16, 2018.

603.    On November 7, 2018, E.B. returned to Spine & Health for a re-examination, where Gonte again recommended that E.B. just continue physical therapy treatment and follow up in approximately one (1) month.

604.   Less than one (1) week later, Spine & Health inexplicably billed for two (2) levels of lumbar epidural steroid injections allegedly performed by Jankowksi on November 13, 2018, which was not included at all in Gonte's treatment plan.

605.   E.B. was also receiving physical therapy billed by 411 Therapy throughout this time that Spine & Health inexplicably billed for multiple injections, and notably reported a pain score of only 6/10 on July 16, 2018, which was **lower** than the pain score of 7/10 he reported at his final physical therapy appointment on October 31, 2018 following Spine & Health's battery of injections.

606.   Despite E.B.'s documented deterioration, Spine & Health still ordered a third round of injections on November 13, 2018, demonstrating that these procedures were ordered as a matter of course to generate additional charges to Allstate.

607.   Similarly, a Spine & Health physician assistant recommended that patient C.S. (Claim No. 0554181685) undergo an epidural steroid injection on February 7, 2020, despite C.S. reporting to her physical therapist the previous day that her pain was reduced from 8/10 to 4-5/10.

608.   Spine & Health billed for the alleged injection to C.S. on March 17, 2020, and reported that the procedure was performed because of C.S.'s "[n]eck and arm" and failure to respond to conservative care.

609.   Both of these purported justifications for the injection to C.S. are contradicted by prior records of Spine & Health and other treatment providers.

610.   Spine & Health also reported that C.S.'s pre-injection pain score was 9/10, which is drastically different than what C.S. reported to her physical therapist the previous day.

611.   Spine & Health also claimed that C.S. had an immediate reduction in pain, to 2/10, following the injection, but she actually reported to her physical therapist that her pain worsened to 7/10 the day after the purported injection.

612.   Spine & Health used this fabricated report of improvement to schedule and bill for a second injection to C.S. on May 5, 2020.

613.   Spine & Health and Gonte routinely conflated the injection procedures that are intended to be used for diagnostic purposes with procedures that are intended for therapeutic purposes.

614.   Spine & Health and Gonte ignored diagnostic information gleaned from previous injections, and instead persisted in recommending that patients undergo additional rounds of injections to generate bills for submission to Allstate.

615.   Consequently, patients received unjustified invasive procedures that offered little therapeutic efficacy while subjecting patients to unnecessary risks of infection.

616.   Defendants Spine & Health and Gonte also resorted to rendering injections to patients at issue in this Complaint without regard for conservative forms of treatment.

617.   Even in those instances where patients reported improvement from conservative treatment, Spine & Health and Gonte nevertheless pushed for injections to be administered while also continuing patients' excessive course of physical therapy and chiropractic treatment at the defendant clinics.

618.   Spine & Health and Gonte frequently ordered repeat injections without analyzing the efficacy of prior procedures, in derogation of established standards of care.

619.   Indeed, the defendants routinely scheduled patients for multiple injections at once, an improper practice that makes it impossible to evaluate the efficacy of the first (and subsequent) injection.

620.   Applicable standards of care direct that physicians should not perform steroid injections too frequently, usually no more than three (3) times per six (6) month period or four (4) times per year.

621.   Facet injections should not be performed more frequently than once every three (3) months.

622.   Spine & Health and Gonte disregarded these practice standards, and placed their patients in danger, to maximize the amount of bills submitted to Allstate.

623.   For example, Spine & Health billed for allegedly performing an epidural steroid injection and trigger point injections for three (3) or more muscles to patient R.P.'s (Claim No. 0449849776) lumbar and cervical spine on April 11, 2018.

624.   Gonte evaluated R.P. six (6) days later and documented that the injections resulted in only a minimal improvement in pain.

625. Despite acknowledging the injections failed to improve R.P.'s condition, Spine & Health nevertheless billed for another epidural steroid injection less than two (2) months later on June 8, 2018, which was performed well before the period required for patient safety.

626. In total, Spine & Health billed for five (5) injections to R.P. in a period of less than two (2) months.

627. Allstate has no obligation to pay for injections that were medically unnecessary and rendered contrary to applicable standards of care.

## G.   UNNECESSARY SURGICAL PROCEDURES

628. Spine & Health billed Allstate for allegedly providing assistance with surgeries performed by other participants in the defendants' "cooperative," including surgeries by ISpine and Pribil.

629. The purported use of assistants during these surgeries was never medically necessary and was done only to increase the amount of charges submitted to Allstate, including to increase the amount of the kickback payments made by Velocity, Fund V, and HMRF.

630. ISpine routinely billed for the same surgeries for which Spine & Health billed without the use of any assistants.

631. When bills were submitted for the alleged use of surgical assistants, the operative reports rarely, if ever, discussed any specific assistance rendered.

632.   Indeed, Pribil, who lives in Florida and flies to Michigan to perform surgeries one day per week to take advantage of the benefits available under the No-Fault Act, has testified that he only uses assistants during surgery so that someone is familiar with the patient to perform follow-up care since he will not be in the State to do so himself.

633.   It is never proper to submit a bill for performing surgical assistance unless such assistance is actually performed and documented and is a medically necessary service that cannot otherwise be performed by the operating room technicians.

634.   Adding surgical assistants to these procedures was a scheme devised by ISpine's practice administrator Barber for the express purpose of increasing the amount billed (and therefore his own personal profit since Barber received a "commission" [i.e., kickback] from defendants Velocity, Fund V, and HMRF for every bill factored to Velocity, Fund V, and HMRF).

635.   Moreover, the surgeries for which Spine & Health billed for assisting were not medically necessary at all.

636.   For example, Spine & Health billed for alleged assistance for a surgery performed by ISpine and Pribil on patient T.Y. (Claim No. 0557411600) on January 22, 2020 despite the fact that T.Y.'s long-term physician reported just days beforehand that he declined any intervention.

637.   Spine & Health billed for alleged assistance for a surgery performed on K.H. (Claim No. 0550821920) despite Pribil's report just two (2) weeks prior that K.H. should attempt conservative care before proceeding to surgery.

638.   Allstate is not required to pay Spine & Health for medically unnecessary surgical procedures and is entitled to a return of the monies it paid in reliance on the defendants' fraudulent submissions.

## XI.   <u>FRAUDULENT BILLING PRACTICES</u>

639.   Providers like the defendants have a responsibility to select and submit the billing code that accurately and truthfully identifies the services performed and the complexity involved in rendering those services.

640.   The defendants failed to meet this responsibility and instead submitted bills for unreasonable payments to Allstate for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra*.

641.   All of the medical records, bills, and invoices submitted to Allstate by, and on behalf of, the defendants contained CPT Codes, which are published by the AMA.

642.   The bills submitted to Allstate by the defendants were submitted on Health Insurance Claim Forms (HICF) approved by the National Uniform Claim Committee (NUCC) and referenced in the NUCC Instruction Manual.

643. The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

644. Despite the warning on the back of the HICF forms, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Allstate through interstate wires and the U.S. Mail.

## A.   FRAUDULENT UNBUNDLING

645. The Centers for Medicare and Medicaid Services ("CMS") instituted the National Correct Coding Initiative ("NCCI") to promote national correct coding methodologies and to control improper coding leading to inappropriate payment for Medicare Part B claims.

646. The NCCI contains an edit table entitled the "Column One/Column Two Correct Coding Edit Table" that identifies billing codes that should not be reported together because the services (and reimbursement) of the Column Two code is subsumed by the services (and reimbursement) for the Column One code.

647. Violation of the edits (billing a Column One code and a Column Two code on the same day for the same claimant) is known as "unbundling," which occurs when a provider bills separately for individual components of a procedure which are included in another billing code also billed for the same date of service.

648.   If a provider reports the two codes of an edit pair, the Column Two code is denied and the Column One code is eligible for payment.

649.   The defendant clinics routinely unbundled services billed to Allstate, which resulted in tens of thousands of dollars in fraudulent bills.

### 1.   Spine & Health's Fraudulent Unbundling

650.   Every charge submitted by Spine & Health for purported assistance for surgeries performed by ISpine was fraudulently unbundled.

651.   ISpine only claimed to perform (and Spine & Health only claimed to assist with) two (2) types of surgeries: cervical disc replacements and lumbar laminectomies.

652.   For cervical disc replacements, Spine & Health submitted separate bills for the alleged disc replacements discectomies, fluoroscopy, and use of a microscope.

653.   The CPT Codes used by Spine & Health to bill for disc replacements (22856 and 22858) expressly include the performance of discectomies.

654.   A discectomy is the removal of some or all of an intervertebral disc, which is obviously a necessary component of replacing an intervertebral disc.

655.   Thus, every time Spine & Health billed Allstate using a separate CPT Code for a discectomy in conjunction with a disc replacement, it was seeking

payment for a service that was already covered by a different code, which constitutes fraudulent unbundling.

656.   Indeed, the AMA coding guidelines unequivocally state that the codes used by Spine & Health to bill for discectomies (63075 and 63076) are never to be billed in conjunction with disc replacement CPT Codes.

657.   Similarly, performance of fluoroscopy and use of an operating microscope are included in the charges for disc replacements and discectomies, and are never properly billed with separate charges in addition to those procedures.

658.   Of the four (4) separate charges submitted by Spine & Health in relation to each vertebral level of every purported cervical spine surgery at issue herein, only one (1) could ever have been proper.

659.   Bills submitted by Spine & Health for purported assistance with lumbar spine procedures also included separate charges for fluoroscopy and purported use of a microscope in addition to charges for laminectomies, which were also always improper and constituted fraudulent multiple charges for the same alleged procedure.

660.   Spine & Health also routinely unbundled charges for use of surgical trays using CPT Code A4550 during injection procedures.

661.   To properly bill for surgical trays in relation to procedures performed in an office setting (like the injections billed by Spine & Health), the medical record

must explain the need for and specifically designate the supplies used, which the defendants never did.

662. Spine & Health also added a charge for hot packs to nearly every bill for injections, using CPT Code 97010.

663. CPT Code 97010 is a physical therapy code that is fraudulently unbundled when billed in conjunction with an injection procedure.

## 2. Defendant Clinics' Fraudulent Unbundling

664. 411 Therapy, 4 Ur Recovery, A1, and New Horizon each routinely submitted charges to Allstate using CPT Code 97124 ("*massage, including effleurage, petrissage and/or tapotement (stroking, compression, percussion)*") and CPT Code 97140 ("*manual therapy techniques (eg, mobilization/manipulation, manual lymphatic drainage, manual traction), 1 or more regions, each 15 minutes*") for the same patient on the same date of service. *See* Exhibits 1, 2, 3, and 6.

665. CPT Code 97124 is a Column Two code and CPT Code 97140 is a Column One code when billed for the same patient on the same date of service.

666. The submission of these codes for the same patient on the same date of service constitutes fraudulent unbundling.

667. 411 Therapy, 4 Ur Recovery, A1, and New Horizon submitted claims totaling at least $13,205 for purported massage using CPT Code 97124 on the same

dates of service they billed for purported manual therapy using CPT Code 97140, all of which constitutes fraudulent unbundling. Id.

668.   In addition to unbundling the same codes for massage and manual therapy, New Horizon further unbundled both massage (CPT Code 97124) and manual therapy (CPT Code 97140) with CPT Code 98941 chiropractic manipulation treatment ("CMT") (*"chiropractic manipulation treatment (CMT); spinal, 1-2 regions"*) allegedly performed on the same date of service.  *See* Exhibit 6.

669.   CPT Codes 97124 and 97140 are Column Two codes and CMT billed using CPT Code 98941 is a Column One code when billed for the same patient on the same date of service.

670.   New Horizon submitted claims totaling at least $18,140 for purported CMT using CPT Code 98941 on the same dates of service it billed for either purported manual therapy using CPT Code 97140 or massage using CPT Code 97124, which constitutes fraudulent unbundling. Id.

671.   All claims submitted to Allstate for CMT, massage, and manual therapy allegedly performed on the same date of service were fraudulently unbundled, and none of these unbundled claims were owed by Allstate.

### 3.   Unique Labs's Fraudulent Unbundling

672.   Unique Lab routinely unbundled urine drug testing CPT Codes billed to Allstate, which resulted in thousands of dollars in fraudulent bills.

673.   For example, for patient K.M. (Claim No. 0586402414), Unique Lab billed Allstate using HCPCS Code G0483 (*"Drug test(s), definitive, utilizing (1) drug identification methods able to identify individual drugs and distinguish between structural isomers (but not necessarily stereoisomers), including, but not limited to gc/ms (any type, single or tandem) and lc/ms (any type, single or tandem and excluding immunoassays (e.g., ia, eia, elisa, emit, fpia) and enzymatic methods (e.g., alcohol dehydrogenase)), (2) stable isotope or other universally recognized internal standards in all samples (e.g., to control for matrix effects, interferences and variations in signal strength), and (3) method or drug-specific calibration and matrix-matched quality control material (e.g., to control for instrument variations and mass spectral drift); qualitative or quantitative, all sources, includes specimen validity testing, per day; **_22 or more drug class(es)_**, including metabolite(s) if performed"* [emphasis added]) on multiple dates of service.

674.   As the emphasized language above makes clear, twenty-two individual drug classes are considered inclusive for the definitive testing entirely encompassed by HCPCS Code G0483.

675.   However, for patient K.M., Unique Lab billed Allstate using HCPCS Code G0483, a Column One code, together with at least twelve (12) separate Column Two CPT Codes that describe the individual drugs and analytes that were counted to reach the 22 or more drug classes to bill using HCPCS Code G0483.

676.   By unbundling the Column Two codes and improperly billing these twelve (12) inclusive codes as separate charges, Unique Lab fraudulently billed Allstate more than $4,556 just in relation to unbundling for patient K.M. alone.

### B.   FRAUDULENT UPCODING

677.   Physician examinations of patients are billed using CPT Codes that reflect the complexity involved in the examination and it is the responsibility of the provider to select the appropriate CPT Code for the complexity involved in the examination.

678.   As discussed above, the defendants made misrepresentations to Allstate by submitting documentation that included CPT Codes for medical services that (1) were not actually performed, (2) were not performed consistent with established standards of care, and/or (3) were wholly unwarranted and unnecessary.

679.   The bills codes submitted to Allstate by Spine & Health also consistently exaggerated the complexity of evaluations purportedly provided in order to inflate the charges submitted to Allstate.

680.   There are five (5) levels at which an office visit/examination or office consultation can be billed, with level one being the least involved examination and level five being the most complex.

681.   Initial office visits/examinations are billed using a CPT Code that starts with the numbers "9920"; reexaminations are billed using a CPT Code that starts

with the numbers "9921"; and consultations are billed using a CPT Code that starts with the numbers "9924."

682. The final number to complete each five-digit CPT Code for examinations and consultations is one (1) through five (5), depending on the complexity of the evaluation performed.

683. To properly bill using level 5 complexity codes, the physician must have taken a comprehensive history, performed a comprehensive examination, and engaged in medical decision-making of high complexity.

684. To properly bill using level 4 complexity codes, the physician must have taken a comprehensive (initial encounter) or detailed (reevaluation) history, performed a comprehensive (initial encounter) or detailed (reevaluation) examination, and engaged in medical decision-making of moderate complexity.

685. The AMA has guided that level 5 initial examinations should involve approximately 60 minutes of face-to-face time with the patient, and level 5 reexaminations should involve approximately 40 minutes of face-to-face time with the patient.

686. Level 4 examinations typically involve 45 minutes of face-to-face time, and level 4 reexaminations typically involve 25 minutes of face-to-face time.

687. Spine & Health, First Medical, and Gonte almost always submitted charges billed to Allstate for level four examinations (i.e., CPT Codes 99204 and

99214), and also billed Allstate for purported level five examinations (i.e., CPT Codes 99205 and 99215).  *See* Exhibit 7.

688.  All bills submitted using CPT Codes 99204, 99205, 99214, and 99215 as a matter of course rather than based on an independent assessment of the complexity of medical decision-making were fraudulent.

689.  Spine & Health has billed Allstate for at least 521 patient examinations since May 13, 2019.  *See* Exhibit 7.

690.  Just three (3) of these purported examinations was billed as a level 1 encounter.  Id.

691.  Only (1) of these purported examinations was billed as a level 2 encounter.  Id.

692.  Just seven (7) (1.34%) of the 521 patient examinations billed by Spine & Health were billed as level 3 encounters.  Id.

693.  Every one of Spine & Health's bills for purported initial examinations was billed as either a level 4 or 5 encounter.  Id.

694.  All but one (1) of the purported examinations billed by First Medical was billed as a level 4 encounter.  *See* Exhibit 8.

695.  To warrant a medical bill demanding payment for a level four examination, the injury/condition necessarily requires:

- moderate risk of mortality, morbidity and/or complications;

138

- <u>moderate</u> diagnoses and review of complex data; and

- the defendants to: (1) obtain <u>comprehensive</u> patient histories; (2) conduct <u>comprehensive</u> examinations; and (3) evaluate the patient (face-to-face) in an interaction lasting approximately 45 minutes.

696. To warrant a medical bill demanding payment for a level five examination, the injury/condition necessarily requires:

- <u>high</u> risk of mortality, morbidity, and/or complications;

- <u>extensive</u> diagnoses and review of complex data; and

- the defendants to: (1) obtain <u>comprehensive</u> patient histories; (2) conduct <u>comprehensive</u> examinations; and (3) evaluate the patient (face-to-face) in an interaction lasting approximately 60 minutes.

697. Spine & Health's and First Medical's examinations fall woefully short of meeting the threshold standard to bill for level four or five office visits.

698. For the patient appointments resulting in pre-printed and formulaic office records based off the predetermined treatment protocol described above, Spine & Health and First Medical uniformly and improperly upcoded bills to represent alleged complex medical evaluations.

699. Spine & Health and First Medical almost never performed detailed patient histories or detailed physical examinations, and instead used templates that resulted in all examinations consisting of pre-printed, non-patient specific language as detailed above.

700.   Spine & Health billed for purported level 4 encounters even when it was impossible that it performed any examination at all.

701.   For example, Spine & Health reported that patient M.E. (Claim No. TXA-0247586) was unable to present in person to its office on March 24, 2020 because he was exhibiting flu-like symptoms during the COVID-19 pandemic.

702.   Spine & Health nevertheless billed the encounter as a comprehensive level 4 examination despite the fact that no examination was performed and M.E.'s treatment plan was unchanged.

703.   First Medical both fraudulently upcoded its evaluations and improperly billed for alleged post-surgical treatment that was required to be included in the bill for the surgery itself.

704.   For example, First Medical submitted a bill for $450 for a purported level 4 evaluation of patient C.G. (Claim No. 0538422998) on September 28, 2020 for which the only diagnosis code was ICD Z48.02 ("Encounter for removal of sutures").

705.   The entirety of First Medical's record for its alleged September 28, 2020 encounter is copied below:

The patient presents today for suture removal after left shoulder surgery.

REVIEW OF SYSTEMS: Unchanged.

PHYSICAL EXAMINATION: Unchanged except for sutures in left shoulder.

ASSESSMENT: Suture removal.

TREATMENT PLAN: Sutures are removed today from the left shoulder. No complications. He will see Dr. Lewis for followup.

DIAGNOSIS CODES: Z48.02

706.   Not only was this encounter nowhere close to the complexity required to bill for a level 4 encounter, it was not permitted to be billed at all as it was nothing but an extension of the purported surgical treatment.

707.   Spine & Health and First Medical routinely billed for re-examinations that were claimed to be comprehensive and complex but that resulted in nothing more than a report that the patient was "unchanged."

708.   Further, Spine & Health improperly billed Allstate for multiple initial examinations of patients.

709.   For example Spine & Health billed for a level 4 initial examination of patient D.T. (Claim No. TXA-0211441) on November 5, 2019, and then submitted a second bill for an alleged level 5 initial examination only three (3) days later on November 8, 2019.

710.   New patient evaluations are generally paid at higher rates than established patient evaluations, so improperly claiming to have performed multiple initial examinations is upcoding.

141

711.   By creating medical bills that included CPT Codes for office visits and then causing such bills to be faxed and mailed to Allstate, the defendants represented to Allstate that the invoiced medical services had been performed in conformity with the AMA's CPT Code Guidelines.

712.   However, all of the bills prepared, faxed, and mailed by the defendants were submitted using fraudulent and deceptive examination CPT Codes.

713.   As such, Allstate is not obligated to pay any pending bills for office visits and is entitled to reimbursement for those office visits for which it has already tendered payment.

## XII.   EXCESSIVE AND UNREASONABLE CHARGES

714.   The defendants routinely billed Allstate at rates that were unreasonable and had no relation to the services allegedly performed.

### A.   CHARGES SUBMITTED BY GRAVITY IMAGING

#### 1.   Gravity Imaging's Representations Regarding Cost and Revenue

715.   On October 9, 2015, Gravity Imaging filed an application for a Certificate of Need ("CON") to acquire host sites on several mobile MRI routes that were owned by an entity called Horizon Imaging, LLC.

716.   The application included disclosure of financial components of the transaction, including a representation that the total project cost would be $1,456,200. *See* Exhibit 13.

717.   The itemized costs include $50,000 for acquisition, $106,200 to extend the facility lease for three (3) years, and $1,300,000 for a five (5) year lease of clinical equipment with trained staff.  Id.

718.   Gravity Imaging represented to the State of Michigan that its average charge per MRI scan would be $1,200.  Id.

719.   Gravity Imaging's CON application was approved on November 30, 2015 based on the representations submitted.

## 2.   Gravity Imaging's Charges to Allstate

720.   Gravity Imaging began regularly billing Allstate for the purported performance of MRIs of patients at issue herein on July 6, 2018, and continues to bill Allstate.  *See* Exhibit 4.

721.   Despite representing to the State of Michigan that MRIs would be charged at an average rate of $1,200, Gravity Imaging's actual charges to Allstate were far greater.

722.   Gravity Imaging has submitted the following charges for the MRIs billed to Allstate:

| MRI CPT Code Billed | CPT Code Description | Amount Billed Per MRI |
|---|---|---|
| 70551 | Brain MRI, without contrast | $5,100.00 |
| 72141 | Cervical MRI, without contrast | $5,100.00 |
| 72146 | Thoracic MRI, without contrast | $5,100.00 |
| 72148 | Lumbar MRI, without contrast | $5,100.00 |
| 73221 | Upper extremity joint MRI, without contrast | $5,100.00 |
| 73721 | Lower extremity MRI, without contrast | $4,800.00 - $5,100.00 |

143

723.   As documented above, Gravity Imaging uniformly billed Allstate at least $4,800.00 for each MRI since commencing operations.

724.   As itemized in the chart annexed hereto at Exhibit 4, Gravity Imaging has billed Allstate for 460 MRIs since July 6, 2018.

725.   Gravity Imaging billed Allstate in the amount of $2,458,200 for the 460 MRIs allegedly performed since July 6, 2018.  Id.

726.   Gravity Imaging represented to the State of Michigan that its charges for this number of MRIs would be only $552,000 (460 x $1,200).

727.   Thus, Gravity Imaging's charges to Allstate for MRIs since July 6, 2018 were nearly 4.5 times the amount it represented it would charge when it obtained its CON from the State of Michigan.

728.   It is untenable that the Michigan No-Fault Act was enacted to permit such gross exploitation of the benefits available thereunder.

729.   Indeed, such excessive charges stand in stark contrast to the established public policy in Michigan that the No-Fault Act should not increase the cost of healthcare treatment.

730.   Gravity Imaging's charges are not and were not reasonable and the defendants cannot sustain their burden of proving otherwise.

### 3.    Gravity Imaging's MRI's Charges Far Exceeded the Amounts Paid by Other Michigan Payors

731.   In addition to its charges being unreasonable and excessive, Gravity Imaging's charges are also grossly excessive when compared to other prominent Michigan payors.

732.   For example, Medicare paid for MRIs performed in Macomb, Oakland, and Wayne counties at the following amounts:

|  | 2015A | 2015B | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| CPT Code 70551 | $230.15 | $231.30 | $232.01 | $234.22 | $236.32 |
| CPT Code 72141 | $244.06 | $224.52 | $225.73 | $228.00 | $229.91 |
| CPT Code 72146 | $223.40 | $224.52 | $225.73 | $228.35 | $230.26 |
| CPT Code 72148 | $223.33 | $223.44 | $224.66 | $227.29 | $229.91 |
| CPT Code 73221 | $235.81 | $236.99 | $237.80 | $240.78 | $242.67 |
| CPT Code 73721 | $325.45 | $236.63 | $238.16 | $240.42 | $242.67 |

733.   Michigan Medicaid paid for MRIs at the following amounts:

|  | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| CPT Code 70551 | $127.77 | $128.37 | $129.16 | $129.76 |
| CPT Code 72141 | $124.01 | $124.80 | $125.60 | $126.19 |
| CPT Code 72146 | $124.01 | $124.80 | $125.79 | $126.39 |
| CPT Code 72148 | $123.22 | $124.21 | $125.20 | $126.19 |
| CPT Code 73221 | $130.75 | $131.54 | $132.73 | $133.32 |
| CPT Code 73721 | $130.75 | $131.74 | $132.53 | $133.32 |

145

734.   The Michigan workers' compensation program paid MRIs at the following amounts:

|  | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| **CPT Code 70551** | $321.48 | $298.30 | $300.36 | $304.95 |
| **CPT Code 72141** | $319.35 | $290.21 | $292.34 | $296.70 |
| **CPT Code 72146** | $319.35 | $290.21 | $292.79 | $297.16 |
| **CPT Code 72148** | $319.99 | $288.84 | $291.43 | $296.70 |
| **CPT Code 73221** | $334.04 | $305.46 | $308.47 | $312.95 |
| **CPT Code 73721** | $334.51 | $305.92 | $308.02 | $312.95 |

735.   These payment amounts are indicative of the range of what constitutes a reasonable charge for MRIs.

736.   Gravity Imaging's charges are well outside this range and the spectrum of reasonableness and the defendants cannot sustain their burden of proving otherwise.

## B.   EXCESSIVE AND UNREASONABLE TRANSPORTATION CHARGES

737.   The transportation charges submitted by 4 Transport to Allstate are unreasonable and excessive.

738.   4 Transport did not use medical or specialized vehicles, but rather just used normal vehicles to transport (if at all) patients.  In other words, there was nothing unique or special about the transportation billed by 4 Transport.

739.   For numerous patients at issue herein, 4 Transport billed Allstate $35 and $40 pick-up and drop off fees, plus $3.50 to $4.50 per mile.

740.   4 Transport billed these unreasonable amounts even when they transported multiple patients in the same vehicle at the same time.

741.   For example, patients L.P. (Claim No. 0449849776) and R.P. (Claim No. 0449849776) were involved in the same motor vehicle accident and allegedly received round trip transportation together from their home to 411 Therapy billed by 4 Transport.

742.   4 Transport billed $4.50 per mile and $35 pick-up and drop off fees charged to both patients despite the patients being transported together on each date of service, which produced more than $47,000 in charges.

743.   The charges for transportation services submitted by 4 Transport are particularly unreasonable when compared to pricing from taxicab or ridesharing services for the same distance.

744.   For example, 4 Transport submitted bills to Allstate for patient J.T. (Claim No. 0466622537) charging a $35 pick-up fee and a total mileage charge of $306.60 ($3.50 per mile) for a $376.60 total charge for round trip transportation from her home to 411 Therapy and Spine & Health on October 4, 2019.

745.   These rates are hundreds of dollars more than the cost to take an application-based ride-hailing service, such as Uber or Lyft, or a roundtrip taxi.

746.   J.T. could have obtained transportation in a taxi, with 15% tip, to 411 Therapy for $49.27 and to Spine & Health for $48.88.

747.   If J.T. were to ride as a single passenger using Uber, her estimated fare would be $20.73 to 411 Therapy and $25.18 to Spine & Health in each direction.

748.   If J.T. were to ride as a single passenger using Lyft, her estimated fare would be $30-$35 to 411 Therapy and $35-$42 to Spine & Health in each direction.

749.   These charges are particularly outrageous considering 4 Transport transported multiple passengers at the same time.

750.   4 Transport billed excessive and unreasonable rates for transportation services and it cannot sustain its burden of proving otherwise.

### C.   EXCESSIVE AND UNREASONABLE DME CHARGES

751.   In addition to being unlicensed, medically unnecessary, and issued contrary to applicable standards of care, as discussed *supra*, items of DME billed by Spine & Health and 411 Therapy were charged at unreasonable rates.

752.   As discussed above, the predetermined treatment protocol used by the defendants involved billing for the issuance of DME, including a variety of braces, PEMF devices, and compression devices.

753.   All of the DME billed by Spine & Health and 411 Therapy was charged at outrageous prices many times higher than the actual cost of these items.

754.   411 Therapy's outrageous charges for PEMF and compression devices were particularly egregious considering 411 Therapy is a physical therapy clinic that does not possess a license to issue DME.

755.   For example, patient E.A. (Claim No. 0570990580) first reported to 411 Therapy on December 23, 2019 and was immediately issued a compression device, which was "rented" to her by 411 Therapy at a price of $300 per day.

756.   In less than one (1) month, 411 Therapy billed Allstate $300 per day on twenty four (24) separate dates of service for the rented compression device, which generated an outrageous $7,200 by January 17, 2020.

757.   Without performing any re-examination, 411 therapy then billed for a PEMF device, which together with separate charges for "supplies" and "delivery" was billed for an outrageous $40,950.

758.   Even after E.A. was allegedly issued this separate PEMF device, 411 Therapy still billed Allstate $2,100 for another purported week of rental of the compression device.

759.   For numerous patients, Spine & Health charged Allstate $350 for a back brace using HCPCS Code L0631.

760.   This same type of brace can be purchased on Amazon for $60.00:

Alpha Medical Pain Relieving Back Brace, Lumbo-Sacral Orthosis Corset, Spinal Decompression, LSO, L0631 / L0648, Universal Back Support
by Alpha Medical
★★★★☆ ∨   15 customer reviews
Amazon's Choice for "lso back brace"

Price: $60.00 & FREE Shipping. Details

761. DME charged at nearly a six (6) times mark up of its publically available price cannot be considered a "reasonable" charge, and Spine & Health cannot sustain its burden of proving otherwise.

762. Allstate is not required to pay Spine & Health and 411 Therapy for DME fraudulently billed pursuant to a predetermined treatment protocol, or charged for more than reasonable and customary rates, and is entitled to the return of all sums paid due to the fraudulent issuance of DME by Spine & Health and 411 Therapy.

## XIII. MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A. MISREPRESENTATIONS BY THE DEFENDANTS

763. To induce Allstate to pay promptly their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they referred and billed for were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

764. Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products,

services and accommodations for an injured person's care, recovery, or rehabilitation." Mich. Comp. Laws § 500.3107(1)(a).

765.   Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]." Mich. Comp. Laws § 500.3157(1).

766.   Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

767.   There are no less than seventeen (17) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

a.   411 Therapy, 4 Ur Recovery, A1, 4 Transport, New Horizon, Spine & Health, Unique Lab, Hassan Fayad, Mirna Fayad, Gonte, Sagala, and Carulla billed Allstate for treatment and services that were not actually provided.

b.   The defendants made cash payment kickbacks and other improper inducements to lure patients to undergo medically unnecessary treatments that the patients did not need, did not seek out on their own, and would not have undergone but for the improper inducements.

c.   Velocity, Fund V, and HMRF paid kickbacks to brokers (like Barber) to incentivize unnecessary treatment and referrals, all of which was billed to Allstate, but was not medically necessary nor lawful since the treatment and referrals were made by laypersons.

d.      The defendants engaged in financial *quid pro quo* relationships with other medical providers to improperly incentivize referrals of patients into their network.

e.      The defendants illegally solicited patients for unnecessary treatment and engaged in *quid pro quo* relationships with each other.   The defendants utilized tow truck drivers, runners, police reports, hospitals, and telephonic solicitation to identify and recruit individuals who claimed to be in motor vehicle accidents to receive unnecessary treatment and intentionally sought out patients who did not require medical care and would not have presented for the same but for the unlawful solicitation.   The defendants' methods of obtaining patients did not include considerations of medical necessity and allowed individuals with no medical training to control patients' treatment.

f.      The defendants used an improper predetermined treatment protocol, implemented by use of pre-printed and boilerplate purported examination findings, to order excessive physical therapy, chiropractic treatment, occupational therapy, injections, surgical procedures, DME, urine drug testing, medications, and MRIs.   This predetermined protocol is confirmed by the identical purported findings and treatment plans ordered for patients at issue in this Complaint, which have no relationship to medical necessity or any patient-specific considerations.

g.      Spine & Health, First Medical, and Gonte indiscriminately referred patients for physical therapy, chiropractic treatment, and occupational therapy at the defendant clinics without any individual determination of medical necessity, and without any evaluation of the efficacy of such treatment.

h.      Spine & Health, First Medical, and Gonte referred patients for MRIs, 411 Therapy and Hassan Fayad pressured patients to receive MRIs, and Gravity Imaging billed for MRIs that were medically unnecessary and performed in violation of applicable standards of care in furtherance of the scheme to bill Allstate for as many ancillary services as possible, and not based on the individual needs of patients.

i.      Gravity Imaging submitted bills to Allstate seeking payment for medically unnecessary MRIs that were ordered as a matter of course at

the outset of treatment and were excessive in number in violation of the standard of care.

j.     Spine & Health, 411 Therapy, Gonte, Hassan Fayad, and Mirna Fayad submitted bills to Allstate for unlawful and unlicensed treatment and services, including submitting bills for unlicensed issuance of DME. Allstate is not required to pay the defendants for unlawful treatment that violated Michigan laws and regulations.

k.     Spine & Health and Gonte ordered and billed for medically unnecessary injections and surgical procedures in violation of applicable standards of care.

l.     Spine & Health and Gonte fraudulently submitted claims for payment to Allstate for supplies that are necessarily incident to the procedure and cannot be separately billed.

m.     Spine & Health, First Medical, and Gonte fraudulently upcoded office visits, as the vast majority of the office visits billed to Allstate were for level four or level five even though the office visits did not meet the criteria set by the AMA to bill at such high levels.  When done intentionally, as the defendants did, upcoding constitutes a fraudulent billing practice.

n.     Spine & Health, 411 Therapy, 4 Ur Recovery, A1, New Horizon, Gonte, Hassan Fayad, Mirna Fayad, Sagala, and Carulla submitted claims using multiple CPT codes to describe the same procedure allegedly performed, which is a fraudulent billing practice known as unbundling.

o.     4 Transport, Mirna Fayad, and Hassan Fayad submitted charges to Allstate for medically unnecessary transportation before the patient had ever been evaluated by any physician or obtained any disability certificate disabling the patient from driving.

p.     Spine & Health, 4 Transport, 411 Therapy, Gonte, Mirna Fayad, and Hassan Fayad submitted charges to Allstate at amounts that were excessive and unreasonable for nearly all services at issue herein, including MRIs, transportation, and DME.

q.   Spine & Health, First Medical, Unique Lab, Gonte, Mirna Fayad, and Hassan Fayad ordered and billed for urine drug testing that was excessive, predetermined, medically unnecessary, and not actually used in any way to guide patient care or medical decision-making.

768.   As detailed *supra*, the defendants frequently violated established standards of care, treated excessively, and rendered treatment without basis or adequate substantiation.

769.   If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

770.   The foregoing facts – billing for services not rendered, unlawfully soliciting patients, paying kickbacks, using a predetermined treatment protocol to inflate charges, and misrepresenting the necessity of treatment and testing – were not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

771.   Allstate had and has no contractual relationship with any of the defendants at all, including with respect to the claims at issue herein, and had no access to information or documents exposing the defendants' fraudulent conduct until it conducted the investigation that led to the filing of this action.

772.   Unlike Allstate, Velocity, Fund V, HMRF, and NHF did have contracts with the defendant clinics and access to the defendants' records and operations so knew about the defendants' fraudulent practices, yet Velocity, Fund V, HMRF, and NHF still bankrolled the defendant clinics (giving them needed liquidity to continue

the scheme to defraud detailed herein) and substantively contributed to the operation of the defendant clinics, including submitting bills to insurers like Allstate and assisting with collection efforts.

773. Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment and testing allegedly provided by the defendants unnecessary and unlawful.

774. The fact of violations of medical standards is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 through 9.

775. Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act faxed and mailed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

776. Moreover, each HICF submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

777.   Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via the interstate wires and the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, testing, procedures, and ancillary services for which they billed Allstate.

778.   As the defendants did not render lawful and reasonably necessary medical treatment and testing, and misrepresented the treatment and testing purportedly performed, each bill and accompanying documentation faxed or mailed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

### B.   ALLSTATE'S JUSTIFIABLE RELIANCE

779.   The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

780.   At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of services allegedly provided and referred by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under the No-Fault Act.

781.   These misrepresentations include submitting false medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of medical treatment, testing, and services in order to seek payment under Michigan's No-Fault Act.

782. Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

783. Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

784. In reliance on the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

785. Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services billed.

786. As a result, Allstate has paid in excess of $876,936 to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for payment under the Michigan No-Fault Act.

## XIV. MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

787. As discussed above, the referrals, treatment, and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

788.   The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibits 1 through 9, was to collect No-Fault benefits to which the defendants were not entitled because the medical services rendered, if at all, were a product of unlawful solicitation, unlawful kickbacks, were not necessary and were not lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

789.   This objective necessarily required the submission of claims for payment to Allstate.

790.   The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service or sent through faxes over interstate wires.

791.   All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through interstate wires or the U.S. Mail.

792.   All medical records and bills submitted through interstate wires by the defendants were faxed from the defendants in Michigan to Allstate in Iowa.

793.   Allstate received all medical records and bills faxed to it by the defendants in Iowa.

794.   Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim, insurance payments, and the return of the cancelled checks.

795.   It was foreseeable to the defendants that faxing bills and medical records to Allstate would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Allstate.

796.   Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

797.   The fraudulent medical billing scheme detailed herein generated thousands of mailings and faxes.

798.   A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 14.

799.   As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be submitted to Allstate via fax or mail related to each exemplar patient discussed in this Complaint.

800.   It was within the ordinary course of business for 411 Therapy, 4 Ur Recovery, A1, Gravity Imaging, 4 Transport, New Horizon, Spine & Health, First

Medical, and Unique Lab to submit claims for No-Fault payment to insurance carriers like Allstate through interstate wires and the U.S. Mail.

801.   Moreover, the business of billing for medical services by each of the defendant clinics at issue herein is regularly conducted by fraudulently seeking payment to which each defendant clinic is not entitled through the use of fraudulent communications sent via intestate wires and the U.S. Mail.

802.   In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for each of the defendants.

803.   The defendant clinics, at the direction and with the knowledge of their owners and managers and Velocity, Fund V, HMRF, and NHF, continue to submit claims for payment to Allstate and, in some instances, continue to commence litigation against Allstate seeking to collect on unpaid claims.

804.   Thus, the defendants' commission of mail and wire fraud continues.

805.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

806.   As several of the defendants named herein agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the

Michigan No-Fault Act, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

807.   Allstate reasonably relied on the submissions it received from 411 Therapy, 4 Ur Recovery, A1, Gravity Imaging, 4 Transport, New Horizon, Spine & Health, First Medical, and Unique Lab including the representative submissions set out in Exhibits 1 through 9 annexed hereto and identified in the exemplar claims above.

808.   As the defendants agreed to pursue the same criminal objective (namely, mail and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XV.   DAMAGES

809.   The pattern of fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

810.   Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $876,936.

811.   Exhibits 15 through 22 annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to and for the benefit of the defendants by date, payor, patient claim number, check number, and amount.

812.   Exhibit 15  (411 Therapy), 16 (4 Ur Recovery), 17 (Gravity Imaging), 18 (4 Transport), 19 (New Horizon), 20 (Spine & Health), 21 (First Medical), and 22 (Unique Lab) annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to the defendants by date, payor, patient claim number, check number, and amount.

813.   Allstate's claim for compensatory damages, as set out in Exhibits 15 through 22, does not include payment made with respect to any Assigned Claim Facility/Michigan Automobile Insurance Placement Facility claimant.

814.   Every payment identified in Exhibits 15 through 22 was made by Allstate alone and Allstate has not been reimbursed for any of the payments itemized in Exhibits 15 through 22.

815.   Moreover, every payment identified in Exhibits 15 through 22 derives from a check sent by Allstate to the defendants through the U.S. Mail.

816.   As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only faxed and mailed medical records and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

817.   Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed and faxed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

818.   Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XVI.  CAUSES OF ACTION

### COUNT I
### VIOLATION OF 18 U.S.C. § 1962(c)
### (411 Therapy Enterprise)
### Against 4 Ur Recovery Therapy LLC, A1 Occupational Therapy LLC, Gravity Imaging, LLC, 4 Transport Inc., New Horizon Chiropractic PLLC, Spine & Health PLLC, First Medical Group, PLLC, 4 Health Management LLC, Velocity MRS – Fund IV, LLC, Velocity MRS – Fund V, LLC, HMRF – Fund III, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.

819.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

820.   411 Therapy constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

821.   In connection with each of the claims identified in the within Complaint, 4 Ur Recovery, A1, Gravity Imaging, 4 Transport, New Horizon, Spine & Health, First Medical, 4 Health, Velocity, Fund V, HMRF, Hassan Fayad, Mirna

Fayad, Gonte, Sagala, and Carulla ("Count I defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by 411 Therapy, or knew that such false medical documentation would be faxed and mailed in the ordinary course of 411 Therapy's business, or should have reasonably foreseen that the mailing of such false medical documentation by 411 Therapy would occur, in furtherance of the Count I defendants' scheme to defraud.

822. The Count I defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 14.

823. As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by 411 Therapy, which they knew would be billed by 411 Therapy, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

824. Hassan Fayad and Mirna Fayad owned and managed 411 Therapy and were responsible for all actions taken by 411 Therapy and its staff.

825. Carulla was responsible for the excessive, medically unnecessary physical therapy billed by 411 Therapy, if treatment was rendered at all.

164

826.    4 Transport was responsible for transporting patients to 411 Therapy for unnecessary treatment, which allowed 411 Therapy to submit bills to Allstate.

827.    Hassan Fayad, Mirna Fayad, and 4 Health were responsible for the illegal solicitation and inducement of patients and improper referrals that resulted in unlawful and unnecessary treatment by 411 Therapy that was billed to Allstate.

828.    4 Ur Recovery, A1, New Horizon, Spine & Health, First Medical, Gonte, and Sagala made and received patient referrals to and from 411 Therapy that allowed 411 Therapy to continue billing Allstate and falsely giving the appearance of injury.

829.    Gravity Imaging billed Allstate for medically unnecessary MRIs, which were used to create the appearance that 411 Therapy was performing lawful and necessary treatment to the patients at issue herein and the false appearance that patients needed treatment.

830.    Velocity, Fund V, and HMRF perpetuated and financed 411 Therapy's medically unnecessary and unlawful treatment by bankrolling it by purchasing accounts receivable on claims that they knew were fraudulent and by assisting 411 Therapy with its operation.

831.    The Count I defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury

165

and permitted 411 Therapy to continue providing unlawful and medically unnecessary treatment, if provided at all.

832.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to 411 Therapy for the benefit of the Count I defendants that would not otherwise have been paid.

833.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

834.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (411 Therapy Enterprise)
**Against 4 Ur Recovery Therapy LLC, A1 Occupational Therapy LLC, Gravity Imaging, LLC, 4 Transport Inc., New Horizon Chiropractic PLLC, Spine & Health PLLC, First Medical Group, PLLC, 4 Health Management LLC, Velocity MRS – Fund IV, LLC, Velocity MRS – Fund V, LLC, HMRF – Fund III, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.**

835.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

836.   Defendants 4 Ur Recovery, A1, Gravity Imaging, 4 Transport, New Horizon, Spine & Health, First Medical, 4 Health, Velocity, Fund V, HMRF, Hassan Fayad, Mirna Fayad, Gonte, Sagala, and Carulla ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of 411 Therapy.

837.   The Count II defendants each agreed to further, facilitate, support, and operate the 411 Therapy enterprise.

838.   As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

839.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of 411 Therapy even though 411 Therapy was not eligible to collect such payments by virtue of its unlawful conduct.

840.   The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

841.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count II defendants' unlawful conduct described herein.

842.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>**COUNT III**</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(4 Ur Recovery Enterprise)**
**Against 411 Help, LLC, Gravity Imaging, LLC, 4 Transport Inc., New Horizon Chiropractic PLLC, Spine & Health PLLC, First Medical Group, PLLC, 4 Health Management LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.**

843.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

844.   4 Ur Recovery constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

845.   In connection with each of the claims identified in the within Complaint, 411 Therapy, Gravity Imaging, 4 Transport, New Horizon, Spine & Health, First Medical, 4 Health, Hassan Fayad, Mirna Fayad, Gonte, Sagala, and Carulla ("Count III defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by 4 Ur Recovery, or knew that such false medical documentation would be faxed and mailed in the ordinary course of 4 Ur Recovery's business, or should have reasonably foreseen that the mailing of such

false medical documentation by 4 Ur Recovery would occur, in furtherance of the Count III defendants' scheme to defraud.

846. The Count III defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 14.

847. As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by 4 Ur Recovery, which they knew would be billed by 4 Ur Recovery, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

848. Hassan Fayad and Mirna Fayad owned and managed 4 Ur Recovery and were responsible for all actions taken by 4 Ur Recovery and its staff.

849. Carulla was responsible for the excessive, medically unnecessary physical therapy billed by 4 Ur Recovery, if treatment was rendered at all.

850. 4 Transport was responsible for transporting patients to 4 Ur Recovery for unnecessary physical therapy, which allowed it to bill Allstate.

851. Hassan Fayad, Mirna Fayad, and 4 Health were responsible for the illegal solicitation and inducement of patients and improper referrals that resulted in unlawful and unnecessary treatment by 4 Ur Recovery that was billed to Allstate

852.   411 Therapy, New Horizon, Spine & Health, First Medical, Gonte, Sagala, and Carulla made and received patient referrals to and from 4 Ur Recovery that allowed 4 Ur Recovery to continue billing Allstate and falsely giving the appearance of injury.

853.   Gravity Imaging billed Allstate for medically unnecessary MRIs, which were used to create the appearance that 4 Ur Recovery was performing lawful and necessary treatment to the patients at issue herein and the false appearance that patients needed treatment.

854.   The Count III defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted 4 Ur Recovery to continue providing unlawful and medically unnecessary treatment, if provided at all.

855.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to 4 Ur Recovery for the benefit of the Count III defendants that would not otherwise have been paid.

856.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

857.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason

of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
### VIOLATION OF 18 U.S.C. § 1962(d)
### (4 Ur Recovery Enterprise)
### Against 411 Help, LLC, Gravity Imaging, LLC, 4 Transport Inc., New Horizon Chiropractic PLLC, Spine & Health PLLC, First Medical Group, PLLC, 4 Health Management LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.

858.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

859.   Defendants 411 Therapy, Gravity Imaging, 4 Transport, New Horizon, Spine & Health, First Medical, 4 Health, Hassan Fayad, Mirna Fayad, Gonte, Sagala, and Carulla ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of 4 Ur Recovery.

860.   The Count IV defendants each agreed to further, facilitate, support, and operate the 4 Ur Recovery enterprise.

861.   As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

862.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of 4 Ur Recovery even though 4 Ur Recovery was not eligible to collect such payments by virtue of its unlawful conduct.

863.   The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

864.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count IV defendants' unlawful conduct described herein.

865.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count IV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
### VIOLATION OF 18 U.S.C. § 1962(c)
### (A1 Enterprise)
**Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, 4 Transport Inc., Spine & Health PLLC, 4 Health Management LLC, Velocity MRS – Fund V, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.**

866.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

867.   A1 constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

868. In connection with each of the claims identified in the within Complaint, 411 Therapy, 4 Ur Recovery, 4 Transport, 4 Health, Spine & Health, Fund V, Hassan Fayad, Mirna Fayad, Gonte, Sagala, and Carulla ("Count V defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by A1, or knew that such false medical documentation would be faxed and mailed in the ordinary course of A1's business, or should have reasonably foreseen that the mailing of such false medical documentation by A1 would occur, in furtherance of the Count V defendants' scheme to defraud.

869. The Count V defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 14.

870. As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by A1, which they knew would be billed by A1, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

871. Hassan Fayad and Mirna Fayad owned and controlled A1 and were responsible for all actions taken by A1 and its staff.

872. 4 Transport was responsible for transporting patients to A1 for unnecessary occupational therapy, which allowed it to bill Allstate.

873. 411 Therapy, 4 Ur Recovery, Spine & Health, Gonte, Sagala, and Carulla made and received patient referrals to and from A1 that allowed A1 to continue billing Allstate and falsely giving the appearance of injury.

874. Hassan Fayad, Mirna Fayad, and 4 Health were responsible for the illegal solicitation of patients and improper referrals that resulted in unlawful and unnecessary treatment by A1 that was billed to Allstate.

875. Fund V perpetuated A1's medically unnecessary and unlawful treatment by bankrolling it by purchasing accounts receivable to claims that it knew were fraudulent and by assisting A1 with its operation.

876. The Count V defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted A1 to continue providing unlawful and medically unnecessary treatment, if provided at all.

877. The activities alleged in this Complaint had the direct effect of causing Allstate to incur costs related to the review of claims caused to be submitted by the Count V defendants.

878. The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

879. By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
## VIOLATION OF 18 U.S.C. § 1962(d)
### (A1 Enterprise)
**Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, 4 Transport Inc., Spine & Health PLLC, 4 Health Management LLC, Velocity MRS – Fund V, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.**

880. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

881. Defendants 411 Therapy, 4 Ur Recovery, 4 Transport, 4 Health, Spine & Health, Fund V, Hassan Fayad, Mirna Fayad, Gonte, Sagala, and Carulla ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of A1.

882. The Count VI defendants each agreed to further, facilitate, support, and operate the A1 enterprise.

883. As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

884.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of A1 even though A1 was not eligible to collect such payments by virtue of its unlawful conduct.

885.   The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

886.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has incurred costs to review and adjust the claims submitted as a result of the Count VI defendants' unlawful conduct described herein.

887.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Gravity Imaging Enterprise)
**Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, 4 Transport Inc., New Horizon Chiropractic PLLC, Spine & Health PLLC, First Medical Group, PLLC, 4 Health Management LLC, Velocity MRS – Fund IV, LLC, HMRF – Fund III, LLC, National Health Finance DM, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.**

888.  Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

889.  Gravity Imaging constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

890.  In connection with each of the claims identified in the within Complaint, 411 Therapy, 4 Ur Recovery, 4 Transport, New Horizon, Spine & Health, First Medical, 4 Health, Velocity, HMRF, NHF, Hassan Fayad, Mirna Fayad, Gonte, Sagala, and Carulla ("Count VII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Gravity Imaging, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Gravity Imaging's business, or should have reasonably foreseen that the mailing of such false medical documentation by Gravity Imaging would occur, in furtherance of the Count VII defendants' scheme to defraud.

891.  The Count VII defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates,

including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 14.

892.   As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Gravity Imaging, which they knew would be billed by Gravity Imaging, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

893.   Hassan Fayad and Mirna Fayad owned and controlled Gravity Imaging and were responsible for all actions taken by Gravity Imaging and its staff.

894.   Hassan Fayad, Mirna Fayad, and 4 Health were responsible for the illegal solicitation and inducement of patients and improper referrals that resulted in unlawful and unnecessary imaging billed by Gravity Imaging.

895.   Spine & Health, First Medical, New Horizon, Gonte, and Sagala were responsible for the MRI prescriptions that allowed Gravity Imaging to submit bills to Allstate for medically unnecessary imaging.

896.   4 Transport was responsible for transporting patients to Gravity Imaging for unnecessary imaging.

897.   411 Therapy, 4 Ur Recovery, and Carulla billed Allstate for medically unnecessary treatment that was used to create the appearance that Gravity Imaging's

MRIs were used to guide patient treatment and directed patients to present for medical evaluations that led to prescriptions for the MRIs billed by Gravity Imaging.

898. Velocity, HMRF, and NHF perpetuated Gravity Imaging's medically unnecessary and unlawful services by bankrolling it by purchasing accounts receivable on claims that they knew were fraudulent and by assisting Gravity Imaging with its operation.

899. The Count VII defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Gravity Imaging to continue providing unlawful and medically unnecessary MRIs, if provided at all.

900. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Gravity Imaging for the benefit of the Count VII defendants that would not otherwise have been paid.

901. The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

902. By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them,

and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Gravity Imaging Enterprise)
### Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, 4 Transport Inc., New Horizon Chiropractic PLLC, Spine & Health PLLC, First Medical Group, PLLC, 4 Health Management LLC, Velocity MRS – Fund IV, LLC, HMRF – Fund III, LLC, National Health Finance DM, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.

903.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

904.    Defendants 411 Therapy, 4 Ur Recovery, 4 Transport, New Horizon, Spine & Health, First Medical, 4 Health, Velocity, HMRF, NHF, Hassan Fayad, Mirna Fayad, Gonte, Sagala, and Carulla ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Gravity Imaging.

905.    The Count VIII defendants each agreed to further, facilitate, support, and operate the Gravity Imaging enterprise.

906.    As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

907.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Gravity Imaging even though Gravity Imaging was not eligible to collect such payments by virtue of its unlawful conduct.

908.   The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

909.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count VIII defendants' unlawful conduct described herein.

910.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (4 Transport Enterprise)
### Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, A1 Occupational Therapy LLC, Gravity Imaging LLC, New Horizon Chiropractic PLLC, Spine & Health PLLC, First Medical Group, PLLC, 4 Health Management LLC, Velocity MRS – Fund IV, LLC, Velocity MRS – Fund V, LLC, HMRF – Fund III, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.

911.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

912.   4 Transport constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

913.   In connection with each of the claims identified in the within Complaint, 411 Therapy, 4 Ur Recovery, A1, Gravity Imaging, New Horizon, Spine & Health, First Medical, 4 Health, Velocity, Fund V, HMRF, Hassan Fayad, Mirna Fayad, Gonte, Sagala, and Carulla ("Count IX defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by 4 Transport, or knew that such false medical documentation would be faxed and mailed in the ordinary course of 4 Transport's business, or should have reasonably foreseen that the mailing of such false medical documentation by 4 Transport would occur, in furtherance of the Count IX defendants' scheme to defraud.

914.   The Count IX defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates,

182

including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 14.

915.   As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by 4 Transport, which they knew would be billed by 4 Transport, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

916.   Hassan Fayad and Mirna Fayad owned and controlled 4 Transport and was responsible for all actions taken by 4 Transport and its staff.

917.   Spine & Health, First Medical, New Horizon, Gonte, and Sagala were responsible for issuing patients medically unnecessary disability certificates that included driving restrictions as a matter of course, which allowed 4 Transport to submit bills to Allstate for medically unnecessary transportation.

918.   411 Therapy, 4 Ur Recovery, A1, Spine & Health, First Medical, Gravity Imaging, New Horizon, Gonte, Sagala, and Carulla billed for medically unnecessary treatment and testing for patients transported by 4 Transport that allowed 4 Transport to submit bills to Allstate for medically unnecessary transportation.

919.   Velocity, Fund V, and HMRF perpetuated 4 Transport's medically unnecessary and unlawful treatment by bankrolling it by purchasing accounts

receivable on claims that they knew were fraudulent and by assisting 4 Transport with its operation.

920.   Hassan Fayad, Mirna Fayad, and 4 Health were responsible for the illegal solicitation and inducement of patients and improper referrals that resulted in unlawful and unnecessary transportation by 4 Transport.

921.   The Count IX defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted 4 Transport to continue providing unlawful and medically unnecessary transportation, if provided at all.

922.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Michigan First for the benefit of the Count IX defendants that would not otherwise have been paid.

923.   The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

924.   By virtue of the Count IX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (4 Transport Enterprise)
### Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, A1 Occupational Therapy LLC, Gravity Imaging LLC, New Horizon Chiropractic PLLC, Spine & Health PLLC, First Medical Group, PLLC, 4 Health Management LLC, Velocity MRS – Fund IV, LLC, Velocity MRS – Fund V, LLC, HMRF – Fund III, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.

925.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

926.   Defendants 411 Therapy, 4 Ur Recovery, A1, Gravity Imaging, New Horizon, Spine & Health, First Medical, 4 Health, Velocity, Fund V, HMRF, Hassan Fayad, Mirna Fayad, Gonte, Sagala, and Carulla ("Count X defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of 4 Transport.

927.   The Count X defendants each agreed to further, facilitate, support, and operate the 4 Transport enterprise.

928.   As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

929.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of 4 Transport even though 4 Transport was not eligible to collect such payments by virtue of its unlawful conduct.

930. The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

931. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count X defendants' unlawful conduct described herein.

932. By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (New Horizon Enterprise)
### Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, Gravity Imaging LLC, 4 Health Management LLC, Velocity MRS – Fund V, LLC, Hassan Fayad, Mirna Fayad, Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.

933. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

934. New Horizon constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

186

935.   In connection with each of the claims identified in the within Complaint, 411 Therapy, 4 Ur Recovery, Gravity Imaging, 4 Health, Fund V, Hassan Fayad, Mirna Fayad, Sagala, and Carulla ("Count XI defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by New Horizon, or knew that such false medical documentation would be faxed and mailed in the ordinary course of New Horizon's business, or should have reasonably foreseen that the mailing of such false medical documentation by New Horizon would occur, in furtherance of the Count XI defendants' scheme to defraud.

936.   The Count XI defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 14.

937.   As documented above, the Count XI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by AMC, which they knew would be billed by AMC, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

938.   Hassan Fayad and Sagala owned and controlled New Horizon and were responsible for all actions taken by New Horizon and its staff.

939.   Fund V perpetuated New Horizon's medically unnecessary and unlawful treatment by bankrolling it by purchasing accounts receivable on claims that it knew were fraudulent and by assisting New Horizon with its operation.

940.   Hassan Fayad, Mirna Fayad, and 4 Health were responsible for the illegal solicitation of patients and improper referrals that resulted in unlawful treatment by New Horizon.

941.   411 Therapy, 4 Ur Recovery, and Carulla made and received patient referrals to and from New Horizon that allowed New Horizon to continue billing Allstate and falsely giving the appearance of injury.

942.   Gravity Imaging billed Allstate for medically unnecessary MRIs, which were used to create the appearance that New Horizon was performing lawful and necessary treatment to the patients at issue herein and the false appearance that patients needed treatment.

943.   The Count XI defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted New Horizon to continue providing unlawful and medically unnecessary treatment, if provided at all.

944.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued

payment drafts to New Horizon for the benefit of the Count XI defendants that would not otherwise have been paid.

945.   The Count XI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

946.   By virtue of the Count XI defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (New Horizon Enterprise)
### Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, Gravity Imaging LLC, 4 Health Management LLC, Velocity MRS – Fund V, LLC, Hassan Fayad, Mirna Fayad, Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.

947.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

948.   Defendants 411 Therapy, 4 Ur Recovery, Gravity Imaging, 4 Health, Fund V, Hassan Fayad, Mirna Fayad, Sagala, and Carulla ("Count XII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of New Horizon.

949.   The Count XII defendants each agreed to further, facilitate, support, and operate the New Horizon enterprise.

950.   As such, the Count XII defendants conspired to violate 18 U.S.C. § 1962(c).

951.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of New Horizon even though New Horizon was not eligible to collect such payments by virtue of its unlawful conduct.

952.   The Count XII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

953.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XII defendants' unlawful conduct described herein.

954.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XIII**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Spine & Health Enterprise)**
**Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, A1 Occupational**
**Therapy LLC, Gravity Imaging LLC, First Medical Group, PLLC, 4 Health**
**Management LLC, Velocity MRS – Fund IV, LLC, HMRF – Fund III, LLC,**
**Hassan Fayad, Mirna Fayad, William Gonte, M.D., and Ernesto Carulla, P.T.**

955.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

956.   Spine & Health constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

957.   In connection with each of the claims identified in the within Complaint, 411 Therapy, 4 Ur Recovery, A1, Gravity Imaging, First Medical, 4 Health, Velocity, HMRF, Hassan Fayad, Mirna Fayad, Gonte, and Carulla ("Count XIII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Spine & Health, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Spine & Health's business, or should have reasonably foreseen that the mailing of such false medical documentation by Spine & Health would occur, in furtherance of the Count XIII defendants' scheme to defraud.

958.   The Count XIII defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain

dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 14.

959.   As documented above, the Count XIII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Spine & Health, which they knew would be billed by Spine & Health, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

960.   Hassan Fayad and Gonte owned and controlled Spine & Health and were responsible for all actions taken by Spine & Health and its staff.

961.   411 Therapy, 4 Ur Recovery, A1, Hassan Fayad, Mirna Fayad, and Carulla directed patients to Spine & Health, which allowed Spine & Health to submit bills to Allstate.

962.   First Medical was used interchangeably with Spine & Health to order unnecessary services and submit unnecessary and improper bills.

963.   411 Therapy, 4 Ur Recovery, A1, Gravity Imaging, and Carulla billed Allstate for medically unnecessary treatment, testing, and services prescribed by Spine & Health, which were used to create the appearance that Spine & Health was performing lawful and necessary treatment to the patients at issue herein and the false appearance that patients needed treatment.

964.   Velocity and HMRF perpetuated Spine & Health's medically unnecessary and unlawful treatment by bankrolling it by purchasing accounts receivable on claims that they knew were fraudulent and by assisting Spine & Health with its operation.

965.   Hassan Fayad, Mirna Fayad, and 4 Health were responsible for the illegal solicitation of patients and improper referrals that resulted in unlawful treatment by Spine & Health.

966.   The Count XIII defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Spine & Health to continue providing unlawful and medically unnecessary treatment, if provided at all.

967.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Spine & Health for the benefit of the Count XIII defendants that would not otherwise have been paid.

968.   The Count XIII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

969.   By virtue of the Count XIII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted

by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIV
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Spine & Health Enterprise)
### Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, A1 Occupational Therapy LLC, Gravity Imaging LLC, First Medical Group, PLLC, 4 Health Management LLC, Velocity MRS – Fund IV, LLC, HMRF – Fund III, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., and Ernesto Carulla, P.T.

970.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

971.    Defendants 411 Therapy, 4 Ur Recovery, A1, Gravity Imaging, First Medical, 4 Health, Velocity, HMRF, Hassan Fayad, Mirna Fayad, Gonte, and Carulla ("Count XIV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Spine & Health.

972.    The Count XIV defendants each agreed to further, facilitate, support, and operate the Spine & Health enterprise.

973.    As such, the Count XIV defendants conspired to violate 18 U.S.C. § 1962(c).

974.    The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Spine & Health even though Spine & Health was not eligible to collect such payments by virtue of its unlawful conduct.

194

975.    The Count XIV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

976.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XIV defendants' unlawful conduct described herein.

977.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count XIV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XIV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XV
### VIOLATION OF 18 U.S.C. § 1962(c)
### (First Medical Enterprise)
### Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, Gravity Imaging LLC, Spine & Health, PLLC, 4 Health Management LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., and Ernesto Carulla, P.T.

978.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

979.    First Medical constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

980.   In connection with each of the claims identified in the within Complaint, 411 Therapy, 4 Ur Recovery, Gravity Imaging, Spine & Health, 4 Health, Hassan Fayad, Mirna Fayad, Gonte, and Carulla ("Count XV defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by First Medical, or knew that such false medical documentation would be faxed and mailed in the ordinary course of First Medical's business, or should have reasonably foreseen that the mailing of such false medical documentation by First Medical would occur, in furtherance of the Count XV defendants' scheme to defraud.

981.   The Count XV defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 14.

982.   As documented above, the Count XV defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by First Medical, which they knew would be billed by First Medical, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

983.   Hassan Fayad and Gonte owned and controlled First Medical and were responsible for all actions taken by First Medical and its staff.

984.   411 Therapy, 4 Ur Recovery, Spine & Health, Hassan Fayad, Mirna Fayad, and Carulla directed patients to First Medical, which allowed First Medical to submit bills to Allstate.

985.   First Medical was used interchangeably with Spine & Health to order unnecessary services and submit unnecessary and improper bills.

986.   411 Therapy, 4 Ur Recovery, Gravity Imaging, and Carulla billed Allstate for medically unnecessary treatment, testing, and services prescribed by First Medical, which were used to create the appearance that First Medical was performing lawful and necessary treatment to the patients at issue herein and the false appearance that patients needed treatment.

987.   Hassan Fayad, Mirna Fayad, and 4 Health were responsible for the illegal solicitation of patients and improper referrals that resulted in unlawful treatment by First Medical.

988.   The Count XV defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted First Medical to continue providing unlawful and medically unnecessary treatment, if provided at all.

989.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued

payment drafts to First Medical for the benefit of the Count XV defendants that would not otherwise have been paid.

990.   The Count XV defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

991.   By virtue of the Count XV defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<div align="center">

**COUNT XVI**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(First Medical Enterprise)**
**Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, Gravity Imaging LLC, Spine & Health, PLLC, 4 Health Management LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., and Ernesto Carulla, P.T.**

</div>

992.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

993.   Defendants 411 Therapy, 4 Ur Recovery, Gravity Imaging, Spine & Health, 4 Health, Hassan Fayad, Mirna Fayad, Gonte, and Carulla ("Count XVI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of First Medical.

994.   The Count XVI defendants each agreed to further, facilitate, support, and operate the First Medical enterprise.

995.   As such, the Count XVI defendants conspired to violate 18 U.S.C. § 1962(c).

996.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of First Medical even though First Medical was not eligible to collect such payments by virtue of its unlawful conduct.

997.   The Count XVI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

998.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XVI defendants' unlawful conduct described herein.

999.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XVI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XVII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Unique Lab Enterprise)
### Against Spine & Health, PLLC, First Medical Group, PLLC, 4 Health Management LLC, Hassan Fayad, Mirna Fayad, and William Gonte, M.D.

1000. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

1001. Unique Lab constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1002. In connection with each of the claims identified in the within Complaint, Spine & Health, First Medical, 4 Health, Hassan Fayad, Mirna Fayad, and Gonte ("Count XVII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Unique Lab, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Unique Lab's business, or should have reasonably foreseen that the mailing of such false medical documentation by Unique Lab would occur, in furtherance of the Count XVII defendants' scheme to defraud.

1003. The Count XVII defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 14.

1004. As documented above, the Count XVII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Unique Lab, which they knew would be billed by Unique Lab, in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

1005. Spine & Health, First Medical, 4 Health, Hassan Fayad, Mirna Fayad, and Gonte owned and controlled Unique Lab and arranged for urine specimens to be improperly and unnecessarily collected and sent to Unique Lab to generate claims to Allstate.

1006. The Count XVII defendants submitted, or caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Unique Lab to continue providing unlawful and medically unnecessary treatment, if provided at all.

1007. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Unique Lab for the benefit of the Count XVII defendants that would not otherwise have been paid.

1008. The Count XVII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1009. By virtue of the Count XVII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XVIII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Unique Lab Enterprise)
### Against Spine & Health, PLLC, First Medical Group, PLLC, 4 Health Management LLC, Hassan Fayad, Mirna Fayad, and William Gonte, M.D.

1010. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

1011. Defendants Spine & Health, First Medical, 4 Health, Hassan Fayad, Mirna Fayad, and Gonte ("Count XVIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Unique Lab.

1012. The Count XVIII defendants each agreed to further, facilitate, support, and operate the Unique Lab enterprise.

1013. As such, the Count XVIII defendants conspired to violate 18 U.S.C. § 1962(c).

1014. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Unique Lab even though Unique Lab was not eligible to collect such payments by virtue of its unlawful conduct.

1015. The Count XVIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1016. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XVIII defendants' unlawful conduct described herein.

1017. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XVIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIX
## COMMON LAW FRAUD
### Against All Defendants

1018. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

1019. The scheme to defraud perpetrated by 411 Therapy, 4 Ur Recovery, A1, Gravity Imaging, 4 Transport, New Horizon, Spine & Health, First Medical, Unique

Lab, 4 Health, Velocity, Fund V, HMRF, NHF, Hassan Fayad, Mirna Fayad, Gonte, Sagala, and Carulla ("Count XIX defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect benefits pursuant to applicable provisions of the Michigan No-Fault Act.

1020. The misrepresentations of fact made by the Count XIX defendants include, but are not limited to, those material misrepresentations discussed in section XIII, *supra*.

1021. The Count XIX defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1022. The misrepresentations were intentionally made by the Count XIX defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment pursuant to applicable provisions of the Michigan No-Fault Act would be submitted to Allstate.

1023. The Count XIX defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

1024. Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

1025. As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

## COUNT XX
## CIVIL CONSPIRACY
### Against All Defendants

1026. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

1027. Defendants 411 Therapy, 4 Ur Recovery, A1, Gravity Imaging, 4 Transport, New Horizon, Spine & Health, First Medical, Unique Lab, 4 Health, Velocity, Fund V, HMRF, NHF, Hassan Fayad, Mirna Fayad, Gonte, Sagala, and Carulla ("Count XX defendants") combined and concerted to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment pursuant to applicable provisions of the Michigan No-Fault Act to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices.

1028. The Count XX defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

1029. This purpose was known to all of the Count XX defendants and intentionally pursued.

1030. Despite knowing that the defendants were not entitled to payment pursuant to applicable provisions of the Michigan No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and because they engaged in fraudulent billing practices, the Count XX defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment.

1031. In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

1032. All of the Count XX defendants directly benefited from the payments made to 411 Therapy, 4 Ur Recovery, Gravity Imaging, 4 Transport, New Horizon, Spine & Health, First Medical, and Unique Lab.

1033. All of the Count XX defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XX defendants in the commission of acts done for the benefit of all Count XX defendants and to the unjustified detriment of Allstate.

1034. Accordingly, all of the Count XX defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

## COUNT XXI
### PAYMENT UNDER MISTAKE OF FACT
**Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, Gravity Imaging LLC, 4 Transport Inc., New Horizon Chiropractic PLLC, Spine & Health PLLC, First Medical Group, PLLC, and Unique Lab Solutions LLC**

1035. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

1036. Allstate paid the amounts described herein and itemized in Exhibits 15 through 22 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed 411 Therapy, 4 Ur Recovery, Gravity Imaging, 4 Transport, New Horizon, Spine & Health, First Medical, and Unique Lab ("Count XXI defendants").

1037. Allstate sustained damages by paying under a mistake of fact the claims submitted by the Count XXI defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

1038. The Count XXI defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

1039. Allstate is entitled to restitution from each of the Count XXI defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

## COUNT XXII
## UNJUST ENRICHMENT
### Against All Defendants

1040. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

1041. Defendants 411 Therapy, 4 Ur Recovery, A1, Gravity Imaging, 4 Transport, New Horizon, Spine & Health, First Medical, Unique Lab, 4 Health, Velocity, Fund V, HMRF, NHF, Hassan Fayad, Mirna Fayad, Gonte, Sagala, and Carulla ("Count XXII defendants") submitted, caused to be submitted, or benefited from claims submitted to Allstate that caused Allstate to pay money, in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

1042. Allstate's payments constitute a benefit which the Count XXII defendants aggressively sought and voluntarily accepted.

1043. The Count XXII defendants wrongfully obtained or benefited from payments from Allstate through the fraudulent scheme detailed herein.

1044. The Count XXII defendants have been unjustly enriched by receipt of or benefit from these wrongfully obtained payments from Allstate.

1045. The Count XXII defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXIII
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

1046. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 818 set forth above as if fully set forth herein.

1047. Defendants 411 Therapy, 4 Ur Recovery, A1, Gravity Imaging, 4 Transport, New Horizon, Spine & Health, First Medical, Unique Lab, 4 Health, Velocity, Fund V, HMRF, NHF, Hassan Fayad, Mirna Fayad, Gonte, Sagala, and Carulla ("Count XXIII defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

1048. The Count XXIII defendants also billed for services not rendered.

1049. The Count XXIII defendants also billed for services pursuant to a fraudulent scheme whereby patients were illegally solicited and referred to them for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

1050. Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment arising out of a motor vehicle accident. Mich. Comp. Laws §§ 500.3105 and 500.3107.

1051. The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident. Mich. Comp. Laws § 500.3107.

1052. The lack of lawfully-rendered treatment (such as treatment arising from illegal solicitation and unlicensed treatment) is also a defense to an insurer's obligation to pay No-Fault benefits.

1053. Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

1054. The Count XXIII defendants continue to submit claims under applicable provisions of the Michigan No-Fault Act for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

1055. The Count XXIII defendants will continue to submit claims under applicable provisions of the Michigan No-Fault Act absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and previously-denied insurance claims submitted by any of the Count XXIII defendants for any or all of the reasons set out in the within Complaint.

1056. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXIII defendants billed

for unnecessary and unlawful treatment that is not compensable under applicable provisions of the Michigan No-Fault Act.

1057. Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXIII defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

1058. As such, the Count XXIII defendants have no standing to submit, pursue, or receive benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXIII defendants cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

1059. Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXIII defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

## XVII. DEMAND FOR RELIEF

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Property and Casualty Insurance Company, Allstate Fire and Casualty Insurance Company, Esurance Insurance Company, and Esurance Property and Casualty Insurance Company respectfully pray that judgment enter in their favor as follows:

<div align="center">

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(411 Therapy Enterprise)**
**Against 4 Ur Recovery Therapy LLC, A1 Occupational Therapy LLC, Gravity Imaging, LLC, 4 Transport Inc., New Horizon Chiropractic PLLC, Spine & Health PLLC, First Medical Group, PLLC, 4 Health Management LLC, Velocity MRS – Fund IV, LLC, Velocity MRS – Fund V, LLC, HMRF – Fund III, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.**

</div>

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(d)
### (411 Therapy Enterprise)
### Against 4 Ur Recovery Therapy LLC, A1 Occupational Therapy LLC, Gravity Imaging, LLC, 4 Transport Inc., New Horizon Chiropractic PLLC, Spine & Health PLLC, First Medical Group, PLLC, 4 Health Management LLC, Velocity MRS – Fund IV, LLC, Velocity MRS – Fund V, LLC, HMRF – Fund III, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.

(a)     AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (4 Ur Recovery Enterprise)
### Against 411 Help, LLC, Gravity Imaging, LLC, 4 Transport Inc., New Horizon Chiropractic PLLC, Spine & Health PLLC, First Medical Group, PLLC, 4 Health Management LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.

(a)     AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
## (4 Ur Recovery Enterprise)
**Against 411 Help, LLC, Gravity Imaging, LLC, 4 Transport Inc., New Horizon Chiropractic PLLC, Spine & Health PLLC, First Medical Group, PLLC, 4 Health Management LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.**

(a)      AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT V
## VIOLATION OF 18 U.S.C. § 1962(c)
## (A1 Occupational Enterprise)
**Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, 4 Transport Inc., Spine & Health PLLC, 4 Health Management LLC, Velocity MRS – Fund V, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.**

(a)      AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

<div align="center">

**COUNT VI**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(A1 Occupational Enterprise)**
**Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, 4 Transport Inc., Spine & Health PLLC, 4 Health Management LLC, Velocity MRS – Fund V, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.**

</div>

(a)      AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT VII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Gravity Imaging Enterprise)
**411 Help, LLC, 4 Ur Recovery Therapy LLC, 4 Transport Inc., New Horizon Chiropractic PLLC, Spine & Health PLLC, First Medical Group, PLLC, 4 Health Management LLC, Velocity MRS – Fund IV, LLC, HMRF – Fund III, LLC, National Health Finance DM, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VIII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Gravity Imaging Enterprise)
**411 Help, LLC, 4 Ur Recovery Therapy LLC, 4 Transport Inc., New Horizon Chiropractic PLLC, Spine & Health PLLC, First Medical Group, PLLC, 4 Health Management LLC, Velocity MRS – Fund IV, LLC, HMRF – Fund III, LLC, National Health Finance DM, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

<div align="center">

**COUNT IX**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(4 Transport Enterprise)**
**Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, A1 Occupational**
**Therapy LLC, Gravity Imaging LLC, New Horizon Chiropractic PLLC,**
**Spine & Health PLLC, First Medical Group, PLLC, 4 Health Management**
**LLC, Velocity MRS – Fund IV, LLC, Velocity MRS – Fund V, LLC, HMRF –**
**Fund III, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey**
**Kemoli Sagala, D.C., and Ernesto Carulla, P.T.**

</div>

(a)     AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT X
### VIOLATION OF 18 U.S.C. § 1962(d)
### (4 Transport Enterprise)
### Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, A1 Occupational Therapy LLC, Gravity Imaging LLC, New Horizon Chiropractic PLLC, Spine & Health PLLC, First Medical Group, PLLC, 4 Health Management LLC, Velocity MRS – Fund IV, LLC, Velocity MRS – Fund V, LLC, HMRF – Fund III, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (New Horizon Enterprise)
### Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, Gravity Imaging LLC, 4 Health Management LLC, Velocity MRS – Fund V, LLC, Hassan Fayad, Mirna Fayad, Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (New Horizon Enterprise)
**Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, Gravity Imaging LLC, 4 Health Management LLC, Velocity MRS – Fund V, LLC, Hassan Fayad, Mirna Fayad, Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T.**

(a)     AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Spine & Health Enterprise)
**Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, A1 Occupational Therapy LLC, Gravity Imaging LLC, First Medical Group, PLLC, 4 Health Management LLC, Velocity MRS – Fund IV, LLC, HMRF – Fund III, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., and Ernesto Carulla, P.T.**

(a)     AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XIV
## VIOLATION OF 18 U.S.C. § 1962(d)
## (Spine & Health Enterprise)
## Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, A1 Occupational Therapy LLC, Gravity Imaging LLC, First Medical Group, PLLC, 4 Health Management LLC, Velocity MRS – Fund IV, LLC, HMRF – Fund III, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., and Ernesto Carulla, P.T.

(a)    AWARD Allstate its actual and consequential damages in an amount

to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964,

together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from

engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XV
### VIOLATION OF 18 U.S.C. § 1962(c)
### (First Medical Enterprise)
### Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, Gravity Imaging LLC, Spine & Health, PLLC, 4 Health Management LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., and Ernesto Carulla, P.T.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XVI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (First Medical Enterprise)
### Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, Gravity Imaging LLC, Spine & Health, PLLC, 4 Health Management LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., and Ernesto Carulla, P.T.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XVII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Unique Lab Enterprise)
### Against Spine & Health, PLLC, First Medical Group, PLLC, 4 Health Management LLC, Hassan Fayad, Mirna Fayad, and William Gonte, M.D.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XVIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Unique Lab Enterprise)
### Against Spine & Health, PLLC, First Medical Group, PLLC, 4 Health Management LLC, Hassan Fayad, Mirna Fayad, and William Gonte, M.D.

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIX
## COMMON LAW FRAUD
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the

defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative

costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XX
## CIVIL CONSPIRACY
### Against All Defendants

(a)     AWARD Allstate its actual and consequential damages against the

defendants jointly and severally in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including, but not limited to, investigative

costs incurred in the detection of the defendants' illegal conduct; and

(c)     GRANT all other relief this Court deems just.

## COUNT XXI
## PAYMENT UNDER MISTAKE OF FACT
### Against 411 Help, LLC, 4 Ur Recovery Therapy LLC, \Gravity Imaging LLC, 4 Transport Inc., New Horizon Chiropractic PLLC, Spine & Health PLLC, First Medical Group, PLLC, and Unique Lab Solutions LLC

(a)     AWARD Allstate its actual and consequential damages in an amount

to be determined at trial; and

(b)    GRANT all other relief this Court deems just.

## COUNT XXII
## UNJUST ENRICHMENT
**Against All Defendants**

(a)    AWARD Allstate its actual and consequential damages in an amount
to be determined at trial; and

(b)    GRANT all other relief this Court deems just.

## COUNT XXIII
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
**Against All Defendants**

(a)    DECLARE that Allstate has no obligation to pay pending and
previously-denied insurance claims submitted by 411 Help, LLC, 4 Ur Recovery
Therapy LLC, A1 Occupational Therapy LLC, Gravity Imaging, LLC, 4 Transport
Inc., New Horizon Chiropractic PLLC, Spine & Health PLLC, First Medical Group,
PLLC, Unique Lab Solutions LLC, 4 Health Management LLC, Velocity MRS –
Fund IV, LLC, Velocity MRS – Fund V, LLC, HMRF – Fund III, LLC, National
Health Finance DM, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D.,
Geoffrey Kemoli Sagala, D.C., and/or Ernesto Carulla, P.T. for any or all of the
reasons set out in the within Complaint;

(b)    DECLARE that 411 Help, LLC, 4 Ur Recovery Therapy LLC, A1
Occupational Therapy LLC, Gravity Imaging, LLC, 4 Transport Inc., New Horizon
Chiropractic PLLC, Spine & Health PLLC, First Medical Group, PLLC, Unique Lab

Solutions LLC, 4 Health Management LLC, Velocity MRS – Fund IV, LLC, Velocity MRS – Fund V, LLC, HMRF – Fund III, LLC, National Health Finance DM, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T., jointly and severally, cannot seek payment from Allstate pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)     DECLARE that 411 Help, LLC, 4 Ur Recovery Therapy LLC, A1 Occupational Therapy LLC, Gravity Imaging, LLC, 4 Transport Inc., New Horizon Chiropractic PLLC, Spine & Health PLLC, First Medical Group, PLLC, Unique Lab Solutions LLC, 4 Health Management LLC, Velocity MRS – Fund IV, LLC, Velocity MRS – Fund V, LLC, HMRF – Fund III, LLC, National Health Finance DM, LLC, Hassan Fayad, Mirna Fayad, William Gonte, M.D., Geoffrey Kemoli Sagala, D.C., and Ernesto Carulla, P.T., jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)     GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XVIII.   DEMAND FOR JURY TRIAL

The plaintiffs hereby demand a trial by jury on all claims.

<div style="margin-left:40%">

Respectfully submitted,

SMITH & BRINK

*/s/ Jacquelyn A. McEttrick*

_____
Richard D. King, Jr.
rking@smithbrink.com
Nathan A. Tilden (P76969)
ntilden@smithbrink.com
Jacquelyn A. McEttrick
jmcettrick@smithbrink.com
Andrew H. DeNinno
adeninno@smithbrink.com
Robert F. Leone
rleone@smithbrink.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

*Attorneys for Plaintiffs*
*Allstate Insurance Company,*
*Allstate Fire and Casualty Insurance*
*Company, Allstate Property and*
*Casualty Insurance Company,*
*Esurance Insurance Company, and*
*Esurance Property and Casualty*
*Insurance Company*

</div>

Dated: November 2, 2020